## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DANIAL NISSAN** (A077-656-263), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case #: _____ |
| | ) | |
| **PAM BONDI**, Attorney General of the United | ) | |
| States, and **KRISTI NOEM**, Secretary, U.S. | ) | |
| Department of Homeland Security. | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR DECLARATORY RELIEF, MANDAMUS, HABEAS, AND EMERGENCY INJUNCTIVE RELIEF

Plaintiff Danial Nissan ("Nissan"), through counsel, states as follows:

### INTRODUCTION

1.    This is a constitutional and statutory action arising from the federal government's near 3½ year refusal to decide a Motion to Reopen filed by a Syrian national who has lived with formal government permission in the United States for well over a decade.

2.    Plaintiff, Danial Nissan, is an Assyrian Christian from Al-Hasakah, Syria, who entered the United States in 2002 to donate bone marrow for his sister's surgery at the University of Chicago Hospital.

3.    Plaintiff has been the husband of a United States citizen for nearly twenty years. He has continuously complied with all federal supervision required and is the beneficiary of multiple approved I-130 immediate relative petitions through his U.S. citizen wife.

4.    On June 27, 2022, Plaintiff filed a Motion to Reopen with the Board of Immigration Appeals (Board) based on changed country conditions in Syria; defective charging documents under Supreme

[1]

Court precedent in *Pereira v. Sessions* and *Niz-Chavez v. Garland*; his statutory Temporary Protected Status (TPS) safeguards; extraordinary family hardship; and fundamental due process violations.

5.     Despite the gravity of these claims and overwhelming documentary evidence, the Board has allowed the Motion to sit undecided for more than forty months without explanation or other notice.

6.     During this time, Defendant agencies have: (a) refused communication; (b) blocked counsel contact; (c) developed a policy of conditioning emergency stay of removal protection on alerting Immigration & Customs Enforcement (ICE) agents beforehand, and (d) exposed Plaintiff to imminent arrest and removal.

7.     Plaintiff is now faced with Defendants' measures terminating TPS – while the Board continues to refuse to rule on the Motion to Reopen.

8.     This case seeks judicial intervention to restore lawful process, prevent irreparable constitutional injury, and force Defendants to do what the law requires: decide a properly-lodged Motion to Reopen.

## JURISDICTION & VENUE

9.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, including the Immigration and Nationality Act, the Administrative Procedure Act, and federal habeas statutes.

10.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel officers of the United States to perform nondiscretionary duties owed to Plaintiff.

11.     This Court has jurisdiction under 5 U.S.C. §§ 555(b) and 706(1) to compel agency action unlawfully withheld or unreasonably delayed.

12.     This Court retains jurisdiction under 28 U.S.C. § 2241 because Defendants' conduct imposes present and severe restraints on Plaintiff's liberty, even absent his current physical detention.

13.     This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202, and Fed. R. Civ. P. 65.

14.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiff resides here and a substantial part of the events giving rise to these claims occurred within the Northern District of Illinois.

## PARTIES

15.     Plaintiff Danial Nissan (Nissan) is a native and citizen of Syria, an Assyrian Christian, and a long-term resident of the United States. He resides in Mt. Prospect, IL and he has lived continuously in the Northern District of Illinois since 2002.

16.     Defendant Pam Bondi is the Attorney General of the United States and she is sued in her official capacity. As head of the United States Department of Justice, Defendant Bondi exercises authority and control over the Executive Office for Immigration Review (EOIR) and the Board of Immigration Appeals (Board), which are responsible for adjudicating immigration benefits, motions to reopen, and motions to stay removal.

17.     Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security (DHS) and she is sued in her official capacity. As head of DHS, Defendant Noem exercises authority, supervision, and control over the U.S. Citizenship and Immigration Services (USCIS) as well as Immigration & Customs Enforcement (ICE), and Enforcement & Removal Operations (ERO).

18.     At all relevant times, the acts and omissions of EOIR, the Board, DHS, USCIS, ICE, and ERO were undertaken at the direction, supervision, or control of Defendants Bondi and Noem.

## FACTUAL BACKGROUND

19.     Plaintiff Nissan is a native and citizen of Syria, born in Al-Hasakah, a region subject to ethnic and religious violence. He is an Assyrian Christian (**Ex. A**), a persecuted religious minority there.

[3]

20.     Nissan was lawfully admitted to the United States on January 19, 2002 (**Ex. B**) with a B-2 visitor visa at the age of 20. He traveled solely for the humanitarian purpose of donating bone marrow to his younger sister then undergoing emergency, life-saving leukemia treatment at the University of Chicago Hospital (**Ex. C**).

21.     Following admission, Plaintiff complied with all federal filing requirements, including timely-extension of his visitor B-2 visa stay in 2002, and the National Security Entry-Exit Registration System (NSEERS), created in September, 2002, in response to the 9/11 terrorist attacks in New York City.

22.     Nissan was placed into removal proceedings on December 16, 2002 as a result of NSEERS registration (**Ex. D**). At that time, the *legacy*-Immigration & Naturalization Service (INS) issued a defective Notice to Appear (**Ex. E**) that failed to list a date and time for his initial court hearing.

23.     Notwithstanding, Plaintiff appeared at all scheduled hearings and he retained counsel. At the pretrial stage, Plaintiff was denied a continuance and ordered removed by the Chicago immigration court on July 29, 2004 (**Ex. F**). An appeal of that decision was dismissed by the Board in 2005 leading to the present removal order. DHS never attempted to enforce the removal order against Plaintiff between 2005-2013 (**Exs. G, H**).

24.     Plaintiff married Sadeta Kalamperovic (Sadeta) on December 5, 2005 (**Ex. I**). Their marriage is well-documented, bonafide, and will celebrate its 20-year anniversary in less than 3 weeks.

25.     Sadeta is a United States citizen (**Ex. J**) and DHS authorities have approved multiple I-130 immediate-relative petitions she has filed for Nissan (**Ex. K**), none of which has ever been revoked.

26.     In 2012, DHS established Temporary Protected Status (TPS) (**Ex. L**) for Syrian nationals based on that country's humanitarian crisis. Plaintiff has continuously held TPS since initial grant in early-2013 (**Ex. M**), timely renewing and paying all required fees, plus receiving and utilizing employment authorization issued by DHS (**Ex. N**).

[4]

27.     Based on his approved I-130s, Nissan sought adjustment of status before the DHS in 2019, and thus regularizing his immigration status by securing permanent residency. This was denied on September 26, 2019 based on DHS' lack of jurisdiction given the outstanding removal order (**Ex. O**).

28.     From 2020 through 2022, Plaintiff and his counsel attempted to resolve the final order of removal administratively, requesting that ICE counsel join a motion to reopen removal proceedings given Plaintiff's approved I-130s, his TPS and longtime lawful presence in this country, plus the cumulative weight of equities balanced in his favor (**Ex. P**). Those requests were rebuffed.

29.     On June 27, 2022, Plaintiff filed a Motion to Reopen (**Ex. Q**) with the Board based on: (a) changed country conditions in Syria (incl. evidence of targeted violence against Assyrian Christians); (b) defects in the charging document under Supreme Court precedent; and (c) his eligibility for *sua sponte* Board reopening due to exceptional circumstances.

30.     The Motion to Reopen included 330-pages of country reports from the U.S. State Department, the United Nations High Commissioner for Refugees, and both national and international human rights organizations describing new dangers for the small remaining Christian population in Syria. That Motion to Reopen remains pending.

31.     For nearly 3½ years, the Board has taken no action and provided no explanation for the delay in deciding the Motion to Reopen.

32.     During this period, Plaintiff has lived in a constant state of legal uncertainty, unable to plan his future, unable to travel, and unable to live free from daily fear of arrest and return to Syria, the country where he spent his youth before coming to the United States almost 24 years ago.

33.     During the Motion to Reopen's pendency, Plaintiff Nissan (**Ex. H**) and his wife (**Ex. R**) have experienced severe emotional and psychological distress, including chronic sleep disruption, marital strain, and persistent anxiety that Plaintiff could be detained and removed without warning.

[5]

34.     On September 22, 2025, the DHS published a notice in the Federal Register terminating Syria's TPS designation November 21, 2025 at 11:59 p.m., local time (**Ex. S**). This places Nissan at imminent risk of arrest and removal right at a time that USCIS agents were executing a highly-publicized immigration enforcement action (referred to as "Operation Midway Blitz") in Chicago, IL.

35.     Given the fall of the Bashar al-Assad regime in late-2024, Nissan filed a Motion to Supplement his Motion to Reopen on November 6, 2025 describing continued serious safety concerns for Assyrian Christians in Syria in 2025 with the rise to power of Hayat Tahrir al-Sham (HTS) (**Ex. T**).

36.     HTS is a militant Islamist jihadist organization, designated by the United States as a Foreign Terrorist Organization from May 2014 to July 8, 2025. HTS has been credibly reported for years to persecute Assyrian Christians through threats, forced displacement, religious destruction, and violence aimed at eradicating Christian communities from areas it controls. HTS was formed in early-2017 and seized power in Syria less than a year ago.

37.     Plaintiff has also filed a Motion to Stay Removal (**Ex. U**) with the Board. There has been absolutely no response to these Motions from Defendants.

38.     Plaintiff's Counsel contacted (**Ex. V**) the Board's Emergency Stay of Removal Unit by telephone (703-305-0289) on November 19, 2025 to follow-up on the Motion to Stay Removal. At that time, Board personnel informed Counsel that it would not treat the Motion to Stay Removal as an "emergency" unless Chicago ERO was first notified of Plaintiff's legal circumstances.

39.     Subsequent thereto, Counsel has learned that the current Board policy is to not treat any stay of removal request as an emergency, unless or until the Board successfully contacts the local ERO to confirm whether there is a firm ERO plan to remove the foreign national, to which ERO responds in the affirmative. Id. This policy creates a highly coercive environment where Nissan cannot seek emergency

stay of removal protection from the Board without the Board first alerting the very agency empowered to detain and deport him.

40.     On November 19, 2025, Plaintiff's counsel also attempted multiple good-faith communications with Chicago ICE counsel to resolve the impending, very-possible detention cooperatively, both via email and telephone (312-260-9513). Id.

41.     These efforts were met with automated, non-responsive email messages and an automated telephone system that repeatedly terminates inbound calls without granting counsel access to live ICE personnel (**Ex. V**).

42.     As a result, Plaintiff has no meaningful administrative avenue remaining to protect his life, his liberty, or his family.

43.     On November 19, 2025, a federal court in *Doe v. Noem*, Case No. 1:25-cv-08686 (S.D.N.Y.) (**Ex. X**) issued a nationwide injunction enjoining Defendant DHS from terminating Syria TPS.

44.     The Court in *Doe* recognized that TPS beneficiaries possess reliance interests and constitutional protections that cannot be extinguished through procedural mechanisms that effectively punish individuals for seeking U.S. government protection. Plaintiff's situation mirrors *Doe* in all material respects, yet uniquely a bit worse: here, the government has not acted unlawfully by decision, but *unlawfully through utter silence*.

45.     Nissan has never been arrested inside or outside the United States, he has complied with all DHS requirements of him since arrival, and he has built an exemplary family life in this country.

46.     Nissan seeks judicial intervention to stop irreparable constitutional injury and to compel action unlawfully withheld.

## <u>COUNT I – WRIT OF MANDAMUS (28 U.S.C. § 1361)</u>

47.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 here.

[7]

48.     For foreign nationals with removal orders, Congress has created a statutory right to file a Motion to Reopen and to receive a full and lawful adjudication of that motion. See 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.2(a). Thus, Defendants have a clear, nondiscretionary duty to adjudicate motions pending before the Board.

49.     In *Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002), the United States Court of Appeals for the Seventh Circuit held that mandamus relief is appropriate where an immigration agency unreasonably delays action on a matter Congress intended to be resolved within a reasonable time.

50.     The *Iddir* Court explained that when agency inaction frustrates statutory rights and forecloses meaningful judicial review, federal courts have the authority to compel action through a writ of mandamus. Plaintiff's case is materially indistinguishable from *Iddir*.

   a.  Plaintiff filed a complete, properly lodged Motion to Reopen on June 27, 2022, presenting new statutory, constitutional, and humanitarian grounds for relief.

   b.  Defendants have refused to act on that Motion for nearly three-and-one-half years, despite a clear regulatory duty, and without providing any explanation or timetable.

   c.  As a direct result of Defendants' inaction, Plaintiff has been denied access to appellate review, placed in imminent risk of arrest and removal, the constant emotional anguish attached thereto, and exposed to irreparable constitutional harm.

   d.  Plaintiff has no other adequate remedy. Defendant's silence has rendered the administrative process functionally unavailable and has foreclosed meaningful relief.

51.     Under *Iddir*, Plaintiff is entitled to a writ compelling Defendants to perform their mandatory duty to adjudicate the pending Motions to Reopen in full, and to neither detain nor remove Plaintiff during that time. Absent judicial intervention, Defendants will continue to unlawfully withhold agency action, to Plaintiff's severe, irreparable, and ongoing injury.

**COUNT II – ADMINISTRATIVE PROCEDURE ACT & UNREASONABLE DELAY**
**[5 U.S.C. §§ 555(b), 706(1)]**

52.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 here.

53.    The Administrative Procedure Act (APA) requires that agencies conclude matters presented to

them "within a reasonable time." 5 U.S.C. § 555(b). The APA likewise authorizes federal courts to

"compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

54.    The Board's failure to adjudicate Plaintiff's Motion to Reopen for nearly 3½ years constitutes

unreasonable delay as a matter of law.

54.    Courts determine whether agency delay is reasonable by applying the factors set forth in

*Telecommunications Research & Action Center v. FCC* ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984).

Application of the TRAC factors here demonstrates that Defendants' delay is unlawful:

    a.  The delay violates any rule of reason because no rational system permits a life-and-death immigration motion to remain undecided for three-and-one-half years.

    b.  Congress intended timely adjudication of motions to reopen, which exist specifically to prevent removal to dangerous countries when new evidence of persecution on a protected ground under 8 U.S.C. § 1158(a) arises.

    c.  Human life and safety are directly implicated, as Plaintiff faces arrest and return to Syria, a region of war, religious persecution, and targeted violence.

    d.  Plaintiff has suffered severe prejudice, including prolonged psychological harm, family destabilization, and imminent loss of liberty.

    e.  No legitimate agency priority justifies ignoring a properly filed motion to reopen supported by evidence of persecution and constitutional defects.

    f.  No showing of bad faith is required – the delay itself here is sufficiently egregious to violate the APA.

55.    Defendants' conduct therefore constitutes agency action unlawfully withheld or unreasonably

delayed under 5 U.S.C. § 706(1). Plaintiff is entitled to an order compelling Defendants to adjudicate the

pending Motion to Reopen within a time certain.

## COUNT III – FIFTH AMENDMENT & PROCEDURAL DUE PROCESS

56.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 here.

57.    The Fifth Amendment to the United States Constitution prohibits the federal government from

depriving any person of liberty without due process of law.

[9]

58. The Supreme Court's framework in *Mathews v. Eldridge*, 424 U.S. 319 (1976), governs procedural due process claims and requires balancing the private interest affected; the risk of erroneous deprivation; and the government's interest.

59. Plaintiff has a protected liberty interest in: (a) the meaningful opportunity to be heard on his Motion to Reopen; (b) his freedom from arbitrary removal to a country where he faces persecution and death, where he has not previously had the opportunity to seek protection from removal based on changed country conditions since 2004-2005; and (c) the preservation of his family and marital integrity.

59. Nissan's private interest is extraordinary and life-altering: he faces potential ICE detention, removal, the likely **permanent family separation** from his wife [*see* 8 U.S.C. §§ 1182(a)(9)(A)(i), and 1182(a)(9)(B)(i)(II)], and forced return to a war-torn region where Assyrian Christians continue to be targeted on religious grounds.

60. The risk of erroneous deprivation is absolute when an agency refuses to act. Silence is not process; inaction here is equivalent to a constructive denial.

61. There is no legitimate interest in allowing a properly lodged, evidence-supported motion to reopen to remain undecided for nearly three-and-one-half years.

62. Defendants have further denied due process by maintaining an emergency stay system that requires Plaintiff to expose himself to ICE enforcement in order to seek protection; by lacking a functional communications system with ICE counsel; and by blocking meaningful access to ICE personnel to discuss litigation issues.

63. Defendants' conduct deprives Plaintiff of a meaningful opportunity to be heard at a meaningful time, in violation of the Fifth Amendment of the Constitution. Plaintiff is entitled to declaratory and injunctive relief to prevent further constitutional injury.

[10]

## COUNT IV – HABEAS CORPUS (28 U.S.C. § 2241)

66.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 46 here.

67.     Habeas relief is appropriate where executive inaction or procedural coercion places an individual in imminent danger of unlawful detention or removal.

68.     This Court has jurisdiction under 28 U.S.C. § 2241(c)(3) because Plaintiff is "in custody in violation of the Constitution or laws or treaties of the United States." The Supreme Court has held that "custody" extends beyond physical detention to include significant restraints on liberty imposed by the government. *Jones v. Cunningham*, 371 U.S. 236, 240–43 (1963); *Maleng v. Cook*, 490 U.S. 488, 491 (1989). The Seventh Circuit recognizes that constructive custody exists where government action significantly restrains liberty, absent detention. *Virsnieks v. Smith*, 521 F.3d 707, 717 (7th Cir. 2008)

69.     Courts have specifically applied this doctrine in the immigration context. See *Hernandez v. Gonzales*, 424 F. Supp. 2d 905 (N.D. Ill. 2006) (constructive custody exists when a non-citizen faces imminent enforcement and removal such that liberty is meaningfully restrained, despite the absence of physical detention); *Santos v. Warden of Orange County Jail*, 965 F.3d 203, 209 (2nd Cir. 2020) (a non-detained immigrant may be in "constructive custody" for habeas purposes where a final order of removal and imminent enforcement impose present restraints on his liberty).

70.     This is not a case of abstract uncertainty; Plaintiff is presently subject to such custody and restraint because Defendants' actions impose: (a) a continuous and imminent threat of arrest, detention, and removal; (b) legal paralysis preventing normalization of his immigration status; (c) psychological confinement caused by state-imposed uncertainty and fear; and (d) functional restraint on travel, employment freedom, and family stability.

71.     In addition, 28 U.S.C. § 2243 commands that a court entertaining a habeas petition shall "forthwith" inquire into the cause of the restraint and "dispose of the matter as law and justice require."

[11]

70.     Defendants' conduct violates clearly established federal law and the Constitution by: (a) depriving Plaintiff of liberty without due process of law; (b) threatening removal without lawful adjudication of a pending statutory motion meant to safeguard against unlawful removal; and (c) using procedural mechanisms that coerce Plaintiff to expose himself to law enforcement capable of detaining and removing him in order to seek a possible, temporary Board reprieve.

72.     Plaintiff seeks relief under 28 U.S.C. §§ 2241 and 2243 to prevent Defendants from executing his detention or removal before a full adjudication of his June 27, 2022 Motion to Reopen, consistent with 8 U.S.C. § 1229a(c)(7) and 8 C.F.R. § 1003.2(a).

73.     Without habeas relief, Plaintiff's constitutional and statutory rights will continue to be mooted through executive delays.

## PRAYER FOR RELIEF AND DEMAND FOR EMERGENCY HEARING

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Declare that Defendants' failure to adjudicate Plaintiff's Motion to Reopen violates the Administrative Procedure Act, the Immigration and Nationality Act, and the Fifth Amendment to the United States Constitution;

2.     Issue a Writ of Mandamus compelling Defendants to adjudicate Plaintiff's pending Motion to Reopen within a time certain to be set by this Court;

3.     Enter injunctive relief enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them from arresting, detaining, or removing Plaintiff until Defendants have complied with their statutory and constitutional obligations;

4.     Grant relief under 5 U.S.C. § 706(1) compelling agency action unlawfully withheld and unreasonably delayed;

[12]

5.      Grant relief under 28 U.S.C. § 2241 and 28 U.S.C. § 2243, preventing Defendants from

effectuating detention or removal in a manner that would moot Plaintiff's statutory and constitutional

rights;

6.      Declare that Defendants' use of emergency procedures that condition protection on notification

of enforcement agencies empowered to detain and deport him violates fundamental principles of due

process;

7.      Award Plaintiff reasonable costs and fees pursuant to 28 U.S.C. § 2412 (EAJA), and any other

applicable authority;

8.      Grant such other and further relief as this Court deems just and proper.


Respectfully submitted,


/s/ Mark S. Kocol_____.
Mark S. Kocol, Counsel for Petitioner
Mark S. Kocol P.C.
18300 South Halsted Street, Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
ARDC #: 6225348
EOIR #: BL176134

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 21, 2025 I served this Petition via CM/ECF upon the U.S. Attorney for the Northern District of Illinois and via email to the Office of Immigration Litigation.

Respectfully submitted,


<u>/s/ Mark S. Kocol      </u>.
Mark S. Kocol, Counsel for Petitioner
Mark S. Kocol P.C.
18300 South Halsted Street, Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
ARDC #: 6225348
EOIR #: BL176134

[14]

## **TABLE OF AUTHORITIES**

**Page(s)**

**I. Constitutional Provisions**
- U.S. Const. amend. V                                          10, 11, 13

**II. Statutes**
- 5 U.S.C. § 555(b)                                             2, 9
- 5 U.S.C. § 706(1)                                             2, 9, 10, 13
- 8 U.S.C. § 1158(a)                                            9
- 8 U.S.C. § 1182(a)(9)(A)(i)                                   10
- 8 U.S.C. § 1182(a)(9)(B)(i)(II)                               10
- 8 U.S.C. § 1229a(c)(7)                                        8, 12
- 28 U.S.C. § 1331                                              2
- 28 U.S.C. § 1361                                              2, 7
- 28 U.S.C. § 1391(e)                                           3
- 28 U.S.C. § 2201–2202                                         2
- 28 U.S.C. § 2241                                              2, 11, 12, 13
- 28 U.S.C. § 2243                                              12, 13
- 28 U.S.C. § 2412                                              13

**III. Federal Rules**
- Fed. R. Civ. P. 65                                            2

**IV. Regulations**
- 8 C.F.R. § 1003.2(a)                                          8, 12

**V. Supreme Court Cases**
- *Pereira v. Sessions*, 138 S. Ct. 2105 (2018)                1
- *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021)             1
- *Mathews v. Eldridge*, 424 U.S. 319 (1976)                   10
- *Jones v. Cunningham*, 371 U.S. 236 (1963)                   11
- *Maleng v. Cook*, 490 U.S. 488 (1989)                        11

**VI. Circuit Court Cases**
- *Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002)               8
- *Telecommunications Research & Action Ctr. v. FCC (TRAC)*,   9
  750 F.2d 70 (D.C. Cir. 1984)
- *Virsnieks v. Smith*, 521 F.3d 707 (7th Cir. 2008)         11
- *Santos v. Warden of Orange County Jail*, 965 F.3d 203 (2nd Cir. 2020)   11

**VII. District Court Cases**
- *Hernandez v. Gonzales*, 424 F. Supp. 2d 905 (N.D. Ill. 2006)    11

**VIII. Other Authorities**
- *Doe v. Noem*, No. 1:25-cv-08686 (S.D.N.Y. Nov. 19, 2025)    7

## LIST OF EXHIBITS

Page(s)

Exhibit A – Evidence of Birth & Baptismal Certificates (with translations)  3
      for Plaintiff, Danial Nissan

Exhibit B – Record of Lawful Admission (I-94/Visa Entry, Jan. 19, 2002)  3

Exhibit C – Medical Documentation of Bone Marrow Donation at University of  4
      Chicago Hospital for Lina Nissan

Exhibit D – NSEERS Registration/Record of Removal Initiation  4

Exhibit E – Defective Notice to Appear (Missing Time/Date)  4

Exhibit F – Immigration Judge Removal Order (Chicago Immigration Court,  4
      July 29, 2004)

Exhibit G – DHS Non-Enforcement of Removal Order Records (2005–2013)  4

Exhibit H – Psychological/Emotional Harm Declaration of Danial Nissan  4, 6

Exhibit I – Marriage Certificate (Nissan–Kalamperovic, Dec. 5, 2005)  4

Exhibit J – Proof of U.S. Citizenship of Sadeta Kalamperovic  4

Exhibit K – Approved I-130 Petitions Filed by Sadeta Kalamperovic  4

Exhibit L – Initial DHS Federal Register Notice Creating Syria TPS  4

Exhibit M – Initial TPS Approval Notice  5

Exhibit N – Proof of continuous TPS Status & Employment Authorization  5
      Documents (EADs) possessed by Danial Nissan

Exhibit O – DHS Decision Denying Adjustment of Status (Sept. 26, 2019)  5

Exhibit P – Correspondence with ICE Counsel Requesting Joint Motion to  5
      Reopen (2020–2022)

Exhibit Q – June 27, 2022 Motion to Reopen Filed with the Board  5

Exhibit R – Psychological/Emotional Harm Declaration of Sadeta Kalamperovic  6

Exhibit S – Federal Register Notice Terminating Syria TPS (Sept. 22, 2025)  6

Exhibit T – Motion to Supplement Pending Motion to Reopen (Nov. 6, 2025)  6

Exhibit U – Motion to Stay Removal (Nov. 6, 2025)  6

Exhibit V – Phone Log / Call Documentation with Board Emergency Stay Unit  6, 7

Exhibit W – REDACTED

Exhibit X – *Doe v. Noem*, No. 1:25-cv-08686 (S.D.N.Y.) Order / Opinion  7

# A.



# Syrian Arab Republic
# Ministry of Interior
# Civil Affairs

| | |
|---|---|
| Name: | Danial |
| Surname: | Nissan |
| Father's name: | Chamoun |
| Mother's name: | Warda |
| Place & Date of Birth: | Al Hassaka ▓▓▓▓ |
| Religion & Denomination: | Christiane/Assyrian |
| Sex: | Male |
| Marital Status: | Single |
| Civil Register Domicile: | Tel Makhada |
| Date of Registration: | - ▓▓▓▓▓ |

This data has been extracted from the civil register of the Syrian Arab subjects and it is in conformity with the entry of its bearer in the register on the date of issue.

Inditer
(Signed)

Superintendent of civil registry in Tel Tamer
(Seal & Signature)

Issued on 27/8/2003

Chicago 9-5-03

True translation of the Arabic text hereto attached

MOUFAK A. MISKI

THIS 5TH DAY OF SEPTEMBER 2003
AT 1470 W. BALMORAL

NOTARY PUBLIC

"OFFICIAL SEAL"
EMMANUEL KHANO
Notary Public, State of Illinois
My Commission Expires Nov. 13. 2006

الجمهورية العربية السورية
وزارة الداخلية
الشؤون المدنية

السجل المدني في ...............

# بيان ولادة

| اسم المولود | محل وتاريخ الولادة | تاريخ الولادة بالحروف | الجنس | اسم الأب ونسبته | اسم الأم ونسبتها | البلدة | سجل القيد |
|---|---|---|---|---|---|---|---|
| د. ايتال | الحسكة | اليوم ........ من شهر ........ الموافق كانون ثاني .......... | ذكر | شمعون نيسان | ورد ايلو | بل تمر ط مخاضة ٤ | الخانة / الرقم |

تم تسجيل السجل المدني بتاريخ .......... في سجلات واقعات الولادة في منطقتنا

تاريخ الورود    /    /    هـ    /    /    

صدر و طبق الأصل
٢٠٠٧ / ٨ / ٢٨

أمين السجل المدني في ..........
الاسم ..........
توقيع ..........

الخاتم والتوقيع

أمين السجل المدني في .......... / تاريخ

ملاحظات:
١- يرسل هذا البيان فور تسجيل الولادة الى أمين السجل المدني في مكان قيد نفوس والد المولود ليسجل خلال شهر والا اقتضى.
٢- ترسل نسخة من هذا البيان الى دوائر الأمن اذا كان المولود اجنبياً أو اذا كان فلسطينياً فترسل نسخة فقط الى فرع مؤسسة اللاجئين الفلسطينيين.

# ARCHDIOCESE OF ASSYRIAN CHURCH OF THE EAST
## HASSAKE   SYRIA

**NO.** 19
**DATE** 1/09/2002

## BAPTISMAL CERTIFICATE

WE, the Reverned Georges Suleiman vicar of the Holy Virgin Church witness that

Mr..**Danial Nissan**   son of **Shamoun** and his mother, **Warda**, is born at Hassake

on 

Danial   was baptized at our Holy Virgin Church on April 24,1981 in accordance with

our church rite.

Vicar of the Church
Fr. Georges Suleiman
*Signature and Seal*

We witness to the authenticity of
signature and  seal
of Fr, Georges Suleiman

Archdeacon Afram Athneil
Assyrian Church of the East
Syria
*Signature and Seal*

This is a true translation of an original copy of a baptismal certificate.

Joseph Odisho
12-05-2003

*THIS IS A TRUE COPY
OF ORIGINAL FROM
ARBIC TO ENGLISH*

"OFFICIAL SEAL"
ZAYA CHLIMON
Notary Public, State of Illinois
My Commission Expires 07/28/05

ON 01-05-2004
AT 6328 N. WHIPPLE
CHICAGO, ILL 60659
PHONE N° 773 973 4716

01-05-04



ܐܒܪܫܝܬܐ ܕܥܕܬܐ ܕܡܕܢܚܐ ܐܬܘܪܝܬܐ
ܣܘܪܝܐ - ܚܣܟܐ

أبرشية كنيسة المشرق الآشورية
سورية – الحسكة

الرقـــم: ٥٦٢

التاريخ ٢٧/ ٨/ ٢٠٠٣

﴿ شـــهــادة عمـــاد ﴾

نحن القس كوركيس سليمان كاهن رعية (العذار) نشهد بأن
المدعو دانيال نيسان بن حمون والدته وردة
الم ~~ـــــــــــــ~~

قد عمد في كنيسة (العذار) بتاريخ ٢٢/ ٤/ ١٩٨١
حسـب طقس كنيسـة المشـرق الآشوريــة.

كاهن الرعية

نصادق على صحة خاتم وتوقيع الكاهن.

أفرام أثيل
خادم أسقف كنيسة المشرق الآشورية في سورية



# B.

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0207 of 0215, Page 2 of 29



Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0207 of 0215, Page 2 of 29

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0207 of 0215, Page 3 of 29

الصورة الشمسية



 

٢٠٠٩ يس

TITULAIRE DU PASSEPORT

No. d'enregistrement _14 931-2009_

Prénom(s) et Nom _DANIAL  NISSAN_

Prénom du Père_CHAMOUN_ de la Mère _WARDA_

Date et lieu de naissance ▇▇▇▇▇ _HASSAKE_

Lieu de séjour actuel ___/___

No. et lieu du registre civil _R<sup>t</sup> TELL MAKHADA_

Profession _INSTITUT_

Taille ___/. PH___ Teint ___/___

Yeux ___/___ Cheveux _/___

No du passeport رقم الجواز

$\frac{J.S}{98}$  4 535 642      $\frac{ج س}{٩٨}$ ٤٠٥٠٦٦٢

**441478777 09**

U.S. IMMIGRATION AND NATURALIZATION SERVICE

Immigration and
Naturalization Service

I-94
Departure Record

CLASS UNTIL JUL 1 8 2002

1. Family Name
NISSAN
2. First (Given) Name
DANIAL
7. Country of Citizenship
SYRIA

UNITED STATES
OF AMERICA  VISA

VNSYRNISSANK<DANIAL<<<<<<<<<<<<<<<<<<<
<53584234<9VRB101194M0112307631020C137R998521O

VISA / I-94



THE UNIVERSITY OF CHICAGO CHILDREN'S HOSPITAL
Case 1:12-cv-14208 Document #: 1 Filed: 11/21/23 Page 27 of 222 PageID #:27
Produced 06/22/2017 from USCIS' EDMS; Alien No. 077656263 Document 0134 of 0215, Page 1 of 1

*Pediatrics*

Eric C. Beyer, M.D., Ph.D.
*Section Chief*

Herbert T. Abelson, M.D.
Viviana M. Berthoud, Ph.D.
Joanna Gemel, Ph.D.
James Nachman, M.D.
Charles M. Rubin, M.D.
Ruth Rudinsky, M.D.
Uma Srinivasan, M.D.

*Section of Pediatric Hematology/Oncology and
Stem Cell Transplantation*

5841 South Maryland Avenue
MC 4060
Chicago, Illinois 60637-1470
*Telephone:* (773) 702-6808
*Fax:* (773) 702-9881

June 5, 2002

To Whom It May Concern:

Lina Nissan is a seventeen-year-old girl who is being treated at University of Chicago Children's Hospital under the care of Dr, Charles Rubin for chronic myelogenous leukemia. Lina presented in blast crisis in April 2002. She was started on Gleevac therapy at home, and appears to have responded. A bone marrow aspirate/biopsy was done today to confirm if she is in remission.

The goal is to induce a remission in Lina and then have her undergo a bone marrow transplant from her brother. This is the only curative option for Lina. She will be required to stay to be monitored for six months to a year after the transplant, depending on the side effects.

Please allow Lina and her family to remain in the United States in order to receive all the treatment she needs to afford her a chance at a cure.

Please feel free to contact Dr. Ruben or me at (773) 702-6808 if we can answer any further questions.

Sincerely,

Kelly Kramer APN/CPNP
Pediatric Nurse Practitioner
Pediatric Hematology/Oncology

*Chicago's Children's Hospital*

*LaRabida Children's Hospital
and Research Center* Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0134 of 0215,   *Woodlawn Maternal and Child
Health Care Center* Page 1 of 1

556

Produced 06/22/2017 from USCIS' EDMS;   File No. 077656263 Document 0039 of 02   Page 8   of 25

Pediatrics

Eric C. Beyer, M.D., Ph.D
Secti n Chief

Herbert T. Abelson, M.D.
Viviana M. Berthoud, Ph.D.
Joanna Gemel, Ph.D.
James Nachman, M.D.
Charles M. Rubin, M.D.
Ruth Rudinsky, M.D.
Uma Srinivasan, M.D.

Section of Pediatric Hematology-Oncology and
Stem Cell Transplantation

5841 South Maryland Avenue
MC 4060
Chicago, Illinois 60637-1470
Telephone: (773) 702-6808
Fax: 773 702-9881

December 16, 2002

Tim O'Sullivan
INS Special Agent
312-385-1776, x 2192
F: 312-385-3418

Re: Daniel Nissan
     MR # 264-78-66
     DOB 1-15-81

Dear Special Agent O'Sullivan:

I am writing this letter on behalf of Daniel Nissan, sister of my patient Lina Nissan. Lina is a seventeen year old young lady being followed for a history of chronic myelogenous leukemia at University if Chicago Children's Hospital under the care of Dr. Charles Rubin. Lina underwent a bone marrow transplant on October 10, 2002. Her donor was her brother Daniel Nissan.

Lina has had many post-transplant complications that are currently under control. She has engrafted and is in remission. It is our recommendation that Lina and Daniel remain in the country for six months post transplant (approximately April 11, 2003). In the event that Lina were to have a relapse of her disease, Daniel would be needed to donate more bone marrow/stem cells to perform a donor leukocyte transfusion.

Thank you for your cooperation in this matter. Please feel free to contact Dr. Charles Rubin or myself at (773) 702-6808 if we can answer any further questions.

Sincerely,

Kelly Kramer APN/CPNP
Pediatric Nurse Practitioner
Pediatric Hematology/Oncology

Charles Rubin MD
Associate Professor of Pediatrics

Chicago's Children's Hospital

*LaRabida Children's Hospital
and Research Cent*

33

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0039 of 0215,

*Woodlawn Maternal and Child
Health Care Center*

Page 8 of 25

154

Where Assyrians Get Their News.



101 San Fernando Street, Suite 505
San Jose, CA 95112 U.S.
*Voice* (408) 918-9200
*Fax* (408) 918-9201

29 Tishrin I 6752          Volume VIII          Issue 29          21 October 2002

return to zindamagazine.com

If you are printing the magazine from your web browser, click here.

This Week In Zinda



cover photo

**The Lighthouse**
Stella Alkhass: The Day I Met Lina
Assyrian Aid Society Press Release on Lina Nissan

**Good Morning Bet-Nahrain**
Attackers Destroy Electricity Generator in an Assyrian Village

**News Digest**
First Assyrian Satellite Television Channel Goes Live
Aramaic Inscription on a Jerusalem Box May Belong to Brother of Jesus
Assyrians in Arizona Break Silence on Iraq

**Surf's Up!**
Long Live the Assyrian Diva!
Remembering Christine Britnalik
Why Thank Mr. Bush for Mentioning the Assyrians?
My Family is a Solid Member of Bet-Nahrain
Zinda is Against Assyrians From Iran
Thugs, Spies, and Terrorists Have Penetrated Zinda
Why Endorse Sargon Dadesho?
Supporting This Bishop is a Big Mistake
Wake up Shalalo!
Under the Gifted Leadership of Mar Meelis Zaia
Listen to Assyrian Radio Broadcast from France

**Surfers Corner**
Help An Assyrian Man Suffering From Gangrene
Melbourne Presentation on Assyrians of North Iraq
Fundraiser for Congressman Shakowsky
Assyrian National Foundation Party in Chicago

**Literatus**
Fred Aprim: Assyrians & the New Iraqi Policy & Constitution
Dr. George Habash: To Our Leaders- Tell Arabs and Kurds These are the Assyrian Demands
Kaiser Shahbaz: The KDP Draft Constitution and the Iraqi People

**Bravo**
Treasure Under Saddam Feet

**Calendar of Events**





## Zinda Magazine in Adobe Acrobat Format

Zinda Magazine is now also available in Adobe Acrobat format.

**Download the Magazine** - Approximately 200 kb

You will need Adobe Acrobat Reader to view this document.

There will be no Zinda Says section this week.

---

## The Lighthouse

### THE DAY I MET LINA

Over a year ago, I had seen Lina's face on a few of the Assyrian websites I frequented. There had always been a distant concern there for her. Distant was what Lina was and I was glad it was that way. The distance, however, decreased. Lina arrived in Chicago in November of 2001. I finally got the nerve to email Lina's uncle to ask if the family needed any help with fundraising. I was told that there was a party being held for her here in Chicago. I offered to publicize for the party by putting flyers around the city for them. After

practically memorizing Lina's story by having to look at so many copies of the flyers, I didn't see it in me to continue anymore. A party being thrown for a child halfway into her teenage years; a child who's little body was involuntarily playing the decaying host for a terrible disease. From the vibrant picture on the flyer, one couldn't tell that a deadly cancer was floating around in Lina's blood. Out of sight, out of mind, I say. And that's how it became for the next six months. I didn't want to have the thought of a cancer stricken kid floating around in my head all the time, so I chose to keep my distance from the whole thing.

Jeff, a friend of mine from Michigan, sent me an email in June about Lina's condition at that time. Lina was rushed to the hospital because she had run out of healthy blood.

Two months later, I went to see Lina at the hospital. She is such a sweet kid. She is indeed a child. I actually stopped by the hospital to ask for info about her because I was under the impression that Lina was in a restricted room. I went to the front desk to ask for information about her and the lady at the front desk told me that I could go to her room and find out by myself. This really caught me off guard. I was not expecting myself to go and see her. I mean I knew I would eventually. I thought about how she would look when I went to see her, picturing a frail weak thing, bald and curling in the fetal position in her bed. This is not an image I want to see. Selfish, I know. I didn't know what to do when the lady gave me Lina's room number. It is really hard to visit sick people, especially cancer patients. I remember the hospital my dad was in, I remember the sterile room, the long hallways, his doomed neighbors in the other rooms, the cold and somber atmosphere that feels like an anchor in your chest.

Now imagine this feeling mixed with the feeling of dropping by the house of a complete stranger. Scary. Anyhow, I pulled myself together and took the elevator to the 8th floor. Lina was in a restricted room. However, I could still visit her.

I was told by the nurse that I had to wash my hands thoroughly before seeing her. There was a sign on her door that said that no one with a cold or any kind of illness was allowed to enter the room. She's unable to receive fruits or flowers. I was also supposed to wear a mask to cover my mouth just to really be on the safe side. So then I walked into her room to find Lina, her mother, and her brother Daniel (he is her bone marrow match) there.

Lina looked so small asleep under the sterile white sheet. She was the small, frail girl that I imagined. She had a bandana type headcovering on. I could see through the pink bandana that she barely had any hair. Her mother, brother and I said our greetings. They thought that I worked in the hospital and just came by to check on Lina. They were surprised to find out that I was just an Assyrian student visiting Lina just to see how she was and how I can directly help them. Then they told me to take the mask off, it wasn't really necessary. It was a bit hard communicating with them because they came to Chicago without any knowledge of Assyrian and English. They only spoke Arabic and Turkish.

Lina's mom's family is originally from Turkey, but they moved to Syria and into the Armenian Orthodox Church, so she's part Armenian in someway (that's what she identified herself partly as). They are still learning Assyrian but they are currently proficient enough to hold a conversation in Assyrian. There were some problems in the beginning though.

Lina's mother was on the phone with one of her relatives who speaks English so she handed me the phone to talk. I spoke with the relative and she informed me that Lina DOES NOT KNOW THAT SHE HAS CANCER. She thinks that she has some kind of infection. The "C" word was not to be said. What a shocking statement. Their choice to not tell her is a positive and a negative one. Her family has her best interest at heart. They do not want a 16-year-old girl to dwell on death and dying. Fear would completely diminish the brightness that I saw in her eyes when she was awake. Then again, they are depraving her of the truth. Death is a part of life. We can't deny that.

The lady also told me that her condition right now is very severe. Previously, the doctors did some kind of bone marrow biopsy to see if her condition was stabilized. The results from that were negative. They were

going to give her another biopsy the following Wednesday to see if anything had changed. Lina has a 10% chance of survival.

Daniel and his mother are very sweet people. They offered me cake every two minutes. Then they whipped out the smuggled Coke. Just by looking at Linas' mother's face, you could tell that this woman has been spending every hour at the hospital at Lina's bedside. Daniel has too. He had no trouble declaring his aversion to hospitals. It's really quite understandable. I remember when my family was in the exact same place: caring for a man whose brain was being stolen away by another form of cancer. My mother's pale face greeted every visitor. My aunt's bloodshot eyes would never leave my father's face.

Anyhow, I don't remember what I said to Daniel, but he responded by saying "basima." to me. Then Lina stuck her head up and said with a giggle, "basimTA." It was so sweet how she corrected him. It turns out that her Assyrian is much better than her mother's and her brother's. She seems very close to being fluent. And it also turns out that my initial image of the emaciated, frail girl was not accurate. Lina is a bright bubbly girl with the most beautiful red cheeks I've ever seen. And a gorgeous smile too. She and I joked around a bit and poked fun at her mother and brother for a bit. Then one of her nurses came into the room with a Hallmark paper bag in her hand and gave it to Lina. Lina opened the bag and pulled out a fluffy orange cat. Her face lit up even brighter than it was before. She thanked the nurse and hugged and kissed the stuffed animal over and over again. Throughout the couple hours that I was there, Lina would hold the cat up and kiss its face. She then had her mom show me her continuously growing stuffed animal collection. Lina is a complete innocent. She's also such a smart girl. Like I said, her Assyrian is superior to her mother's and brother's.

The nurse came into her room with this giant machine to take Lina's blood pressure with. Her brother and Lina told the nurse that she should not use that machine to take Lina's blood pressure and to use something else. I asked why. Her brother told me that the pressure the machine puts on Lina's arm is too great. It stops the blood flow in her arm and causes it to turn red. So the nurse uses a gentler one.

I told Lina's mom that if they needed anything, to call me. She said just to come by and visit, and to bring my mom too. They need someone to talk to, all three of them do. Lina just lit up every time the phone rang. She's really a very sweet girl. Her smile was ear to ear.

I just wanted to share that with you.

Stella Alkass
Chicago

[ Lina Nissan received her brother's bone marrow on Wednesday, 9 October and is now on a 7-weekl chemotherapy treatment. Lina's brother, Daniel, is doing well too.

For further information on Lina's condition contact Mr. Yakdan Nissan at 416-261-0459. You may also send a donation to:

Lina Nissan c/o Yakdan Nissan
73 Lochleven Dr.
Toronto, Ont.
M1M 2E9
Canada

Please make the Checks payable to: Lina Nissan ]


## ASSYRIAN AID SOCIETY PRESS RELEASE ON LINA NISSAN

Assyrian Aid Society of America
Press Release
18 October 2002

Lina Nissan, a 16-year-old Assyrian girl and leukemia victim from Syria, has finally received the life saving bone marrow transplant she has been seeking since coming ot the United States earlier this year (see http://www.linanissan.cjb.net for details).



After first learning of her plight last year, the Assyrian Aid Society of America (AAS-A) made inquiries to hospitals in California and Texas to secure pro bono or at-cost treatment. The City of Hope, a charitable foundation specializing in bone marrow research, was also contacted. Unfortunately, these appeals were unsuccessful, as were those of her family in Chicago and Canada.

Several weeks ago we learned that the Univesity of Chicago was offering to perform the $250,000 operation for the $100,000 already raised by the Nissan family trhough charity events in Chicago and from international donations. Theunviesty, howver, required a guarantee that the additional post-operative costs of $3000.00 per month would be paid. AAS-A immediately determined to raise #30,000 so that the surgery conld proceed.

We first contacted Elaine Taylor of the Taylor Family Foundation (http://www.ttfl.org), who offered $5000.00 to stat a challenge grant to be matched by other donors.

Grace Family Vineyards (St. Helena, California), which has dedicated their family foundation to assisting children facing lie-threatening medical conditions, accepted the challenge with a pledge of $5000.00.

Vigrinia and John Madden (forme Oakland Raiders coach, now an ABC football analyst and KCBS Radio sports commentator) also accepted the challenge with another $5000.00.

At a September grape harvest gathering of Grace Family supporters, Elaine Taylor joined us in presenting our case to raise the final $15,000. By the end of the day $7,500 had been collected, and within 48 hours two more checks were received to meet our goal.

The operation was able to proceed on Wednesday, October 18 in Chicago, where Ms. Nissan is now recovering.

The Assyrian Aid Society of America is deeply grateful for this extraordinary display of support from both the Assyrian and the non-Assyrian communities.

We wish Lina Neesan a speedy recovery,

Narsai M. David
Assyrian Aid Society of America



US-VISIT - ANumber Lookup - A077656263
Produced 08/22/2017 from USCIS EDMS, A-File No. 077656263  Document 0184 of 0215  Page 4  of 15  Page 1 of 4

# US-VISIT

## Secondary Processing

PRINT | CLOSE

## Previous Encounters for ANumber A077656263

**Page Summary**

| Organization | Count |
|---|---|
| DHS.CIS.ASC | 3 |

### DHS APPREHEND

| Bio Data | | |
|---|---|---|
| | **Name** | |
| | NISSAN, DANIAL | |
| **DOB** | **Nationality / Birth Place** | **Citizenship** |
| | SYRIA / XX | |
| **Gender** | **Race** | **Height (ins.)** |
| M | | |
| **Weight (lbs.)** | **Eye Color** | **Hair Color** |

(Click to Enlarge)
Encounter ID: 22695249

FIN: 12677449

| Person Identifier | |
|---|---|
| **ID** | **Type** |
| A77 656 263 | A - Number |

**Status**

**Derogatory Data**

| Source | Charge Code | Type | Entry Date | Expiration Date | User ID | |
|---|---|---|---|---|---|---|
| DHS APPREHEND | | Recidivist | 2002 December 16 05:02 PM | | (b)(7)(e) | (b)(7)(c) |

| Apprehension Method | Apprehended By | Entry Status | Time Length |
|---|---|---|---|
| | | NIM | |
| | 2002 December 16 05:02 | 2099 January 1 12:00 AM | |

US VISIT - ANumber Lookup: A077656263

Produced 06/22/2017 from USCIS EDMS; ANumber No. 077656263   Document 0184 of 0215   Page 5   of 15   Page 2 of 4

| Apprehension Method | Absconder | PM | Entry Status | Time Length |
|---|---|---|---|---|
| | **Apprehended By** | | NIM | |

| Comments | | | |
|---|---|---|---|
| **Source** | **Type** | **Entry Date** | **User ID** |
| DHS APPREHEND | COM | 2002 December 16 05:02 PM | |
| SUBJ. ARRESTED ON THIS DATE (read full text) | | | A B-2 OVERSTAY. SUBJ. |

| Transaction Data | | | | |
|---|---|---|---|---|
| **Date Finger Printed** | **Site Code** | **Terminal ID** | **Date Loaded** | **Reason Finger Printed** |
| | CHI | | 2002 December 16 05:02 PM | |

Go To Top

(b)(7)(c)    (b)(7)(e)



# DHS CIS ASC

| Bio Data | | |
|---|---|---|
| (Click to Enlarge) Encounter ID: 1493194196 | **Name** | |
| | NISSAN, DANIAL | |
| **DOB** | **Nationality / Birth Place** | **Citizenship** |
| | / SY | SYR |
| **Gender** | **Race** | **Height (ins.)** |
| M | W | 508 |
| **Weight (lbs.)** | **Eye Color** | **Hair Color** |
| 180 | BRO | BLK |
| FIN: 12677449 | **Person Identifier** | |
| | **ID** | **Type** |
| | A077656263 | A - Number |

| Transaction Data | | | | |
|---|---|---|---|---|
| **Date Finger Printed** | **Site Code** | **Terminal ID** | **Date Loaded** | **Reason Finger Printed** |
| 2010 June 29 12:00 AM | XCC | U1 | 2010 June 29 01:35 PM | I485 - Application to Register Permanent Residence or to Adjust Status |

| Docs Associated with this Encounter | | | | | | |
|---|---|---|---|---|---|---|
| **Type** | **Document ID** | **Issuing Country** | **Name** | **Gender** | **DOB** | **Nationality** | **Issued** |
| IA | MSC1023816336 | USA | NISSAN, DANIAL | U | 1981 January 15 | SYRIA | 2010 November 2 |

Go To Top

https://

Produced 06/22/2017 from USCIS EDMS, A File No. 077656263  Document 0184 of 0215

| DHS  CIS  ASC | | |
|---|---|---|
| **Bio Data** | | |
| **Name** | | |
| NISSAN,  DANIAL | | |
| **DOB** | **Nationality / Birth Place** | **Citizenship** |
| | / SY | SYR |
| **Gender** | **Race** | **Height (ins.)** |
| M | W | 68 |
| **Weight (lbs.)** | **Eye Color** | **Hair Color** |
| 193 | BRO | BRO |
| **Person Identifier** | | |
| **ID** | | **Type** |
| A077656263 | | A - Number |

(Click to Enlarge)
Encounter ID:
2115382885

FIN: 12677449

| **Transaction Data** | | | | |
|---|---|---|---|---|
| **Date Finger Printed** | **Site Code** | **Terminal ID** | **Date Loaded** | **Reason Finger Printed** |
| 2012 October 30 12:00 AM | XCC | 03 | 2012 October 31 12:59 AM | I821 - Application for Temporary Protected Status |

**Go To Top**

| DHS  CIS  ASC | | |
|---|---|---|
| **Bio Data** | | |
| **Name** | | |
| NISSAN,  DANIAL | | |
| **DOB** | **Nationality / Birth Place** | **Citizenship** |
| | / SY | SYR |
| **Gender** | **Race** | **Height (ins.)** |
| M | W | 68 |
| **Weight (lbs.)** | **Eye Color** | **Hair Color** |
| 193 | BRO | BRO |
| **Person Identifier** | | |
| **ID** | | **Type** |
| A077656263 | | A - Number |

(Click to Enlarge)
Encounter ID:
2137897301

FIN: 12677449

| **Transaction Data** | | | | |
|---|---|---|---|---|
| **Date Finger Printed** | **Site Code** | **Terminal ID** | **Date Loaded** | **Reason Finger Printed** |
| 2012 November 26 12:00 AM | XCC | 02 | 2012 November 27 03:55 PM | I821 - Application for Temporary Protected Status |

**Go To Top**                    (b)(7)(e)



U.S. Department of Justice
Immigration and Naturalization Service

**Notice to Appear**

## In removal proceedings under section 240 of the Immigration and Nationality Act

File No: A77 656 263

In the Matter of:

Respondent: Danial            NISSAN

3123 W. Lawrence, Apt. 3-I
Chiago            IL    60640

(Number, street, city, state and ZIP code)        (Area code and phone number)

☐ 1. You are an arriving alien.
☐ 2. You are an alien present in the United States who has not been admitted or paroled.
☒ 3. You have been admitted to the United States, but are deportable for the reasons stated below.

The Service alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of Syria and a citizen of Syria;

3. You were admitted to the United States at Newark, NJ on or about 01-19-02 as a nonimmigrant visitor for pleasure with authorization to remain in the United States for a temporary period not to exceed six months;

4. You remained in the United States beyond 07-18-02 without authorization from the Immigration and Naturalization Service.

**ALLEGATIONS ADMITTED &**
**REMOVABILITY CONCEDED**
IJ CUEVAS: 7-29-07

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you have remained in the United States for a time longer than permitted, in violation of this Act or any other law of the United States.

**EXHIBIT**

OCT 30 2003

# __1__

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8 CFR 208.30(f)(2) ☐ 8 CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at: 55 E. Monroe, Suite 1900, Chicago, IL 60603

on ___TO BE SET___ at ___TO BE SET___ to show why you should not be removed from the United States based on the
   (Date)        (Time)
charge(s) set forth above.

Assistant District Director, Investigations
(Signature and Title of Issuing Officer)

Date: __12-16-02__

Chicago, Illinois
(City and State)

### See reverse for important information

Form I-862 (Rev. 4-1-97)

See reverse for important information

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or deportable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

---

**Request for Prompt Hearing**

To expedite a determination in my case, I request an immediate hearing. I waive my right to have a 10-day period prior to appearing before an immigration judge.

Before: _____

_____
(Signature of Respondent)

_____
(Signature and Title of INS Officer)

Date: _____

---

**Certificate of Service**

This Notice to Appear was served on the respondent by me on ___12/16/02___, in the following manner and in
compliance with section 239(a)(1)(F) of the Act:                                (Date)

[X] in person          ☐  by certified mail, return receipt requested          ☐   by regular mail

[X] Attached is a list of organizations and attorneys which provide free legal services.

[X] The alien was provided oral notice in the ___ENGLISH___ language of the time and place of his or her
hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____
(Signature of Respondent if Personally Served)

_____  SPECIAL AGENT
(Signature and Title of Officer)

U.S. Department of Justice
Immigration and Naturalization Service

**Warrant for Arrest of Alien**

File No. A77 656 263

Date: 12-16-02

**To any officer of the Immigration and Naturalization Service delegated authority pursuant to section 287 of the Immigration and Nationality Act:**

From evidence submitted to me, it appears that:

Danial _____ NISSAN _____
                                      (Full name of alien)

an alien who entered the United States at or near _____ Newark, NJ _____ on
                                                                        (Port)

_____ 01-19-02 _____ is within the country in violation of the immigration laws and is
                  (Date)

therefore liable to being taken into custody as authorized by section 236 of the Immigration and

Nationality Act.

By the virtue of the authority vested in me by the immigration laws of the United States and the

regulations issued pursuant thereto, I command you to take the above-named alien into custody

for proceedings in accordance with the applicable provisions of the immigration laws and

regulations.

_____
(Signature of authorized INS official)
John P. Torres
(Print name of official)
Assistant District Director, Investigations
(Title)

---

**Certificate of Service**

Served by me at _CHICAGO, IL._ on _12/16/02_ at _7:00 P.M._ .
I certify that following such service, the alien was advised concerning his or her right to counsel and was
furnished a copy of this warrant.

_____
(Signature of officer serving warrant)
SPECIAL AGENT
(Title of officer serving warrant)

Form I-200(Rev. 4-1-97) N

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Custody Determination**

File No: A77 656 263

Date: 12-16-02

Danial
NISSAN

3123 W. Lawrence, Apt. 3-I
Chicago                                IL      60640

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that pending a final determination by the Immigration Judge in your case, and in the event you are ordered removed from the United States, until you are taken into custody for removal, you shall be:

☐ detained in the custody of this Service.

☐ released under bond in the amount of $ _____ .

☒ released on your own recognizance.

☒ You may request a review of this determination by an Immigration Judge.

☐ You may not request a review of this determination by an Immigration Judge because the Immigration and Nationality Act prohibits your release from custody.

_____
(Signature of authorized officer)

**Assistant District Director, Investigations**
(Title of authorized officer)

**Chicago, Illinois**
(INS office location)

☐ do  ☒ do not request a redetermination of this custody decision by an Immigration Judge.

☒ I acknowledge receipt of this notification.

X Danial Nissan
(Signature of respondent)

12/16/02
(Date)

---

### RESULT OF CUSTODY REDETERMINATION

On _____ , custody status/conditions for release were reconsidered by:

☐ Immigration Judge        ☐ District Director        ☐ Board of Immigration Appeals

The results of the redetermination/reconsideration are:
☐ No change - Orignial determination upheld.
☐ Detain in custody of this Service.
☐ Bond amount reset to _____

☐ Release - Order of Recognizance.
☐ Release - Personal Recognizance.
☐ Other: _____

_____
(Signature of officer)

Form I-286 (Rev. 4-1-97) N

000190



Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0167 of 0215. Page 1 of 5

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Chicago, Illinois

File A 77 656 263                                    July 29, 2004

In the Matter of

DANIAL NISSAN,                    )              IN REMOVAL PROCEEDINGS
                                  )
            Respondent            )

CHARGE:        Section 237(a)(1)(B) of the INA, remained longer
               than allowed.

APPLICATION:   Motion to continue.

ON BEHALF OF RESPONDENT:          ON BEHALF OF DHS:

Edwin Gania, Esquire              Lynn Hollander, Esquire
11 South LaSalle Street           Department of Homeland
Suite 2800                         Security
Chicago, Illinois 60603           55 East Land Row
                                  Suite 1700
                                  Chicago, Illinois 60603

                  ORAL DECISION OF THE IMMIGRATION JUDGE

          The respondent is an adult male, native and citizen of

Syria who was admitted to the United States at Newark, New Jersey

on or about January 19, 2002.  At that time he was admitted as a

non-immigrant visitor for pleasure with authorization to remain

in the United States for temporary period not to exceed 6 months.

MAY 0 6 2005

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0167 of 0215, Page 1 of 5

651

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0167 of 0215    Page 2    of 5

kmp

Due to the belief that the respondent had remained longer than allowed, the then Immigration and Naturalization Service (hereinafter "the Department" or "the Government") commenced removal proceedings on December 16, 2002, charging the respondent with having remained longer than allowed.

The respondent through counsel admitted the factual allegations contained in the Notice to Appear and refused to designate Syria as the country of removal. Given the respondent's admissions that he is a native and citizen of Syria who remained longer than allowed, it has been established by clear and convincing evidence that the respondent is removable as charged. 8 C.F.R. Section 1240.8 (2004).

Syria has been designated as the country of removal in the event that this is necessary.

The respondent has requested a continuance pursuant to Matter of Velarde, 23 I&N Dec. 253 (BIA 2000). The Department is opposed to the Velarde motion for reasons based on Matter of Arthur, 20 I&N Dec. 475 (BIA 1992).

Velarde, supra, does allow for a "motion to reopen" for adjustment of status based on a marriage entered into after the commencement of removal proceedings. The Board in granting motions to reopen set forth various elements including the fact that a motion must be timely filed, a motion must not be numerically barred, a motion is not barred by Matter of Shaar, 21 I&N Dec. 541 (BIA 1996), that clear and convincing evidence is

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0167 of 0215,    Page 2    of 5

652

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0167 of 0215,     Page 3     of 5

kmp

presented indicating a strong likelihood that the marriage is
bonafide and that the Government does not oppose the motion or
bases it's opposition solely on <u>Matter of Arthur</u>, <u>supra</u>.

Turning to the facts in this case, the respondent has
been under proceedings since December 16, 2002.  The respondent
verified receipt of his Notice to Appear on October 30, 2003.  On
that day it was marked as Exhibit 1.  The respondent was given an
opportunity to return with counsel which he did on July 22, 2004.
The record reflects that the respondent was to enter a pleading
on that day as well as apply for any and all forms of relief.
The respondent was not prepared to move forward on July 22, 2004.
Consequently, this case was rescheduled for one week later, today
(July 29, 2004).

The respondent has simply requested a continuance based
on <u>Matter of Velarde</u>.  The respondent's request is premature.
The respondent clearly married to his citizen spouse in early
2004.  The respondent was placed under proceedings in December of
2002.  Essentially the respondent has been under proceedings for
at least one year, potentially 13 months or so prior to his
marriage to a United States citizen.  It is the assessment of
this Judge that given the posture of this case, this is not a
<u>Matter of Garcia</u> motion.  It is a <u>Matter of Arthur</u> motion.  Given
the posture of this case <u>Velarde</u> does not apply because it is not
within the context of a motion to reopen proceeding.  Accordingly
the respondent's motion to continue will be denied.

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0167 of 0215,     Page 3     of 5

653

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0167 of 0215,      Page 4      of 5

kmp

The respondent was given an opportunity to seek voluntary departure alternatively.  The respondent has refused to make representations that he is willing to depart the United States.  This is critical to his request pursuant to Section(B) of the Act.  Given the respondent's reluctance to request voluntary departure, this Judge has not choice other than to order the respondent removed and deported from the United States to Syria on the charges contained in the Notice to Appear. Accordingly, the following order will be entered.

<div align="center">ORDER</div>

IT IS ORDERED that the respondent's motion to continue will be denied.

IT IS FURTHER ORDERED that the respondent be removed and deported from the United States to Syria on the charge contained in the Notice to Appear.

CAROLS CUEVAS
Immigration Judge

A 77 656 263                                                         July 29, 2004
Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0167 of 0215,  Page 4  of 5

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0167 of 0215,    Page 5       of 5

## CERTIFICATE PAGE

I hereby certify that the attached proceeding

before CAROLS CUEVAS in the matter of:

DANIAL NISSAN

A 77 656 263

Chicago, Illinois

was held as herein appears, and that this is the original

transcript thereof for the file of the Executive Office for

Immigration Review.


Kimberly M. Perkins    (Transcriber)


Deposition Services, Inc.
6245 Executive Boulevard
Rockville, Maryland  20852
(301) 881-3344


May 24, 2005
(Completion Date)

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0167 of 0215,      Page 5     of 5

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court

Matter of

    File A 77 656 263

DANIAL NISSAN,    )
         )  IN REMOVAL PROCEEDINGS
Respondent  )
         )  Transcript of Hearing

Before CAROLS CUEVAS, Immigration Judge

Date: July 29, 2004    Place: Chicago, Illinois

Transcribed by DEPOSITION SERVICES, INC. at Rockville, Maryland

Official Interpreter:

Language:

Appearances:

For the Department of
Homeland Security:    For the Respondent:

Lynn Hollander, Esquire    Edwin Ganla, Esquire

000169

---

kmp

1  JUDGE FOR THE RECORD

2      July 29, 2004.  Judge Cuevas in Chicago with the case

3  of Danial Nissan who is here with Mr. Edwin Ganla.  The

4  Government is represented by Lynn Hollander.

5  JUDGE TO MR. GANIA

6      Q.  Mr. Gania, I did receive the motion to continue

7  and it's pursuant to Velarde but I don't -- my understanding is

8  that they married after proceedings but this is more kin to a

9  Matter of Arthur case because his NTA was issued in 2002.  My

10  understanding the marriage -- December 16, 2002.  My

11  understanding the marriage didn't take place until January of

12  '04.

13      A.  That's right.

14      Q.  I'm not granting the motion to continue the case.

15      A.  Well, it's just that this case was set from last

16  week and the wife can't be here to assist us to --

17      Q.  It doesn't matter if she was here, sir.  It's a

18  totally separate matter but the case immediately preceding yours

19  had a wife here, citizen, and it made no difference.  Posture

20  wise, I don't grant.  It's the way I do it.  It doesn't

21  necessarily mean it's the right way but it's the way that I do

22  it.  I think it's the right way.  So he is the -- as a matter of

23  fact, I would've taken care of this case last week.  I was here

24  ready to go.

25      A.  Well, I was too, Judge.

A 77 656 263      9      July 29, 2004

000170

kmp

1  Q. Well, didn't you make here -- well, paragraph 1 of
2  your motion, what does it say?
3  A. Yes, paragraph 1, yes.
4  Q. What does it say?
5  A. Well, actually --
6  Q. It says -- that's right I do recall. You were not
7  wearing a suit jacket. There is some dress codes, sir. You got
8  to -- you can't come in --
9  A. Yes, I didn't actually know -- I had a tie,
10  Q. You always come in with a suit and tie, sir,
11  except for last week.
12  A. Yes, I always do. That's right, (indiscernible)
13  (indiscernible). I just actually wasn't feeling well and it was
14  a really hot day and I -- that's why --
15  Q. Well, you can carry it in your arm.
16  A. Yes.
17  Q. Carry it in your arm. You walk in here. We don't
18  need to get into that but --
19  A. Yes.
20  Q. -- even if you'd been here last week -- or you
21  were here but you didn't get back in time, I still would have
22  moved ahead the same way I'm going to move ahead now and not
23  grant a motion for a continuance based on a marriage entered into
24  after, so, I don't know. I don't know where that leaves you.
25  You could submit a motion, a Velarde motion, if you want or if

A 77 656 263          10          July 29, 2004

kmp

1  you've got any other forms of relief. We've not even taken a
2  pleading, sir. How do you plead?
3  A. Your Honor, I can't find the NTA in my file.
4  Q. All right, we'll pass the case and then you can
5  talk to your client and come back before I'm done. I'm almost
6  done, if you'd like.
7  A. Okay, sure.
8  Q. All right.

ON THE RECORD
OFF THE RECORD

11  JUDGE FOR THE RECORD
12  Back on the record.

ON THE RECORD

13  JUDGE TO MR. GANIA
14  Q. Mr. Gania, have you had time to consult with your
15  client?
16  A. Yes, I have, Your Honor.
17  Q. What do you -- what are you going to do?
18  A. Well, we'd like to pursue a motion under Matter of
19  Velarde.
20  Q. Okay. So --
21  A. You're saying that will occur after an order or
22  removal?
23  Q. Well, no. It's not an order of removal.
24  Voluntary departure. He can't be removed. He needs to
25  ask for that while he's still under voluntary departure so if I

A 77 656 263          11          July 29, 2004

kmp

1 grant him 120 days voluntary departure, until let's say, November
2 26, 2004, he has to timely file the motion together with
3 evidence, clear and convincing evidence that he's -- it's a
4 bonafide relationship between him and his wife. What is that? I
5 don't know. Some folks might, you know, of course, you know, a
6 child, other evidence of the relationship, possibly affidavits,
7 photos of people that recognize that they've had this
8 relationship, statements. But -- statements of the respondent
9 and his spouse, evidence in the form of a lease. The longer, of
10 course, they've been together, the more easy it would be to
11 establish by clear and convincing evidence. Not equivocal. If
12 it's equivocal, maybe or maybe not. That's not good enough. So
13 I -- you can tell me whether he can establish it. That's part of
14 the problem, the difficulty of just continuing these cases when
15 people come in after. You know, they've been under proceedings
16 since late 2002. We're in the middle of 2004, 2 and one half
17 years later. Someone comes in and says, Judge, I've been married
18 a year ago or at the beginning of this year and they've been
19 under proceedings for one and one half years and it's just --
20 well, the law has been changed to reflect that. Folks often
21 times take advantage of the process and I just don't know. One of
22 the way is, you know is the Velarde motion to reopen. If he
23 wants to do that, that's his prerogative to do that. Certainly
24 he's got a right to file one motion of reopen. And I don't know
25 what -- whether -- what you want to do. I -- we didn't take a

kmp

1 pleading. I need to have a pleading entered. How would you
2 plead?
3 A. Sure. We'll admit to the factual allegations and
4 concede to that charge.
5 Q. All right. Is he able or willing to designate
6 Syria as a country of removal if that becomes necessary?
7 A. We'll decline to do so.
8 JUDGE TO MS. HOLLANDER:
9 Q. The Government will have me designate Syria as a
10 country of removal if necessary?
11 A. Yes, Your Honor.
12 Q. That's designated.
13 JUDGE TO MR. GANIA:
14 Q. What will it be, Mr. Gania?
15 A. Well, he has nothing else to apply for except, I
16 guess, a motion to reopen then under Matter of Velarde.
17 Q. So he should then indicate that he's willing to
18 voluntary depart. Obviously 120 days, that's November 26th,
19 2004, and he's willing to depart and -- you know, A Velarde
20 motion is premature at this point. I know that he intends to
21 apply for one but in the event that he applies for one and it's
22 denied and I guess he could appeal that but, you know he has to
23 indicate -- represent that he's willing and able to depart unless
24 he's given permission not to.
25 A. I'm not so sure about that. We may just forge the

kmp

1   voluntary departure.

2   Q.   Okay.  So I don't have any form of relief --

3   A.   (Indiscernible) (indiscernible).

4   Q.   -- so I just order him --

5   A.   Yes, right okay, so.

6   Q.   He's not seeking any other relief other than the

7   continuance, right?

8   A.   Yes, that's correct.

9   Q.   And he doesn't want to leave voluntarily. He just

10  doesn't want to leave?

11  A.   That's right.

12  Q.   Okay. Well, I'll issue an order indicating that

13  he be removed and deported from the United States to Syria.

14  JUDGE RENDERS ORAL DECISION

15  JUDGE TO MR. NISSAN

16  Q.   Sir, you have 30 days to appeal your decision. 30

17  days from today is August 30, 2004.  While your case is pending

18  appeal you may remain in the United States but once they decide

19  your appeal, if your appeal is denied, you must leave. If not

20  then they will pick you up and make you leave the United States.

21  So you wish to reserve appeal.

22  JUDGE TO MR. GANIA

23  Q.   Mr. Gania, am I correct?

24  A.   Yes, we reserve. Yes.

25  JUDGE TO HOLLANDER

A. 77 656 263                14                July 29, 2004

000175

kmp

1   Q.   And the Government would accept the decision?

2   A.   Yes.

3   JUDGE FOR THE RECORD

4   The hearing is closed.

                HEARING CLOSED

A. 77 656 263                15                July 29, 2004

000176

# G.

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0096 of 0215, Page 1 of 4



| ROUTING AND TRANSMITTAL SLIP | | Date AUG – 7 2007 | |
|---|---|---|---|
| TO: (Name, office symbol, room number, building, Agency/ Post) | | Initials | Date |
| 1. _NRC_ | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

| Action | File | Note and Return |
|---|---|---|
| Approval | For Clearance | Per Conversation |
| As Requested | For Correction | Prepare Reply |
| Circulate | For Your Information | See Me |
| Comment | Investigate | Signature |
| Coordination | Justify | |

**REMARKS**

77656263
TO CH
3-1-07
✓2404

ACTION COMPLETED
APPR            R FILING
INITIALS (b)(6);(b)(7)(C)   DATE AUG – 7 2007
FCO/UNIT: CHGO/CCO

DO NOT use this form as a RECORD of approvals, concurrences, disposals, clearances, and similar actions

Office of the Chief Counsel

FROM: Immigration and Customs Enforcement
U.S. Department of Homeland Security
55 East Monroe St.,
Chicago, IL  60603

Room No. — Bldg.

Phone No.  (b)(6);(b)(7)(C)

AUG 22 2007

NSN 7540-00-935-5862
5041-103



OPTIONAL FORM 41 (Rev. 1-94)
Prescribed by GSA
UNICOR FPI - SST

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0071 of 0215 Page 1 of 15

JX 7324

# Document Routing Form



U.S. Immigration and Customs Enforcement

| Date | 01-25-12 | Purpose | ☐Congressional ☒DHS ☐Routine ☐FYI | Field Office Tracking No. |
|---|---|---|---|---|

| From Dir | (b)(6);(b)(7)(C) | Office ERO DHS/ICE | Telephone No. 312 347 2077 | Room No 4000 |

Subject: (b)(6);(b)(7)(C)

**140355**

Response to be signed by

A 077656 263

Comments: INDEX to NRC  Sect: JQ – File Room Number 4LLQ
Resp: 7324 – Row– JQ Shelf – 7374

## Required Concurrences

| Name | Office | Action Requested | Initial | Date | Comments |
|---|---|---|---|---|---|
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |
| | | ☐Concur ☐Sign | | | |

## Office of the Field Office Director Concurrences
**140355**

CHICAGO FIELD OFFICE

| Name | Action Requested | Initial | Date | Comments |
|---|---|---|---|---|
| | ☐Concur ☐Sign | | | |
| (b)(6);(b)(7)(C) | ☐Concur ☐Sign | | | ACTION COMPLETE |
| | ☐Concur ☐Sign | | | (b)(6);(b)(7)(C) |
| | ☐Concur ☐Sign | | | |
| | ☐Concur ☐Sign | | | |
| | ☐Concur ☐Sign | | | |

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0071 of 0215, Page 1 of 15

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0071 of 0215,

WIRC

Office of the Chief Counsel
Page 2    of 15
U.S. Department of Homeland Security
55 E. Monroe St   (b)(6);(b)(7)(C)
Chicago, Illinois 60603



# U.S. Immigration
# and Customs
# Enforcement

*ATTORNEY WORK PRODUCT – DO NOT RELEASE*

## MEMORANDUM

SUBJECT:     FINAL BIA ORDER          DATE: 6/22/06

TO:    FIELD OFFICE DIRECTOR        FROM:    (b)(6);(b)(7)(C)
       DETENTION & REMOVAL                   ASST. CHIEF COUNSEL
       CHICAGO, ILLINOIS                     CHICAGO, ILLINOIS

JUN 27 PM 3 13

RE:   A 77-656-263

The attached decision of the Board of Immigration Appeals is
being forwarded to your section on this date for appropriate action.

THE A-FILE RELATING TO THE ABOVE CASE IS
NOT LOCATED WITHIN THE CHIEF COUNSEL'S OFFICE

## **THIS IS A FINAL ORDER OF REMOVAL**

Mtn. to Reconsider Denied!

Produced 06/22/2017 from USCIS' EDMS; ● File No. 077656263 Document 0115 of 02● Page 2 of 22

| ROUTING AND TR. .IITTAL SLIP | Date 5-2-06 | | |
|---|---|---|---|
| TO: (Name, office symbol, room number, building, Agency Post) | | Initials | Date |
| 1. *Deportations* | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |

| Action | | File | | Note and Return |
|---|---|---|---|---|
| Approval | | For Clearance | | Per Conversation |
| As Requested | | For Correction | | Prepare Reply |
| Circulate | | For Your Information | | See Me |
| Comment | | Investigate | | Signature |
| Coordination | | Justify | | |

**REMARKS**

**DO NOT use this form as a RECORD of approvals, concurrences, disposals, clearances, and similar actions**

| FROM: (Name, org. symbol, Agency/ Post) | Room No. — Bldg. |
|---|---|
| | Phone No. |

NSN 7540-00-935-5862
5041-103

**OPTIONAL FORM 41 (Rev. 1-94)**
Prescribed by GSA
UNICOR FPI - SST

Date

## ROUTING AND TRANSMITTAL SLIP

| TO: (Name, office, symbol, room number, | Initials | Date |
|---|---|---|
| 1. *Records* 0013 | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | Action | ☐ | File | ☐ | Note and Return | |
| ☐ | Approval | ☐ | For Clearance | ☐ | Per Conversation | |
| ☐ | As Requested | ☐ | For Correction | ☐ | Prepare Reply | |
| ☐ | Circulate | ☐ | For Your Information | ☐ | See Me | |
| ☐ | Comment | ☐ | Investigate | ☐ | Signature | |
| ☐ | Coordination | ☐ | Justify | | | |

**REMARKS**

77 - 656 - 263

ACTION COMPLETED
APPROVED FOR FILING
INITIALS (b)(6);(b)(7)(C)  DATE: 6/1/08
FCO/UNIT: CHGO/CCO

DO NOT use this form as a RECORD of approvals, concurrences, disposals,
clearances, and similar actions

| FROM: (Name, org. symbol, Agency | Room No. \ Bldg. |
|---|---|
| CHICAGO CHIEF COUNSEL OFFICE | Phone No. |

5041-102

OPTIONAL FORM 41 (Rev. 7-76)
Prescribed by GSA
FPMR (41 CFR) 101-11.206

**U.S. Department of Justice**
Immigration and Naturalization Service EDMS, Alien File No. 077656263 Document 0171 of 0215, **Record of Deportable/Inadmissible Alien**

| CONTROL Name (Last, First, Middle) NISSAN, Danial | | | | | | | Aliases None |
|---|---|---|---|---|---|---|---|

| Birthdate | Age 21 | Marital Status ☒ Single ☐ Separated | ☐ Widowed ☐ Married ☐ Divorced | File Number A77 656 263 | | Name of Last/Current U.S. Employer Claims none |
|---|---|---|---|---|---|---|

| Sex M | Hair Blk | Eyes Brn | Complexion Medium | Height | Weight | Scars or Marks None visible | Address of U.S. Employer Claims none |
|---|---|---|---|---|---|---|---|

| U.S. Address/Mail (Number) 3123 W. Lawrence, Apt. 3-I (Street) | (City) Chicago | (State) IL | (ZIP CODE) 60640 | Type of Employment Claims none |
|---|---|---|---|---|

| Alien's Telephone # NONE | Date of Action 12-16-02 | Location Code CHI | Salary Claims | Hr. | From: None | To: None |
|---|---|---|---|---|---|---|

| City, Province (State) and Country of Birth Hassake, Syria | Country of Citizenship Syria | Passport Number and Country of Issue 4535642 Syria |
|---|---|---|

| Date, Place, Time, and Manner of Last Entry/Attempted Entry 01-19-02 NEW B-2 until 07-18-02 | Status at Entry Visitor | Length of Time Illegally in U.S. 1 to 6 months | Status When Found Ind & other |
|---|---|---|---|

| Foreign Address/Residence (Number, Street, City, Province, State, Country) 3 Al-Houria St., Hassake, Syria | Arrived From/Boarded At Damascus |
|---|---|

| Method of Location/Apprehension 517.3 | (At/Near) Chgo, IL | Date & Hour 12-16-02 1500 | Apprehended by (b)(6)(b)(7)(C) |
|---|---|---|---|

| Visa # 46763154 ☒ NIV ☐ IMM ☐ None | Date of Visa Iss./Loc. 12-30-01 Damascus | Name on Social Security Card Claims none | Social Security No. N/A |
|---|---|---|---|

| Name, Address, and Nationality of Spouse (Maiden Name, if appropriate) Claims none | Number & Nationality of minor Children C/N |
|---|---|

| Father's Name and Nationality and Address, if Known (b)(6),(b)(7)(C) Syria, SFA | Mother's Present and Maiden Names, Nationality, and Address, if Known (b)(6),(b)(7)(C) Syria, SUSA |
|---|---|

| Monies Due/Property in U.S. Not in immediate possession ☐ None Claimed ☐ See Form I-43 (b)(7)(E) | |
|---|---|

| Deportation Charge(s) 237 (a) ( 1 )( B )( ) ; 237 (a) ( )( ) ; 237 ( )( )( ) | Exclusion Ground(s) 212 (a) ( )( ) ; 212 (a) ( )( ) |
|---|---|

| Place a check on the appropriate box(es) if any of the following actions were completed: | | | DACS Citation(s) |
|---|---|---|---|
| ☒ Doc Lifted (No.) 44147877709 | ☒ Fingerprinted | Photographed ☒ I-217 Executed | R1B |

| Special Programs ☐ OCDETF ☐ Grandfathered Alien | ☐ Sanctions SAVE | Fraudulent Documents ☐ Sanctions ☐ Other | Criminal Record: Yes☐ No☒ ☐ CA ☐ CO ☐ SR ☐ AF | Immigration Record: Yes☐ No☒ ☐ Prior Deport. ☐ Prior VR |
|---|---|---|---|---|

| Smuggled Alien ☐ Claimed ☐ Verified ☐ Land ☐ Water ☐ Aircraft | Assistance in Apprehension ☐ Sensors ☐ Observation Aircraft ☐ Border Patrol ☐ Horse Patrol ☐ All Terrain Vehicle Other Observation Device (specify) |
|---|---|

| Contraband: ☐ Narcotics ☐ Weapons ☐ Currency ☐ Other | Funds in Possession | Alien Initial | Date | A list of free legal services has been provided: ☐ Yes ☐ No (formal proceedings were not instituted) |
|---|---|---|---|---|

| Alien has been advised of communication privileges pursuant to 8 CFR 242.2(g). Initial Date |
|---|
| Narrative: Include details not shown above and whether or not eligible for special status program (e.g., TPS. etc.) |

SUBJECT was encountered at Chicago District Office.
SUBJECT (b)(7)(c) and was found to be out of status.
SUBJECT is a native and citizen of SYRIA and makes no other claims.
SUBJECT last entered the United States through POE Newark, NJ, on 01-19-02. SUBJECT was authorized to remain in the United States until 07-18-02. SUBJECT has remained in the United States beyond 07-18-02 without authority from this Service. SUBJECT claims to have filed for an extension of stay, but Service records (b)(7)(E) do not reflect that.
SUBJECT's sister is a patient at the University of Chicago Hospitals. SUBJECT is her bone-marrow donor. SUBJECT donated bone marrow to his sister on 10-10-02, and the hospital recommends that SUBJECT stay available until 04-10-03 in case further donations are needed. Hospital will fax a letter to the Service today, 12-16-02, stating that.

FINS 12677449

(b)(6),(b)(7)(C)

Special Agent

| Continued on attached continuation page | (Signature and Title) |
|---|---|

| DISTRIBUTION 1-File A77 656 263 1-SSA 1-IO CHI | Received (subject and documents) (report of interview) from |
|---|---|
| | Officer: (b)(6);(b)(7)(C) 12 / 16 19 2002 at 4:20 PM |
| | Disposition NTA ROR |
| | (Receiving Officer) (b)(6),(b)(7)(C) |
| | I-213 (Rev. 4/1/97) X |

I hereby certify that this document
is a true and correct copy of the
original which is maintained in the
Immigration & Naturalization Service
administrative file relating to

File No _A-21-57-363-_

(b)(6);(b)(7)(C)

7-29-65
Date

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0177 of 0215,

U.S. Department of Justice                                                    Notice of Custody Determination

| | |
|---|---|
| File No: | A77 656 263 |
| Date: | 12-16-02 |

Danial
NISSAN

3123 W. Lawrence, Apt. 3-I
Chicago                              IL     60640

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that pending a final determination by the Immigration Judge in your case, and in the event you are ordered removed from the United States, until you are taken into custody for removal, you shall be:

- ☐ detained in the custody of this Service.
- ☐ released under bond in the amount of $ _____ .
- ☒ released on your own recognizance.

☒ You may request a review of this determination by an Immigration Judge.

☐ You may not request a review of this determination by an Immigration Judge because the Immigration and Nationality Act prohibits your release from custody.

```
(b)(6);(b)(7)(C)
```

Assistant District Director, Investigations
(Title of authorized officer)

Chicago, Illinois
(INS office location)

☐ do  ☒ do not request a redetermination of this custody decision by an Immigration Judge.

☒ I acknowledge receipt of this notification.

X *Danial Nissan*                                              12/16/02
(Signature of respondent)                                      (Date)

---

## RESULT OF CUSTODY REDETERMINATION

On _____ , custody status/conditions for release were reconsidered by:

☐ Immigration Judge          ☐ District Director          ☐ Board of Immigration Appeals

The results of the redetermination/reconsideration are:
- ☐ No change - Orignial determination upheld.
- ☐ Detain in custody of this Service.
- ☐ Bond amount reset to _____

- ☐ Release - Order of Recognizance.
- ☐ Release - Personal Recognizance.
- ☐ Other: _____

_____
(Signature of officer)

Form I-286 (Rev. 4-1-97) N

U.S. Department of Justice
Immigration and Naturalization Service

**Warrant for Arrest of Alien**

File No.   A77 656 263

Date:   12-16-02

**To any officer of the Immigration and Naturalization Service delegated authority pursuant to section 287 of the Immigration and Nationality Act:**

From evidence submitted to me, it appears that:

Danial _____ NISSAN _____
(Full name of alien)

an alien who entered the United States at or near _____ Newark, NJ _____ on
(Port)

_____ 01-19-02 _____ is within the country in violation of the immigration laws and is
(Date)

therefore liable to being taken into custody as authorized by section 236 of the Immigration and
Nationality Act.

By the virtue of the authority vested in me by the immigration laws of the United States and the regulations issued pursuant thereto, I command you to take the above-named alien into custody for proceedings in accordance with the applicable provisions of the immigration laws and regulations.

(b)(6);(b)(7)(C)

_____
(Print name of official)

Assistant District Director, Investigations
(Title)

---

**Certificate of Service**

Served by me at ___CHICAGO, IL.___ on ___12/16/02___ at ___7:00 P.M.___

I certify that following such service, the alien was advised concerning his or her right to counsel and was
furnished a copy of this warrant.

(b)(6);(b)(7)(C)

___SPECIAL AGENT___
(Title of officer serving warrant)

Form I-200(Rev. 4-1-97) N

U.S. Department of Justice — USCIS' EDMS; Alien File No. 077656263   Document 0179 of 0215       Page 1   of 1
Immigration and Naturalization Service

# Order of Release on Recognizance

| | |
|---|---|
| File No: | A77 656 263 |
| Date: | 12-16-02 |

Name:  Danial                                              NISSAN

You have been arrested and placed in removal proceedings. In accordance with section 236 of the Immigration and Nationality Act and the applicable provisions of Title 8 of the Code of Federal Regulations, you are being released on your own recognizance provided you comply with the following conditions:

☒  You must report for any hearing or interview as directed by the Immigration and Naturalization Service or the Executive Office for Immigration Review.

☒  You must surrender for removal from the United States if so ordered.

☐  You must report in (writing) (person) to _____
<div align="center">(Name and Title of Case Officer)</div>

at _____ on _____ at _____
<div align="center">(Location of INS Office)                                   (Day of each week or month)                              (Time)</div>

If you are allowed to report in writing, the report must contain your name, alien registration number, current address, place of employment, and other pertinent information as required by the officer listed above.

☒  You must not change your place of residence without first securing written permission from the officer listed above.

☒  You must not violate any local, State, or Federal laws or ordinances.

☒  You must assist the Immigration and Naturalization Service in obtaining any necessary travel documents.

☐  Other. _____
_____ .

☐  See attached sheet containing other specified conditions (Continue on separate sheet if required)

> **NOTICE: Failure to comply with the conditions of this order may result in revocation of your release and your arrest and detention by the Immigration and Naturalization Service.**

(b)(6);(b)(7)(C)

(b)(6);(b)(7)(C)          , Asst. Dist. Dir., Investigations
<div align="center">(Printed Name and Title of Official)</div>

### Alien's Acknowledgment of Conditions of Release on Recognizance

I hereby acknowledge that I have (read) (had interpreted and explained to me in the  _ENGLISH_  language) and understand the conditions of my release as set forth in this order. I further understand that if I do not comply with these conditions the Immigration and Naturalization Service may revoke my release without further notice.

(b)(6);(b)(7)(C)

x Danial Nissan                    12/16/02
<div align="center">(Signature of Alien)                                   (Date)</div>

### Cancellation of Order

I hereby cancel this order of release because:  ☐   The alien failed to comply with the conditions of release.
☐  The alien was taken into custody for removal.  _____  _____
<div align="center">(Signature of INS Official Canceling Order)                              (Date)</div>

Form I-220A (Rev 4-1-97) N

Produced 06/22/2017 from USCIS' EDMS; Alien File No.  077656263  Document 0179 of 0215,       Page 1       of 1

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0180 of 0215,     Page 1     of 1

**U.S. Department of Justice**
Immigration and Naturalization Service

# Notice to EOIR: Alien Address

---

Date:   12-16-02                                    File No:   A77 656 263

To:     Office of the Immigration Judge
        Executive Office for Immigration Review
        55 E. Monroe, [(b)(6);(b)(7)(C)]
        Chicago, IL 60603

From:   Office of the District Director
        Immigration and Naturalization Service
        10 W. Jackson
        Chicago, IL 60604
                Danial
Respondent: NISSAN

---

**This is to notify you that this respondent is:**

☐ Currently incarcerated by other than INS.  A charging document has been served on the respondent and an Immigration Detainer-Notice of Action by the INS (Form I-247) has been filed with the institution shown below.  He/she is incarcerated at:

His/her anticipated release date is: _____

☐ Currently detained by INS at: _____

☐ Currently detained by INS and transferred this date to a new location: _____

**INS motion for change of venue attached.**   ☐ Yes     ☐ No

☒ Released from INS custody on the following condition(s):

   ☐ Personal Recognizance

   ☒ Order of Recognizance (Form I-220A)

   ☐ Bond in the Amount of $ _____     ☐ Surety bond     ☐ Cash bond

   ☐ Other _____

☐ Upon release from INS custody, the respondent reported his/her address and telephone number will be:

☒ Upon release from INS custody, the respondent was reminded of the requirements contained in section 239(a)(1)(F)(ii) of the Immigration and Nationality Act and was provided with an EOIR change of address form (EOIR-33).

---

(Signature of INS official)                              (Title of INS official)

(Printed name of INS official)                           (Location)

Form I-830 (Rev. 4/1/97)N

| Person ID (b)(7)(E) | Sex. M  DOB: 01/15/1981  Current Age: 31  COB: SYRIA  COC: SYRIA | | |
|---|---|---|---|
| Subject ID : 28699740  Processing Disposition: Other  RCA Look-Up | | | |
| Case # : (b)(7)(E) | Case Category: [6B]  Docket: CHI - FGT N 315-377 | (b)(7)(E) | |
| Final Order of Removal: No | Time in Custody: N/A | Special Class: | (b)(7)(E) |
| Final Order Date: N/A | Depart / Cleared Status: ACTIVE | Issued | |
| Proceed With Removal: N/A | | | |
| Days Final Order in Effect: N/A | | | |

**Current / Active Alerts**

## Nissan, Daniel 077 656 263

## Comments

FILTER BY COMMENT TYPE            SHOW / HIDE DELETED COMMENTS

☑ EARM                            ☑ Show Deleted Comments

☑ EADM

☑ ATD

FILTER BY ENTERED DATE

[-- All Dates -- ▾]

All of the following comments are related to Case #   (b)(7)(E)
Results: 15 total

| Date Entered | Entered By | Type | Comments |
|---|---|---|---|
| 08/14/2008 11:33 AM | (b)(6);(b)(7)(C) | EARM | Subj is a fugitive and unable to locate at this time. file forwarded to file room (b)(6);(b)(7)(C) |
| 08/09/2008 03:16 PM | EARM_MIG | EARM | (b)(6);(b)(7)(C) |
| 08/09/2008 03:16 PM | EARM_MIG | EARM | RDED 10/1/07 FOR DENIAL. NOTICE OF INTENT TO REVOKE PETITION SENT ON 04/07/07. HAS FINAL ORDER WILL PROCESS FOR B & B. |
| 08/09/2008 03:15 PM | EARM_MIG | EARM | 3/4/08 I-205/294 PREPARED EXPRIRED PP, IN FILE. <CA> 5/1/08, 7TH CIRCUIT DENIED APPEAL ON 8/9/07 AND LETTER FORWA (b)(6);(b)(7)(C) |
| 08/09/2008 03:15 PM | EARM_MIG | EARM | 11/06/07; FILE REQ AGAIN FROM TA.___  12/11/07; FILE REQ FROM TA. |
| 08/09/2008 03:13 PM | EARM_MIG | EARM | 07/25/07; FILE REQ FROM TA, APPEAL WAS DISMISSED IN 2005, WAITING FOR DECISION FROM TA AS TO MTR. |
| 08/09/2008 03:13 PM | EARM_MIG | EARM | ER.SUBMITTED ON 05/12/06, FILE TO CHI/RAI. CRO. 05/10/2007...REQ FILE FROM DC/TA. (b)(6);(b)(7)(C) |
| 08/09/2008 03:10 PM | EARM_MIG | EARM | 05/05/2006...FILE SENT TO T/A FOR MTR. GB 05/25/2006...DHS' RESPONSE TO RESPONDENT'S MOTION TO RECONSID |
| 08/09/2008 03:09 PM | EARM_MIG | EARM | 3/10/06: MTR PENDING W/BIA |
| 08/09/2008 02:59 PM | EARM_MIG | EARM | 03/07/2006...BIA DISMISSED APPEAL. FILE TO MN/DOCK F/REVIEW ACTION. (b)(6);(b)(7)(C) |
| 08/09/2008 02:58 PM | EARM_MIG | EARM | 04/25/2005...CAT 2A RVW, REQ FILE. CRO. 06/21/2005...CAT 2A RVW, APPEAL PENDING. (b)(6);(b)(7)(C) |
| 08/09/2008 02:38 PM | EARM_MIG | EARM | (b)(6);(b)(7)(C) 09/21/2004...CAT 2A RVW, APPEAL PENDING. (b)(6);(b)(7)(C) |
| 08/09/2008 02:36 PM | EARM_MIG | EARM | 1/9/04..PER EOIR NEXT HRG 7/22/04.LD 08/23/2004...CAT 2A RVW. FILE IN USE AT DC/TA, EXTENDED (b)(6);(b)(7)(C) |
| 08/09/2008 02:24 PM | EARM_MIG | EARM | FILE LOCATION: (b)(6);(b)(7)(C) |
| 08/09/2008 01:52 PM | EARM_MIG | EARM | SUBJ WAS ENCOUNTERED AT CHI DISTRICT OFFICE. SUBJ IS AN OVERSTAY. 01/02/2003, FILE TO TA FOR HRNG TBS (b)(6);(b)(7)(C) |

**Comment Type Legend**
EARM: Case comments entered in the EARM system.
EADM: Detention comments entered in the EADM system.
ATD: Alternatives to Detention comments entered in the EARM system.

```
      13:05            TECS II - PERSON SUBJECT DISPLAY (1 OF 4)      101310           (b)(7)(E)
PFdd        (b)(7)(E)    017 from USCIS' EDMS  Alien File No. 077656263 Document 0186 of 0        Page 9
TECS RECORD I           (b)(7)(E)                          ENTRY 101310 UPDATE 101310
NAME- LAST NISSAN                                    PHYSICAL IDENTIFIERS
FIRST DANIEL        MID              HISPANIC  X  RACE   SEX M HAIR       EYES
      IMAGE        ALIAS   NICKNAME    STC       HT 000      WT 000      ENGLSH
PERSONAL-                                         S/M/T                  MORE
              OB- CNTRY SY ST   CITY                      CTZN SY MORE
   SSN         MORE  AFN 077656263 MORE    RES      EXC/SITE ABS  CHI   MORE
   PPN              TYPE  CNTRY    ISSDT           EXPDT                MORE
ADDRESS- DATE        STREET                                APT
CITY                           STATE   CNTRY   ZIP        TYPE         MORE
CONTACT- ICE HQ FUGOPS                       PHONE 202353   (b)(6);(b)(7)(C)   MORE
OWNER        (b)(6);(b)(7)(C)                CASE NBR                  MORE
```

| (b)(7)(E);(b)(3);49 U.S.C. § 114(r) |
|---|

```
REMARKS-  DATE 101310                                      MORE M
```

| (b)(7)(E) |
|---|

| (b)(7)(E) |
|---|

Syrian

x ⊬

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0193 of 0215    Page 1    of 4

U.S. Department of Homeland Security
Immigration & Customs Enforcement

**Warrant of Removal/Deportation**

File No:  A77 656 263

Date:  March 4, 2008

# To any officer of the United States Immigration and Naturalization Service:

NISSAN, Danial
(Full name of alien)

who entered the United States at   Newark, NY          on   01/19/2002
                                        (Place of entry)                (Date of entry)

is subject to removal/deportation from the United States, based upon a final order by:

☐ an immigration judge in exclusion, deportation, or removal proceedings
☐ a district director or a district director's designated official
☒ the Board of Immigration Appeals
☐ a United States District or Magistrate Court Judge

and pursuant to the following provisions of the Immigration and Nationality Act:

Section 237 (a) (1) (B) of the Immigration and Nationality Act...

I, the undersigned officer of the United States, by virtue of the power and authority vested in the Attorney General under the laws of the United States and by his or her direction, command you to take into custody and remove from the United States the above-named alien, pursuant to law, at the expense of: **the appropriation, "Salaries and Expenses of the Department of Homeland Security, Immigration and Customs Enforcement, FY 2008."**

(b)(6);(b)(7)(C)

(b)(6);(b)(7)(C)    Acting Field Operations Director/ICE
                         (Title of INS official)

March 4, 2008, Chicago, IL
(Date and office location)

Form I-205 (Rev. 4-1-97) N

To be completed by Service officer executing the warrant:

Name of alien being removed:

| (b)(6);(b)(7)(C) |
|---|

Port, date, and manner of removal: _____

<br>

Photograph of alien
removed

Right index fingerprint
of alien removed

_____
(Signature of alien being fingerprinted)

_____
(Signature and title of INS official taking print)

<br><br>

Departure witnessed by: _____
(Signature and title of INS official)

<br><br>

If actual departure is not witnessed, fully identify source or means of verification of departure:

_____
_____
_____
_____

If self-removal (self-deportation), pursuant to 8 CFR 241.7, check here. ☐

<br><br>

Departure Verified by: _____
(Signature and title of INS official)

<br><br>

Form I-205 R (4-1-97) N

U.S. Department of Homeland Security
Immigration & Customs Enforcement

# Warrant of Removal/Deportation

File No: _A77 656 263_

Date: _March 4, 2008_

### To any officer of the United States Immigration and Naturalization Service:

_NISSAN, Danial_
(Full name of alien)

who entered the United States at _Newark, NY_ on _01/19/2002_
(Place of entry)                              (Date of entry)

is subject to removal/deportation from the United States, based upon a final order by:

☐ an immigration judge in exclusion, deportation, or removal proceedings
☐ a district director or a district director's designated official
☒ the Board of Immigration Appeals
☐ a United States District or Magistrate Court Judge

and pursuant to the following provisions of the Immigration and Nationality Act:

Section 237 (a) (1) (B) of the Immigration and Nationality Act...

I, the undersigned officer of the United States, by virtue of the power and authority vested in the Attorney General under the laws of the United States and by his or her direction, command you to take into custody and remove from the United States the above-named alien, pursuant to law, at the expense of: **the appropriation, "Salaries and Expenses of the Department of Homeland Security, Immigration and Customs Enforcement, FY 2008."**

<br>

(Signature of INS official)

(b)(6);(b)(7)(C)    , Acting Field Operations Director/ICE
(Title of INS official)

March 4, 2008, Chicago, IL
(Date and office location)

Form I-205 (Rev. 4-1-97) N

To be completed by Service officer executing the warrant:

Name of alien being removed:

| | |
|---|---|
| | (b)(6);(b)(7)(C) |

Port, date, and manner of removal: _____

Photograph of alien
removed

Right index fingerprint
of alien removed

_____
(Signature of alien being fingerprinted)

_____
(Signature and title of INS official taking print)

Departure witnessed by: _____
(Signature and title of INS official)

If actual departure is not witnessed, fully identify source or means of verification of departure:

_____

_____

_____

If self-removal (self-deportation), pursuant to 8 CFR 241.7, check here. ☐

Departure Verified by: _____
(Signature and title of INS official)

Form I-205 R (4-1-97) N

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0195 of 0215, Page 1 of 11

# DEPORTATION CASE CHECK SHEET

ALIEN: *Missan, Damac*

ADDRESS: *3123 W Lawrence, Ch601C 606yo*

ATTORNEY OR REPRESENTATIVE:

ADDRESS:

| ACTIONS TO BE COMPLETED | Completed (Date) | Initials | ACTIONS TO BE COMPLETED | Completed (Date) | Initials |
|---|---|---|---|---|---|
| I-94 | | | 252(b) CASES | | |
| M-125 Docket Control Tape | | | I-99 Notice of Revocation & Penalty | | |
| I-210 Voluntary Departure Notice | | | I-259 Notice to Detain and Deport | | |
| I-205 Warrant of Deportation | 3/19/08 | | ARRANGING TRANSPORTATION | | |
| I-229 Warning of Six-month Limit 242(e) | | | I-288 Notice to Transportation Line | | |
| I-217 Information-Travel | | (b)(6);(b)(7)(C) | I-380 Record of Billable Expense | | |
| I-141 Medical Certificate | | | I-340 Demand for Surrender Under Bond | | |
| I-294 Notice of Dep'n Destination and Penalty for Reentry | 3/19/06 | | I-166 Notice to Surrender for Deportation | | |
| I-323 Bond Breach | | | G-391 Detail of Det. Off. | | |
| I-241 T.D. Request Country | | | I-216 Record of Person & Property Transferred | | |
| Designated by Alien T.D. (C-N) Request Country of Nationality | | | I-64 Document Envelope | | |
| Passport Noted - O.I. 242.10(g) | | | | | |
| DETAINED CASES | | | CLOSING ACTIONS | | |
| I-256 Notice of Detention or Release Conditions | | | I-157 Notice of Deportation | | |
| I-200 Warrant for Arrest of Alien | | | G-189 | | |
| I-203 Order to Detain or Release Alien | | | G-143 Lookout Notice Worksheet | | |
| G-589 Property Receipt | | | Disposition Notice - FBI | | |
| G-590 Property Envelope | | | Disposition Notice - RCMP | | |
| I-43 Statement of Detained Alien | | | Deportation Expense Billed | | |
| I-294 Notice re: Detention and Baggage & Personal Effects | | | I-94 Stamped and | | |
| I-247 Notice of Detainer | | | "Closed" Tape Placed on File | | |
| | | | I-154 Closed | | |
| | | | Disposition Information furnished the following: | | |

Alien (is)(is not) detained and is ready for deportation to _____ at the expense of

_____ . Alien's condition is: Able____ Mental____ CINS____ Physically Incap.____

_____     _____
Date     Deportation Officer

REMARKS:

Form I-170

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0195 of 0215,    Page 2    of 11

| 1. ALIEN'S NAME | | OFFICE | FILE NUMBER |
|---|---|---|---|
| 2. COUNTRY DESIGNATED BY ALIEN | DATE APPLIED FOR | DENIED<br>____CONSUL<br>____EMBASSY<br>____HOME AUTHORITIES | DATE |
| 3. COUNTRY OF WHICH A CITIZEN | DATE APPLIED FOR | DENIED<br>____CONSUL<br>____EMBASSY<br>____HOME AUTHORITIES | DATE |
| 4. COUNTRY OF WHICH A NATIONAL OR SUBJECT | DATE APPLIED FOR | DENIED<br>____CONSUL<br>____EMBASSY<br>____HOME AUTHORITIES | DATE |
| 5. COUNTRY OF WHICH LAST A RESIDENT BEFORE ENTERING THE U.S. | DATE APPLIED FOR | DENIED<br>____CONSUL<br>____EMBASSY<br>____HOME AUTHORITIES | DATE |
| 6. COUNTRY FROM WHICH ALIEN LAST ENTERED U.S. | | DATE APPLIED FOR | DATE DENIED |
| 7. COUNTRY OF FOREIGN PORT FROM WHICH EMBARKED FOR U.S. OR FOREIGN CONTIGUOUS TERRITORY | | DATE APPLIED FOR | DATE DENIED |
| 8. COUNTRY WHERE BORN | | DATE APPLIED FOR | DATE DENIED |
| 9. COUNTRY WHERE PLACE OF BIRTH NOW SITUATED | | DATE APPLIED FOR | DATE DENIED |
| 10. COUNTRY WHERE ALIEN RESIDED PRIOR TO ENTEERING COUNTRY FROM WHICH HE ENTERED THE U.S. | | DATE APPLIED FOR | DATE DENIED |
| 11. COUNTRY WHICH HAD SOVEREIGNTY OVER BIRTHPLACE AT TIME OF BIRTH | | DATE APPLIED FOR | DATE DENIED |
| 12. OTHER COUNTRY APPLIED TO | | DATE APPLIED FOR | DATE DENIED |
| 13. OTHER COUNTRY APPLIED TO | | DATE APPLIED FOR | DATE DENIED |
| 14. STATE DEPARTMENT REQUESTED ON: | | RESULTS | |
| 15. ASSISTANCE OF SERVICE OFFICER ABROAD - REQUESTED<br>OFFICE:     DATE: | | RESULTS | |
| 16. TO REGIONAL COMMISSIONER REGARDING 243(g) ACTION<br>COUNTRY:     DATE: | | RESULTS | |
| REASONS FOR NOT APPLYING ELSEWHERE | | | |
| FINAL DETERMINATION MADE THAT, UNDER EXISTING CONDITIONS A TRAVEL DOCUMENT TO EFFECT DEPORTATION IS NOT AVAILABLE | SIGNATURE | TITLE | DATE |

### RECORD OF MEASURES TAKEN TO OBTAIN TRAVEL DOCUMENT FOR DEPORTATION

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0195 of 0215,    Page 2    of 11



# Sworn Statement

I, Danial Nissan, declare under penalty of perjury as follows:

1. My name is Danial Nissan. I am a native of Syria and have lived in the United States for more than twenty years during which time the Department of Homeland Security (DHS) has never before required me to depart the United States. I make this declaration from my own personal knowledge and lived experience.

2. I live in constant fear of being arrested, removed, and permanently separated from my wife, Sadeta. The thought of being taken from her causes me overwhelming dread. Even more than fearing for myself, I fear what would happen to her if we were forced apart.

3. The uncertainty of my life has caused deep emotional suffering. There are moments when I feel so overwhelmed by fear and despair that I question whether I could endure life without her or endure life if something were to happen to her. These are not casual thoughts – they come from a place of unbearable psychological pressure that I live with every moment of every day.

4. I have never harmed anyone and I have never lived with criminal intent. I have tried to live my life with honesty and dignity. Despite that, I feel I have spent years being treated as invisible and disposable, denied even the basic human right to live without fear for my liberty being taken from me in the blink of an eye by DHS.

5. I left Syria when I was young. I did not experience adulthood there. I became the person I am in the United States. I built my history here, my marriage here, my friendships here, my work life here. My identity is inextricably tied to this country.

6. Being forced to leave would feel like a living death to me. It would feel like being erased, cut off from everything I know and everything that makes me human.

7. I have been exploited by employers, overworked, mistreated, and taken advantage of because of my status, yet I never gave up. I never stopped working. I never stopped trying to be a good and useful person.

8. I work long hours, I pay taxes, and I contribute to my community. I have always tried to live as someone who belongs here, and someone who respects this country and its laws.

9. The idea that I could lose my job, my home, and my wife because of government inaction feels like being locked in a dark room with no door. It feels hopeless and crushing.

10. I also carry deep grief from losing my father 2023 – he and my family were refugees in Australia but I was never able to travel to see them.

11. When I left Syria in 2002, I never imagined I would lose him without being able to see him again. Because of my immigration situation, I was unable to return to see him or say goodbye. That loss still lives with me. It made my fear of separation permanent and shaped the way I experience the possibility of losing my wife. I live every day with the weight of knowing what it means to lose someone you love without closure.

12. Friends and family live in fear of losing me. I see anxiety and sadness in their faces. That pain adds to my own.

13. This prolonged uncertainty has caused:
    - Sleep disruption
    - Panic
    - Intrusive thoughts
    - Loss of joy
    - Constant dread
    - Feelings of worthlessness

12. I still force myself to work and function every day because I love my wife and because I refuse to let this destroy us, but every day feels like living under a shadow. I am hopeful to be able to see some light, some day.

13. I am not writing this for sympathy. I am writing it because the harm is real, continuous, and life-altering.

I declare under penalty of perjury that the foregoing is true and correct.

Further, affiant sayeth not.

Danial Nissan

Date: 11-21-2025



Rev. 09/17/2015

**Blood Type**
**RH Factor**

**Medical
Information/
Living Will
Seal Area**

ilsos.gov

Class:Single Veh GVWR 16000 or Less Except Cycles
Endorsements:NONE
Restrictions:B -Corrective Lenses

VERIFY PRESENCE OF PAPER WATERMARK    HOLD TO LIGHT TO VIEW

3525 18503350 1 667

# I.

# COUNTY OF COOK
## STATE OF ILLINOIS
## OFFICE OF THE COUNTY CLERK
## DAVID ORR

### CERTIFICATION OF MARRIAGE

LICENSE NUMBER: 0534071-0

**B E T W E E N**

GROOM'S NAME: DANIAL          NISSAN
      AGE: 24

**A N D**

BRIDE'S NAME: SADETA        KALAMPEROVIC
      AGE: 42

**O N**

DATE OF MARRIAGE: DECEMBER 05, 2005

WERE UNITED IN MARRIAGE IN THE COUNTY OF COOK, AND STATE OF ILLINOIS

**I N A**
CIVIL      **CEREMONY**
**B Y**

NAME: LAWRENCE J. DUNFORD
OFFICIATE TITLE: JUDGE

**A T**

PLACE OF MARRIAGE: CHICAGO, ILLINOIS

DATE RECORDED: DECEMBER 05, 2005
APPLICATION DATE: NOVEMBER 28, 2005

0981701

This is to certify that this is a true and correct abstract from the official record filed with the office of the Cook County Clerk.



**DAVID D. ORR**
**COUNTY CLERK**

ISSUED AT: COUNTY BUILDING
CHICAGO, ILLINOIS 60602-1304
12/05/2005     16:47

This copy is not valid unless displaying embossed seals of Cook County and County Clerk signature    CL81

VOID WITHOUT WATERMARK OR IF ALTERED OR ERASED





Endorsements Mentions Spéciales Anotaciones
If your passport expires within six months of your date of departure, you may be denied entry into some countries



SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

PASSPORT
PASSEPORT  PASAPORTE

THE UNITED STATES OF AMERICA

| Type/Type/Tipo | Code/Code/Código | Passport No /No du Passeport/No de Pasaporte |
|---|---|---|
| P | USA | A10969977 |

Surname/Nom Apellidos
KALAMPEROVIC
Given names/Prenoms/Nombres
SADETA
Nationality/Nationalité/Nacional
UNITED STATES OF AMERICA

F

Place of birth/Lieu de naissance/Lugar
MONTENEGRO
Date of issue/Date de déliv
28 SEP 2022
Date of expiration/Date d expiration/Fecha de cad
27 SEP 2032
Authority/Autorité Autoridad
UNITED STATES DEPARTMENT OF STATE

P<USAKALAMPEROVIC<<SADETA<<<<<<<<<<<<<<<<<<<<<<
A109699774USA6303301F3209273426143742<012002

ILLINOIS

USA

Jesse White • Secretary of State

DRIVER'S LICENSE

Federal Limits Apply

4d LIC NO **K451-7806-3692**

3

4b EXP: **03/30/2026**                    1 ISS **04/21/2022**

1 **KALAMPEROVIC**
2 **SADETA**
8 **1919 E HOPI LN**
**MOUNT PROSPECT, IL 60056**

9 CLASS: D          9a END: **NONE**

12 REST: **NONE**

15 SEX: **F**     16 HGT: **5'-06"**
17 WGT: **215 lbs**  18 EYES: **BRN**

5 DD **20220421309NL0707**          TYPE: **ORG**

We the People

Of the United States,
in Order to form a more perfect Union,
establish Justice, insure domestic Tranquility,
provide for the common defence,
promote the general Welfare, and secure
the Blessings of Liberty to ourselves and
our Posterity, do ordain and establish this
Constitution for the United States.

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

| PASSPORT | UNITED STATES OF AMERICA |
| PASSEPORT | |
| PASAPORTE | |

Type / Type / Tipo    Code / Code / Codigo    Passport No / No du Passeport / No de Pasaporte
P     USA            481751611

Surname / Nom / Apellidos
**KALAMPEROVIC**

Given Names / Prénoms / Nombres
**SADETA**

Nationality / Nationalité / Nacionalidad
**UNITED STATES OF AMERICA**

Date of birth / Date de naissance / Fecha de nacimiento

Place of birth / Lieu de naissance / Lugar de nacimiento
**MONTENEGRO**

Sex / Sexe / Sexo
**F**

Date of issue / Date de délivrance / Fecha de expedición
**23 Aug 2011**

Authority / Autorité / Autoridad
**United States
Department of State**

Date of expiration / Date d'expiration / Fecha de caducidad
**22 Aug 2021**

Endorsements / Mentions Spéciales / Anotaciones
**SEE PAGE 27**

```
P<USAKALAMPEROVIC<<SADETA<<<<<<<<<<<<<<<<<<<<<
4817516114USA6303301F2108221244043885<416470
```



Department of Homeland Security
U.S. Citizenship and Immigration Services

**I-797, Notice of Action**

## THE UNITED STATES OF AMERICA

| | | |
|---|---|---|
| WAC-06-072-52595 | I130   IMMIGRANT PETITION FOR RELATIVE, FIANCE(E), OR ORPHAN | |
| **RECEIPT DATE** January 5, 2006 | **PRIORITY DATE** December 22, 2005 | **PETITIONER** A018 713 522 KALAMPEROVIC, SADETA |
| **NOTICE DATE** March 28, 2006 | **PAGE** 1 of 1 | **BENEFICIARY** A077 656 263 NISSAN, DANIAL |

| | |
|---|---|
| MARK J. THOMAS<br>MARK JACOB THOMAS<br>RE: SADETA KALAMPEROVIC<br>11 S LASALLE ST 2800<br>CHICAGO IL 60603 | **Notice Type:** Approval Notice<br>Section: Husband or wife of permanent<br>resident, 203(a)(2)(A) INA |

The above petition has been approved. We have sent the original visa petition to the Department of State National Visa Center (NVC), 32 Rochester Avenue, Portsmouth, NH 03801-2909. NVC processes all approved immigrant visa petitions that need consular action. It also determines which consular post is the appropriate consulate to complete visa processing. NVC will then forward the approved petition to that consulate.

The NVC will contact the person for whom you are petitioning (beneficiary) concerning further immigrant visa processing steps.

If you have any questions about visa issuance, please contact the NVC directly. However, please allow at least 90 days before calling the NVC if your beneficiary has not received correspondence from the NVC. The telephone number of the NVC is (603) 334-0700.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

APR 24 2006

BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
Customer Service Telephone: (800) 375-5283



Form I-797 (Rev. 01/31/05) N

000024

An official website of the United States government    Here's how you know

Español    🌐 Multilingual Resources



MENU

# Case Status Online

## Case Was Approved

On March 28, 2006, we approved your Form I-130, Petition for Alien Relative, Receipt Number WAC0607252595. We sent you an approval notice. Please follow the instructions in the notice. If you do not receive your approval notice by April 12, 2006, please go to www.uscis.gov/e-request. If you move, go to www.uscis.gov/addresschange to give us your new mailing address.

Enter Another Receipt Number ⓘ

```
EAC1234567890
```

Check Status

Already have an Account? Login

Create an Account? Sign up

DHS PRIVACY NOTICE PAPERWORK REDUCTION ACT

## Related Tools

### Change of Address

Produced 06/22/2017 from USCIS; EDMS Alien File No. 077656263 Document 21 of 215

Department of Homeland Security
U.S. Citizenship and Immigration Service

I-797C, Notice of Action

# THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | CASE TYPE I130 IMMIGRANT PETITION FOR RELATIVE, |
| WAC-08-088-16139 | FIANCE(E), OR ORPHAN |
| RECEIPT DATE | PRIORITY DATE | PETITIONER (b)(6) |
| December 31, 2007 | December 23, 2007 | KALAMPEROVIC, SADETA |
| NOTICE DATE | PAGE | BENEFICIARY A077 656 263 |
| May 23, 2008 | 1 of 1 | NISSAN, DANIAL |

SADETA KALAMPEROVIC
2327 W FARWELL APT 1S
CHICAGO IL 60645

Notice Type: Approval Notice
Section: Husband or wife of U.S.
Citizen, 201(b) INA

Courtesy Copy: Original sent to: THOMAS, MARK JACOB

This courtesy notice is to advise you of action taken on this case. The official notice has been mailed to the attorney or representative indicated above. Any relevant documentation included in the notice was also mailed as part of the official notice.

The above petition has been approved. We have sent the original visa petition to the Department of State National Visa Center (NVC), 32 Rochester Avenue, Portsmouth, NH 03801-2909. NVC processes all approved immigrant visa petitions that need consular action. It also determines which consular post is the appropriate consulate to complete visa processing. NVC will then forward the approved petition to that consulate.

The NVC will contact the person for whom you are petitioning(beneficiary) concerning further immigrant visa processing steps.

If you have any questions about visa issuance, please contact the NVC directly. However, please allow at least 90 days before calling the NVC if your beneficiary has not received correspondence from the NVC. The telephone number of the NVC is (603) 334-0700.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

This courtesy copy may not be used in lieu of official notification to demonstrate the filing or processing action taken on this case.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
Customer Service Telephone: (800) 375-5283



An official website of the United States government    Here's how you know

Español    ⊕ Multilingual Resources



U.S. Citizenship
and Immigration
Services

# Case Status Online

## Case Was Approved

On May 23, 2008, we approved your Form I-130, Petition for Alien Relative, Receipt Number WAC0808816139. We sent you an approval notice. Please follow the instructions in the notice. If you do not receive your approval notice by June 7, 2008, please go to www.uscis.gov/e-request. If you move, go to www.uscis.gov/addresschange to give us your new mailing address.

Enter Another Receipt Number ❓

**Error: Please enter an application receipt number.**

> EAC1234567890

Check Status

Already have an Account? Login

Create an Account? Sign up

DHS PRIVACY NOTICE PAPERWORK REDUCTION ACT

# Related Tools

## Change of Address

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**I-797, Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I130 PETITION FOR ALIEN RELATIVE |
|---|---|---|
| LIN-14-902-49852 | | |

| RECEIPT DATE | PRIORITY DATE | PETITIONER A046 093 098 |
|---|---|---|
| January 16, 2014 | January 15, 2014 | KALAMPEROVIC, SADETA |

| NOTICE DATE | PAGE | BENEFICIARY A077 656 263 |
|---|---|---|
| August 6, 2014 | 1 of 1 | NISSAN, DANIAL J. |

| MARK STANLEY KOCOL | Notice Type: Approval Notice |
|---|---|
| MARK S KOCOL PC | Section: Husband or wife of U.S. Citizen, |
| 330 SOUTH WELLS FL 618 D | 201(b) INA |
| CHICAGO IL 60606 | |

The above petition has been approved. The petition indicates that the person for whom you are petitioning is in the United States and will apply for adjustment of status. The evidence indicates that he or she is not eligible to file an adjustment of status application. This determination is based on the information submitted with the petition and any relating files. If the person for whom you are petitioning believes that he or she is eligible for adjustment of status, then he or she should contact the local USCIS office for more information.

Because the person for whom you are petitioning is not eligible to adjust, we have sent the approved petition to the **Department of State National Visa Center (NVC), 32 Rochester Avenue, Portsmouth, NH 03801-2909.** NVC processes all approved immigrant visa which consular post is the appropriate consulate to complete visa processing. NVC will then forward the approved petition to that consulate.

This completes all USCIS action on this petition. You should allow a minimum of 30 days for Department of State processing before contacting the NVC. If you have not received any correspondence from the NVC within 30 days, you may contact the NVC by e-mail at NVCINQUIRY@state.gov. You will need to enter the USCIS receipt number from this approval notice in the subject line. In order to receive information about your petition, you will need to include the Petitioner's name and date of birth, and the Applicant's name and date of birth, in the body of the e-mail.

The NVC will communicate with the person for whom you are petitioning concerning further immigrant visa processing steps.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
NEBRASKA SERVICE CENTER
U. S. CITIZENSHIP & IMMIG SERVICE
P.O. BOX 82521
LINCOLN   NE  68501-2521
**Customer Service Telephone: 800-375-5283**



Form I-797 (Rev. 01/31/05) N

🇺🇸 An official website of the United States government


U.S. Citizenship
and Immigration
Services

Español  ⊕ Multilingual Resources

# Case Status Online

## Case Was Sent To The Department of State

On August 18, 2014, we sent your case, Receipt Number LIN1490249852, to the Department of State for visa processing. You can find general information on Consular Processing by visiting our website at www.uscis.gov . The website will provide information on what to do next, who to contact, and how to inform us of any changes in your situation or address.

Enter Another Receipt Number ⓘ
**Error: Please enter an application receipt number.**

> EAC1234567890

Check Status

Already have an Account? Login

Create an Account? Sign up

DHS PRIVACY NOTICE PAPERWORK REDUCTION ACT

# Related Tools

## Change of Address

# THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| Receipt Number MSC1990517554 | | Case Type I130 - PETITION FOR ALIEN RELATIVE |
|---|---|---|
| Received Date 01/22/2019 | Priority Date 12/23/2007 | Petitioner A018 713 522 KALAMPEROVIC, SADETA |
| Notice Date 09/26/2019 | Page 1 of 1 | Beneficiary A077 656 263 NISSAN, DANIAL J |

SADETA KALAMPEROVIC
c/o MARK STANLEY KOCOL
3011 WEST 183RD STREET STE 134
HOMEWOOD IL 60430

**Notice Type:** Approval Notice
Section: Husband or wife of U.S. Citizen,
201(b) INA

We have mailed an official notice about this case (and any relevant documentation) according to the mailing preferences you chose on Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. **This is a courtesy copy, not the official notice.**

**What the Official Notice Said**

The above petition has been approved. The beneficiary of this petition will be notified separately when a decision is reached on his or her pending adjustment of status application.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

National Benefits Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 648003
Lee's Summit MO 64002
**USCIS Contact Center: www.uscis.gov/contactcenter**



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Form I-797C  04/01/19

 An official website of the United States government    Here's how you know     Español   🌐 Multilingual Resources


**U.S. Citizenship and Immigration Services**

MENU

# Case Status Online

## Interview Was Completed And My Case Must Be Reviewed

Your interview for your Form I-130, Petition for Alien Relative, Receipt Number MSC1990517554, was completed, and your case must be reviewed. We will mail you a notice if we make a decision or take further action. If you move, go to www.uscis.gov/addresschange to give us your new mailing address.

Enter Another Receipt Number  ❓

    EAC1234567890

    Check Status

Already have an Account? Login

Create an Account? Sign up

DHS PRIVACY NOTICEPAPERWORK REDUCTION ACT

# Related Tools

## Change of Address



adopt and implement a security program.

**DATES:** Send your comments by April 30, 2012. A comment to OMB is most effective if OMB receives it within 30 days of publication.

**ADDRESSES:** Interested persons are invited to submit written comments on the proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to Desk Officer, Department of Homeland Security/TSA, and sent via electronic mail to *oira_submission@omb.eop.gov* or faxed to (202) 395–6974.

**FOR FURTHER INFORMATION CONTACT:** Joanna Johnson, Office of Information Technology, TSA–11, Transportation Security Administration, 601 South 12th Street, Arlington, VA 20598–0011; telephone (571) 227–3616; email *joanna.johnson@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## Comments Invited

In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The ICR documentation is available at *www.reginfo.gov.* Therefore, in preparation for OMB review and approval of the following information collection, TSA is soliciting comments to—

(1) Evaluate whether the proposed information requirement is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including using appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

## Information Collection Requirement

*Title:* Aircraft Operator Security.
*Type of Request:* Extension of a currently approved collection.
*OMB Control Number:* 1652–0003.
*Forms(s):* N/A.
*Affected Public:* Aircraft Operators.
*Abstract:* 49 CFR part 1544 requires aircraft operators to maintain, update, and comply with TSA-approved comprehensive security programs to ensure the safety of persons and

property traveling on their flights against acts of criminal violence and air piracy, and the introduction of explosives, incendiaries, or weapons aboard an aircraft. These programs and related records are subject to TSA inspection.

*Number of Respondents:* 801.
*Estimated Annual Burden Hours:* An estimated 1,918,371 hours annually.

Issued in Arlington, Virginia, March 27, 2012.

**Joanna Johnson,**
*Paperwork Reduction Act Officer, Office of Information Technology.*

[FR Doc. 2012–7671 Filed 3–28–12; 8:45 am]

**BILLING CODE 9110–05–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2522–12; DHS Docket No. USCIS 2012–0007]

**RIN 1615–ZB12**

## Designation of Syrian Arab Republic for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has designated the Syrian Arab Republic (Syria) for Temporary Protected Status (TPS) for a period of 18 months, effective March 29, 2012 through September 30, 2013. Under section 244(b)(1) of the Immigration and Nationality Act (Act), 8 U.S.C. 1254a(b)(1), the Secretary is authorized to grant TPS to eligible nationals of designated foreign states or parts of such states (or to eligible aliens having no nationality who last habitually resided in such states) upon finding that such states are experiencing an ongoing armed conflict, an environmental disaster, or extraordinary and temporary conditions that prevent nationals from returning in safety.

This designation allows eligible Syrian nationals (and aliens having no nationality who last habitually resided in Syria) who have both continuously resided in and been continuously physically present in the United States since March 29, 2012 to be granted TPS. This notice also describes the other eligibility criteria applicants must meet.

Individuals who believe they may qualify for TPS under this designation

may apply within the 180-day registration period that begins on March 29, 2012. They may also apply for Employment Authorization Documents (EADs) and for travel authorization. In this notice, DHS also sets forth the procedures for nationals of Syria (or aliens having no nationality who last habitually resided in Syria) to apply for TPS and EADs with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** This designation of Syria for TPS is effective on March 29, 2012 and will remain in effect through September 30, 2013. The 180-day registration period for eligible individuals to submit TPS applications begins March 29, 2012, and will remain in effect through September 30, 2013.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this designation of Syria for TPS by selecting "TPS Designated Country—Syria" from the menu on the left of the TPS Web page.

• You can also contact the TPS Operations Program Manager at Status and Family Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 1–800–375–5283 (TTY 1–800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Abbreviations and Terms Used in This Document

Act—Immigration and Nationality Act
BIA—Board of Immigration Appeals
COI—Independent International Commission of Inquiry, established pursuant to United Nations (UN) Human Rights Council resolution S–17/1 to investigate all alleged violations of international human rights law since March 2011 in the Syrian Arab Republic
COI Report—"*Report of the Independent International Commission of Inquiry on the Syrian Arab Republic,*" dated 22 February 2012, UN Doc. A/HRC/19/69

DHS—U.S. Department of Homeland Security
DOJ—U.S. Department of Justice
DOS—U.S. Department of State
EAD—Employment Authorization Document
FSA—Free Syrian Army
Government—U.S. Government
HRC—United Nations Human Rights Council
IJ—Immigration Judge
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SARG—Syrian Arab Republic Government
SAVE—Systematic Alien Verification for Entitlements
Secretary—Secretary of Homeland Security
Syria—Syrian Arab Republic
TPS—Temporary Protected Status
UN—United Nations
UNHCR—Office of the United Nations High Commissioner for Refugees
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is an immigration status granted to eligible nationals of a country designated for TPS under the Act (or to persons without nationality who last habitually resided in the designated country).

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and obtain an EAD following a request and payment of the EAD fee, if required, so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not lead to permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS (unless that status has since expired or been terminated) or to any other lawfully obtained immigration status they received while registered for TPS.

• TPS applicants are subject to thorough background and security checks. Applicants who have committed a felony or two misdemeanors in the United States and applicants who are subject to certain other mandatory bars, including those who pose a threat to U.S. national security, are not eligible.

## What authority does the Secretary have to designate Syria for TPS?

Section 244(b)(1) of the Act, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1]

The Secretary can designate a foreign state for TPS based on one of three circumstances. One circumstance is if "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." Section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C).

Following the designation of a foreign state for TPS, the Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* section 244(a)(1)(A) of the Act, 8 U.S.C. 1254a(a)(1)(A). Applicants must demonstrate that they satisfy all eligibility criteria, including that they have been "continually physically present" in the United States since the effective date of the designation, which is either the date of the **Federal Register** notice announcing the designation or such later date as the Secretary may determine, and that they have "continuously resided" in the United States since such date as the Secretary may designate. *See* sections 244(a)(1)(A), (b)(2)(A), and (c)(1)(A)(i–ii) of the Act; 8 U.S.C. 1254a(a)(1)(A), (b)(2)(A), (c)(1)(A)(i–ii).

## Why is the Secretary designating Syria for TPS through September 30, 2013?

The Secretary has determined, after consultation with the Department of State (DOS) and other appropriate Government agencies, that there exist extraordinary and temporary conditions in Syria that prevent Syrian nationals from returning in safety, and that permitting such aliens to remain temporarily in the United States would not be contrary to the national interest of the United States.

Protest crowds began to gather in Damascus and Dar'a by mid to late March 2011, when citizens seeking greater political freedom rose up against the rule of President Bashar al-Assad. In response, President al-Assad used the military to suppress the movement, and the Syrian Arab Republic Government (SARG) launched a brutal crackdown, violently repressing and killing thousands of its own civilians. The SARG continues to use excessive force against civilians, arbitrary executions, killing and persecution of protestors and

members of the media, arbitrary detention, disappearances, torture, and ill-treatment in an effort to retain control of the country.

The Independent International Commission of Inquiry (COI), in its second report to the United Nations Human Rights Council (HRC) dated February 22, 2012 (A/HRC/19/69), reports that the SARG's initial violent suppression of dissent was followed by military defections and the formation of anti-government armed groups. The main armed opposition group is the Free Syrian Army (FSA). Other anti-government armed groups include the Higher Military Council and Al Faroukh Battalion, both of which are engaged in combat with the Syrian security forces in Homs. According to the COI report, while anti-government groups have also committed abuses, their actions are not comparable in scale or organization to those carried out by the Syrian state.

The COI report states that army snipers and Shabbiha (mercenaries hired by the SARG) have terrorized the population, targeting and killing small children, women, and other unarmed civilians. Military defectors report that soldiers continue to receive "shoot to kill" orders. Individual officers in the Syrian military have also shot unarmed protestors, including children, medical doctors, ambulance drivers, and mourners at funerals in Da'ra, Rif Dimashq, and Almastoumah governates.

Observers generally agree that the conflict has become increasingly violent and militarized. As of February 2012, the UN Under-Secretary-General for Political Affairs indicated that approximately 7,500 Syrians have been killed since the violence began, and new casualties are reported daily. The COI report pointed out that "casualties rose steeply as the violence intensified" in recent months. In fact, the UN's February 2012 death toll estimate of 7,500 exceeds its January 2012 estimate by 2,100 deaths. As of February 2012, public UN estimates indicated that between 100,000 and 200,000 Syrians are internally displaced, and as many as 500,000 citizens may be trapped in affected areas within Syria. According to the Office of the UN High Commissioner for Refugees (UNHCR), approximately 35,000 Syrians have sought shelter in the neighboring countries of Turkey, Lebanon, and Jordan.

The deteriorating security situation in Syria compelled the United States to suspend Embassy operations on February 6, 2012, and order the departure of all U.S. direct-hire personnel from the country. Several other diplomatic missions have also

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of

2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Act describing functions transferred from the Department of Justice to the DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying HSA, tit. XV, sec. 1517).

suspended operations due to security concerns. On April 25, 2011, DOS advised all United States citizens to avoid travel to Syria and urged United States citizens in Syria to depart immediately. DOS has reiterated the travel warning several times, most recently on March 6, 2012.

The international community has responded to the crisis in Syria by imposing economic sanctions. The regime's economic mismanagement and economic sanctions have negatively affected the whole of the Syrian economy. According to the COI report, the prices of basic food items have increased by as much as 37 percent, and the unemployment rate is in the range of 22 to 30 percent. The economy is estimated to have shrunk by 2 to 4 percent in 2011, and a higher drop is expected in 2012. Tourism, which accounted for 6 to 9 percent of Syria's gross domestic product, has collapsed.

Thousands of Syrians have been uprooted from their communities and sought shelter in Turkey, Lebanon, and Jordan. Many of those that remain in the country are trapped in danger zones and are experiencing the effects of the economic sanctions. As of June 2011, UNHCR reports an estimated 10,000 Syrians are displaced in Turkey. Approximately 15,000 Syrians are displaced in Lebanon. Although in January 2012 Jordan reported that it formally hosts 2,500 to 3,000 Syrians displaced by violence, UNHCR estimates approximately 10,000 displaced Syrians are in Jordan. In February 2012, Jordan government sources stated that approximately 73,000 Syrians have entered Jordan through border crossings.

Journalists and bloggers have been subject to harm, including arrest, prolonged detention, and death. Reports also indicate that medical doctors providing treatment to wounded members of the opposition have been arrested. The campaign group Avaaz, which has been monitoring attacks on medical workers, recorded more than 250 arrests between March and October 2011. This has led to the establishment of clandestine makeshift clinics in mosques and basements of homes. According to the UN General Assembly's *Conflict-related sexual violence: report of the Secretary-General,* published in January 2012, reports of conflict-related sexual violence from both Syrian security forces and anti-government armed groups also have surfaced.

International humanitarian organizations face significant obstacles to gaining access to Syrian cities such as Homs and Hama that are crippled by the brutality and violence. As a result, they cannot assure humanitarian assistance to citizens in need of emergency relief, including medical care, food, and other supplies.

Given extraordinary and temporary conditions on the ground in Syria, Syrian nationals in the United States would face serious danger and threats were they to return to Syria.

Based upon this review, and after consultation with appropriate Government agencies, the Secretary finds that:

• Syrian nationals cannot return to Syria in safety due to extraordinary and temporary conditions. *See* section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C);

• It is not contrary to the national interest of the United States to permit Syrian nationals (and persons without nationality who last habitually resided in Syria) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C);

• The designation of Syria for TPS should be for an 18-month period from March 29, 2012 through September 30, 2013. *See* section 244(b)(2) of the Act, 8 U.S.C. 1254a(b)(2);

• The date by which Syrian TPS applicants must demonstrate that they have continuously resided in the United States is established as March 29, 2012. *See* section 244(c)(1)(A)(ii) of the Act, 8 U.S.C. 1254a(c)(1)(A)(ii);

• The date by which Syrian TPS applicants must demonstrate that they have been continuously physically present in the United States is March 29, 2012, the effective date of this TPS designation of Syria. *See* sections 244(b)(2)(A) and (c)(1)(A)(i) of the Act; 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i); and

• An estimated 2,500 to 3,000 Syrian nationals (and persons without nationality who last habitually resided in Syria) may be eligible for TPS under this designation, based on the issuance of nonimmigrant visas to Syrian nationals.

**Notice of the Designation of Syria for TPS**

By the authority vested in me as Secretary under section 244 of the Act, 8 U.S.C. 1254a, after consultation with the appropriate Government agencies, I designate Syria for TPS under section 244(b)(1)(C) of the Act, 8 U.S.C. 1254a(b)(1)(C), for a period of 18 months from March 29, 2012 through September 30, 2013.

**Janet Napolitano,**
*Secretary.*

**Required Application Forms and Application Fees To Register for TPS**

To register for TPS for Syria, an applicant must submit:

1. Application for Temporary Protected Status (Form I–821) with the form fee; and

2. Application for Employment Authorization (Form I–765).

• If you want an EAD you must pay the Application for Employment Authorization (Form I–765) fee only if you are age 14 through 65.

• No Application for Employment Authorization (Form I–765) fee is required for an EAD with an initial TPS application if you are under the age of 14 or over the age of 65.

You must submit both completed application forms together. If you are unable to pay the required fees, you may apply for a waiver for these application fees and/or the biometrics services fee described below by completing a Request for Fee Waiver (Form I–912), or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for Application for Temporary Protected Status (Form I–821), Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Such applicants must submit a biometric services fee. As previously stated, if you are unable to pay the required fees, you may apply for a biometrics fee waiver by completing a Request for Fee Waiver (Form I–912), or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov/feewaiver.* If your biometrics are required, you will be mailed a notice scheduling you for an appointment at an Application Support Center to have your biometrics collected.

**Re-Filing a TPS Application After Receiving a Denial of a Fee Waiver Request**

If you request a fee waiver when filing your TPS and EAD application forms

and your request is denied, you may re-file your application packet with the correct fees before the filing deadline of September 30, 2013. If you attempt to submit your application with a fee waiver request before the initial filing deadline, but you receive your application back with the USCIS fee waiver denial, and there are fewer than 45 days before the filing deadline (or the deadline has passed), you may still re-file your application within the 45-day period after the date on the USCIS fee waiver denial notice. You must include the correct fees, or file a new fee waiver request. Your application will not be rejected even if the deadline has passed, provided it is mailed within those 45 days and all other required information for the application is included. Please be aware that if you re-file your TPS application with a new fee waiver request after the deadline based on this guidance and that new fee waiver request is denied, you cannot re-file again. **Note:** Alternatively, you may pay the TPS application fee and biometrics fee (if age 14 or older) but wait to request an EAD and pay the EAD application fee after USCIS grants your TPS application.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1:

### TABLE 1—MAILING ADDRESS

| If . . . | Mail to . . . |
| --- | --- |
| You are applying through the U.S. Postal Service ................................. | USCIS, P.O. Box 6943, Chicago, IL 60680–6943. |
| You are using a Non-U.S. Postal Service delivery service .................... | USCIS, Attn: Syria TPS, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, please mail your application to the address in Table 1. Upon receiving a Receipt Notice from USCIS, please send an email to *TPSijgrant.vsc@uscis.dhs.gov* with the receipt number stating that you submitted a request for an EAD based on an IJ/BIA grant of TPS. You can find detailed information on what further information you need to email, and email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

**E-Filing**

You cannot electronically file your application when applying for initial registration for TPS. Please mail your application to the mailing address listed in Table 1.

**Supporting Documents**

*What type of basic supporting documentation must I submit?*

To meet the basic eligibility requirements for TPS, you must submit evidence that you:
• Are a national of Syria or an alien of no nationality who last habitually resided in Syria. Such documents may include a copy of your passport if available, other documentation issued by the SARG showing your nationality (e.g., national identity card, official travel documentation issued by the SARG), and/or your birth certificate with English translation accompanied by photo identification. USCIS will also consider certain forms of secondary evidence supporting your Syrian nationality. If the evidence presented is insufficient for USCIS to make a determination as to your nationality, USCIS may request additional evidence. If you cannot provide a passport, birth certificate with photo identification, or a national identity document with your photo or fingerprint, you must submit an affidavit showing proof of your unsuccessful efforts to obtain such documents and affirming that you are a national of Syria. However, please be aware that an interview with an immigration officer will be required if you do not present any documentary proof of identity or nationality or if USCIS otherwise requests a personal appearance. *See* 8 CFR 103.2(b)(9), 244.9(a)(1);
• Have continually resided in the United States since March 29, 2012. *See* 8 CFR 244.9(a)(2);
• Have been continually physically present in the United States since March 29, 2012, the effective date of the designation of Syria. *See* sections 244(b)(2)(A) and (c)(1)(A)(i) of the Act; 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i); and
• Present two color passport-style photographs of yourself.

The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish basic eligibility for TPS. You may also see information on the acceptable documentation and other requirements for applying for TPS on the USCIS Web site at *www.uscis.gov/tps* under "TPS Designated Country—Syria."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I–821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants at local offices.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on page 5 of the Employment Eligibility Verification (Form I–9). Employers are required to verify the identity and employment authorization of all new employees by using the Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). An EAD is an acceptable document under "List A."

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Syrian citizenship?*

No. When completing the Employment Eligibility Verification (Form I–9), employers must accept any documentation that appears on the lists of acceptable documentation, and that reasonably appears to be genuine and that relates to you. Employers may not request documentation that does not

**19030** Federal Register / Vol. 77, No. 61 / Thursday, March 29, 2012 / Notices

appear on the Employment Eligibility Verification (Form I–9). Therefore, employers may not request proof of Syrian citizenship when completing the Employment Eligibility Verification (Form I–9). If presented with EADs that are unexpired on their face, employers should accept such EADs as valid "List A" documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the "Note to All Employees" section for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you because of your citizenship or immigration status, or national origin.

**Note to All Employers**

Employers are reminded that the laws requiring employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For questions, employers may call the USCIS Customer Assistance Office at 1–800–357–2099. The USCIS Customer Assistance Office accepts calls in English and Spanish only. Employers may also call the Department of Justice (DOJ), Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), Employer Hotline at 1–800–255–8155.

**Note to Employees**

Employees or applicants may call the DOJ OSC Worker Information Hotline at 1–800–255–7688 for information regarding employment discrimination based upon citizenship or immigration status and national origin, unfair documentary practices related to the Employment Eligibility Verification (Form I–9), and discriminatory practices related to E-Verify. Employers must accept any document or combination of documents acceptable for the Employment Eligibility Verification (Form I–9) completion if the documentation reasonably appears to be genuine and to relate to the employee. Employers may not require extra or additional documentation beyond what is required for the Employment Eligibility Verification (Form I–9) completion. Further, employees who receive an initial mismatch via E-Verify must be given an opportunity to challenge the mismatch, and employers are prohibited from taking adverse action against such employees based on

the initial mismatch unless and until E-Verify returns a final non-confirmation. The Hotline accepts calls in multiple languages. Additional information is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/.*

**Note Regarding Federal, State and Local Government Agencies (Such as Departments of Motor Vehicles)**

State and local government agencies are permitted to create their own guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. If you are applying for a state or local government benefit, you may need to provide the state or local government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your EAD that has a valid expiration date; and/or

(2) A copy of your Application for Temporary Protected Status Approval Notice (Form I–797), if you receive one from USCIS.

Check with the state or local agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this notice.

Some benefit-granting agencies use the Systematic Alien Verification for Entitlements (SAVE) Program to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response following completion of all required SAVE verification steps, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has completed all SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *www.uscis.gov/save,* then by choosing "How to Correct Your Records" from the menu on the right.

[FR Doc. 2012–7498 Filed 3–28–12; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

[CBP Dec. No. 12–06]

## Automated Commercial Environment Required for the Transmission of Advance Ocean and Rail Cargo Information

**AGENCY:** U.S. Customs and Border Protection, DHS.

**ACTION:** Notice.

**SUMMARY:** Various U.S. Customs and Border Protection (CBP) regulations require the transmission of advance cargo information to CBP through a CBP-approved electronic data interchange (EDI) system. CBP recently completed the testing of the Automated Commercial Environment (ACE) for the transmission of advance ocean and rail cargo information. This notice announces that, after a six month transition period, ACE will be the only CBP-approved EDI for submitting required advance information for ocean and rail cargo.

**DATES:** On September 29, 2012, ACE will be the only CBP-approved EDI for transmitting to CBP required advance information for ocean and rail cargo.

**FOR FURTHER INFORMATION CONTACT:** Susan Maskell, Office of International Trade, *Susan.Maskell@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

Section 343(a) of the Trade Act of 2002, as amended by the Maritime Transportation Security Act of 2002 (19 U.S.C. 2071 note) (referred to in this notice as the Trade Act), directed U.S. Customs and Border Protection (CBP) to promulgate regulations providing for the mandatory transmission of electronic cargo information by way of a CBP-approved electronic data interchange (EDI) system before the cargo is brought into or departs the United States by any mode of commercial transportation (ocean, air, rail or truck). The required cargo information is that which is reasonably necessary to enable high-risk shipments to be identified for purposes of ensuring cargo safety and security and preventing smuggling pursuant to the laws enforced and administered by CBP. To effectuate the provisions of the Trade Act, CBP published a final rule in the **Federal Register** in 2003, requiring the advance electronic transmission of information pertaining to cargo prior to its being brought into, or sent from, the United States by sea, air, rail or truck. *See* Required Advance Electronic



Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 021 Page 2

OMB No. 1615-0043; Exp. 10/31/2013

Department of Homeland Security
U.S. Citizenship and Immigration Services

# I-821, Application for
# Temporary Protected Status

**START HERE - Please type or print in black ink.**

| | For USCIS Use Only |
|---|---|

## Part 1.  Type of application *(check one)*

a. ☐ This is my first application to register for Temporary Protected Status (TPS).

b. ☒ This is my application for re-registration or renewal of temporary treatment benefits. I have previously been granted TPS or temporary treatment benefits. I have maintained and continue to maintain eligibility for TPS.

## Part 2.  Information about you

**Family Name (Last Name):** Nissan
**Given Name (First Name):** Danial
**Full Middle Name:** J

**U.S. Mailing Address: (Street Number and Name):** 2327 W. Farwell Ave.   **Apt. #:** 1S

**C/O: (In Care Of):**

**Town/City:** Chicago   **State:** IL

**County:** Cook   **Zip Code:** 60645

**Gender:** ☒ Male   ☐ Female

**Place of Birth (Town or City):** Haseka   **State/Country:** Syria

**Country of Residence:** USA   **Country of Citizenship/Nationality:** Syria

**Marital Status:** ☐ Single   ☒ Married   ☐ Divorced   ☐ Widowed

**Other Names Used *(including maiden name)*:** None

**Date of Entry Into the U.S. *(mm/dd/yyyy)*:** 01/19/2002   **Place of Entry Into the U.S.:** Newark, NJ

**Manner of Arrival *(Visitor, student, stowaway, without inspection, etc.)*:** Visitor

**Arrival/Departure Record (I-94) Number:** 44147877709   **Date authorized stay expired/or will expire, as shown on Form I-94 or I-95 *(mm/dd/yyyy)*:** 07/18/2002

**Your Current Immigration Status:**
In Status *(state nonimmigrant classification, e.g., F-1, etc.)*: X – EOIR
Out of Status *(state nonimmigrant violation, e.g., overstay student, EWI etc.)*: Temporary Protected Status

**Alien Registration Number (A#) *(if any)*:** 077-656-263   **U.S. Social Security Number *(if any)*:**

**Are you now or have you ever been under immigration proceedings?**
☒ Yes   ☐ No

If you answered "Yes" to the above question, provide the following information.
**Type of proceedings:**
☐ Exclusion   ☒ Removal/Deportation   ☐ Recission   ☐ Judicial Proceedings

**Location of Proceedings:** Board of Immigration Appeals   **Date of Proceedings *(mm/dd/yyyy)*:** 06/14/2006

### For USCIS Use Only

| | |
|---|---|
| Returned | Receipt |
| Date | |
| Date | |
| Resubmitted | |
| Date | |
| Date | |
| Reloc Sent | |
| Date | |
| Date | |
| Reloc Rec'd | |
| Date | |
| Date | |

☐ Applicant Interviewed on _____

**Case ID #:**

**A #:**

**Remarks**

**Action Block**

**To Be Completed by**
*Attorney or Representative, if any.*
☒ Fill in box if G-28 is attached to represent the applicant.

**ATTY State License #**
6225348

EAC139085557   APP I821   08/14/2013

Form I-821 (Rev. 11/23/10) Y

Document 0014 of 0215,   Page 2   of 8

39

Produced 06/22/2017 from USCIS' EDMS; A File No. 077656263 Document 0014 of 0215 Page 3 of 8

## Part 3.  Information about your spouse and children *(if any)*

**1. Provide the following information about your spouse** *(if married).*

| Last Name of Spouse | First Name | Middle Name |
|---|---|---|
| Kalamperovic | Sadeta | |

| Address (Street Number and Name) | Apt # |
|---|---|
| 2327 W. Farwell Ave. | |

| Town/City | State/Province | Country | Zip/Postal Code |
|---|---|---|---|
| Chicago | IL | USA | 60645 |

| Your Spouse's Birth Date *(mm/dd/yyyy)* | Date and Place of Present Marriage |
|---|---|
| 03/30/1963 | |

| Name of Prior Husbands/Wives | Date(s) Marriage(s) Ended *(mm/dd/yyyy)* | |
|---|---|---|
| Migdalia Reyes | 01/13/2004 | 10/04/2005 |

**2. List the names, ages, and current residence of children** *(if any).*

| Name *(First/Middle/Last)* | Date of Birth (mm/dd/yyyy) | Residence |
|---|---|---|
| None | | |
| | | |
| | | |
| | | |
| | | |

## Part 4.  Eligibility standards

**1. Provide the following information:**

I am a national of (or an alien having no nationality, who last habitually resided in the state of):

Syria

I entered the United States on the following date (provide month/day/year), and have resided in the United States since that time.

01/19/2002

**2.** To be eligible for Temporary Protected Status, you must be admissible as an immigrant to the United States, with certain exceptions.

If any of the questions beginning below on this page and continuing on **Pages 3, 4, and 5** apply to you, describe the circumstances and include a full explanation on a separate sheet(s) of paper. Use the number 2 before each letter referring to the specific question (2a, 2b, etc).

If you were ever arrested, provide the disposition (outcome) for all arrests. For example, "case dismissed" from the appropriate authority. **NOTE:** For information about waivers concerning the grounds of inadmissibility, see **Page 5.**

**2a.** Have you been convicted of any felony or two or more misdemeanors committed in the United States?

☐ Yes ☒ No

**2b.** (i) Have you ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion?

☐ Yes ☒ No

(ii) Have you been convicted by a final judgment of a particularly serious crime, constituting a danger to the community of the United States (an alien convicted of an aggravated felony is considered to have committed a particularly serious crime)?

☐ Yes ☒ No

(iii) Have you committed a serious nonpolitical crime outside of the United States prior to your arrival in the United States?

☐ Yes ☒ No

Document 0014 of 0215, Page 3 of 8

40

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 0215    Page 4    of 8

(iv) Have you engaged in or are you still engaged in activities that could be reasonable grounds for concluding that you are a danger to the security of the United States?

☐ Yes ☒ No

**2c.** (i) Have you been convicted of, or have you committed acts which constitute the essential elements of a crime (other than a purely political offense) or a violation of or a conspiracy to violate any law relating to a controlled substance as defined in Section 102 of the Controlled Substance Act?

☐ Yes ☒ No

(ii) Have you been convicted of two or more offenses (other than purely political offenses) for which the aggregate sentences to confinement actually imposed were five years or more?

☐ Yes ☒ No

(iii) Have you trafficked in or do you continue to traffic in any controlled substance, or are you or have you been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking of any controlled substance?

☐ Yes ☒ No

(iv) Have you engaged in or do you continue to engage solely, principally, or incidentally in any activity related to espionage or sabotage or violate any law involving the export of goods, technology, or sensitive information, any other unlawful activity, or any activity the purpose of which is in opposition, or the control, or overthrow of the Government of the United States?

☐ Yes ☒ No

(v) Have you engaged in or do you continue to engage in terrorist activities?

☐ Yes ☒ No

(vi) Have you engaged in or do you continue to engage in or plan to engage in activities in the United States that would have potentially serious adverse foreign policy consequences for the United States?

☐ Yes ☒ No

(vii) Have you been or do you continue to be a member of the Communist or other totalitarian party, except when membership was involuntary?

☐ Yes ☒ No

(viii) Have you participated in Nazi persecution or genocide?

☐ Yes ☒ No

**2d.** Have you been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations, or been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency, or similar action?

☐ Yes ☒ No

**2e.** Have you committed a serious criminal offense in the United States and asserted immunity from prosecution?

☐ Yes ☒ No

**2f.** Have you within the past ten years, engaged in prostitution or procurement of prostitution or do you continue to engage in prostitution or procurement of prostitution?

☐ Yes ☒ No

**2g.** Have you been or do you intend to be involved in any other commercial vice?

☐ Yes ☒ No

**2h.** Have you been excluded and deported from the United States within the past year, or have you been deported or removed from the United States at government expense within the last five years (20 years if you have been convicted of an aggravated felony)?

☐ Yes ☒ No

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 0215,    Page 4    of 8

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 0215    Page 5    of 8

**2i.** Have you ever assisted any other person to enter the United States in violation of the law?

☐ Yes  ☒ No

**2j.** (i) Do you have a communicable disease of public health significance?

☐ Yes  ☒ No

(ii) Do you have or have you had a physical or mental disorder and behavior (or a history of behavior that is likely to recur) associated with the disorder which has posed or may pose a threat to the property, safety, or welfare of yourself or others?

☐ Yes  ☒ No

(iii) Are you now or have you been a drug abuser or drug addict?

☐ Yes  ☒ No

**2k.** Have you entered the United States as a stowaway?

☐ Yes  ☒ No

**2l.** Are you subject to a final order for violation of section 274C (producing and/or using false documentation to unlawfully satisfy a requirement of the Immigration and Nationality Act)?

☐ Yes  ☒ No

**2m.** Do you practice polygamy?

☐ Yes  ☒ No

**2n.** Were you the guardian of, and did you accompany another alien who was ordered excluded and deported (or removed) from the United States?

☐ Yes  ☒ No

**2o.** Have you detained, retained, or withheld the custody of a child having a lawful claim to U.S. citizenship, outside the United States from a U.S. citizen granted custody?

☐ Yes  ☒ No

**2p.** Have you EVER ordered, incited, called for, committed, assisted, helped with, or otherwise participated in any of the following:

(i) acts involving torture or genocide?

☐ Yes  ☒ No

(ii) killing any person?

☐ Yes  ☒ No

(iii) intentionally and severely injuring any person?

☐ Yes  ☒ No

(iv) engaging in any kind of sexual contact or relations with any person who was being forced or threatened?

☐ Yes  ☒ No

(v) limiting or denying any person's ability to exercise religious beliefs?

☐ Yes  ☒ No

**2q.** Have you EVER:

(i) served in, been a member of, assisted in, or participated in any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, rebel group, guerrilla group, militia, or insurgent organization?

☐ Yes  ☒ No

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 0215,    Page 5    of 8

42

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 0215 Page 6 of 8

(ii) served in any prison, jail, prison camp, detention facility, labor camp, or any other situation that involved detaining persons?

☐ Yes ☒ No

**2r.** Have you EVER been a member of, assisted in, or participated in any group, unit, or organization of any kind in which you or other persons used any type of weapon against any person or threatened to do so?

☐ Yes ☒ No

**2s.** Have you EVER assisted or participated in selling or providing weapons to any person who to your knowledge used them against another person, or in transporting weapons to any person who to your knowledge used them against another person?

☐ Yes ☒ No

**2t.** Have you ever received any type of military, paramilitary, or weapons training?

☐ Yes ☒ No

**NOTE ABOUT WAIVERS:** You may be eligible for a waiver of the grounds described in the questions: 2e; 2f; 2g; 2h; 2i; 2j; 2k; 2l; 2m; 2n or 2o. The Form I-601 is the USCIS application used to request a waiver. The form is available at local USCIS offices, on our Web site at **www.uscis.gov** or by calling the USCIS toll-free forms line at **1-800-870-3676.**

---

| Part 5. | Signature. | *Read the information on penalties in the instructions before completing this section. If someone helped you prepare this petition, he or she must complete Part 6.* |
|---------|------------|---|

**Applicant's Statement** (check one):

☒ I can read and understand English, and have read and understand each and every question and instruction on this form, as well as my answer to each question.

☐ Each and every question and instruction on this form, as well as my answer to each question, has been read to me by the person named below in _____ , a language in which I am fluent. I understand each and every question and instruction on this form, as well as my answer to each question.

**YOUR (APPLICANT'S) CERTIFICATION:**

I certify, under penalty of perjury under the laws of of the United States of America, that the foregoing is true and correct. Copies of documents submitted are exact photocopies of unaltered original documents, and I understand that I may be required to submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from my records that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefits that I am seeking.

| Signature | Daytime Phone Number *(Area/Country Codes)* | Date *(mm/dd/yyyy)* |
|-----------|---------------------------------------------|---------------------|
| *[signature]* | 312-607-1282 | 8 12 13 |

**NOTE:** If you do not completely fill out this form or fail to submit required documents listed in the instructions, you may not be found eligible for the requested benefit and this petition may be denied.

43

**Part 6. Interpreter's Statement:**

Language used: _____

I certify that I am fluent in English and the above-mentioned language.

I further certify that I have read each and every question and instruction on this form, as well as the answer to each question, to this applicant in the above-mentioned language, and the applicant has understood each and every instruction and question of the form, as well as the answer to each question.

| Signature | Print Your Name | Date (mm/dd/yyyy) |
|---|---|---|
| | | |

**Part 7. Preparer's Statement:**

I declare that I prepared this petition at the request of the above person and it is based on all the information of which I have knowledge.

Attorney or Representative: In the event of a Request for Evidence (RFE), may USCIS contact you by fax or e-mail?

☐ Yes  ☒ No

| Signature | Print Your Name | Date (mm/dd/yyyy) |
|---|---|---|
| | Mark S. Kocol | 8/2/13 |

| Firm Name and Address | Daytime Phone Number | Fax Number |
|---|---|---|
| Mark S. Kocol, PC, 330 S. Wells St. #618D, Chicago, IL | 312-588-0466 | 866-725-0343 |

**Part 8. Checklist.**

☐ Did you answer each question?

☐ Did you sign the Form I-821 application?

☐ Did you submit the required application and biometric services fees, or a written request for waiver of the fees?

☐ Did you submit the necessary documents and photos, if required?

☐ Did you also submit the Form I-765 with the filing fee or a written request for a waiver of the filing fee (See instructions, items **10**, **11** and **12**)?

**Have you submitted:**

☐ The filing fee for this application or a written request for a waiver of the filing fee (see instructions, items **10** and **12**)?

☐ Supporting evidence to prove identity, nationality, date of entry, and residence?

☐ Other required supporting documents (photos, etc.) for each application?

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263  Document 0014 of 02  Page 8    of 8

APP I821

EAC1390855537          08/14/2013

DANIAL J. NISSAN
2327 W FARWELL AVE APT 1S
CHICAGO, IL  60645

APP I821

EAC1390855537          08/14/2013

DANIAL J. NISSAN
2327 W FARWELL AVE APT 1S
CHICAGO, IL  60645

APP I821

# EAC1390855537

MARK S. KOCOL
330 SOUTH WELLS
CHICAGO, IL  60606

APP I821

# EAC1390855537

MARK S. KOCOL
330 SOUTH WELLS
CHICAGO, IL  60606

APP I821

# EAC1390855537

MARK S. KOCOL
330 SOUTH WELLS
CHICAGO, IL  60606

DANIAL J. NISSAN
2327 W FARWELL AVE APT 1S
CHICAGO, IL  60645

05                    1903645

**1013110992800**

APP I821      N

45

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0015 of 0215, Page 1 of 1



Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0015 of 0215, Page 1 of 1

46

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0014 of 0215 Page 2 of 8

OMB No. 1615-0043; Exp. 10/31/2013

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

# I-821, Application for
# Temporary Protected Status

| | |
|---|---|
| **START HERE - Please type or print in black ink.** | **For USCIS Use Only** |

## Part 1. Type of application *(check one)*

a. ☐ This is my first application to register for Temporary Protected Status (TPS).

b. ☒ This is my application for re-registration or renewal of temporary treatment benefits. I have previously been granted TPS or temporary treatment benefits. I have maintained and continue to maintain eligibility for TPS.

## Part 2. Information about you

| Family Name (Last Name) | Given Name (First Name) | Full Middle Name |
|---|---|---|
| Nissan | Danial | J |

| U.S. Mailing Address: (Street Number and Name) | Apt. # |
|---|---|
| 2327 W. Farwell Ave. | 1S |

C/O: (In Care Of)

| Town/City | State |
|---|---|
| Chicago | IL |

| County | Zip Code |
|---|---|
| Cook | 60645 |

Gender: ☒ Male ☐ Female

| Place of Birth (Town or City) | State/Country |
|---|---|
| Haseka | Syria |

| Country of Residence | Country of Citizenship/Nationality |
|---|---|
| USA | Syria |

Marital Status: ☐ Single ☒ Married ☐ Divorced ☐ Widowed

Other Names Used (including maiden name)
None

| Date of Entry Into the U.S. *(mm/dd/yyyy)* | Place of Entry Into the U.S. |
|---|---|
| 01/19/2002 | Newark, NJ |

Manner of Arrival (Visitor, student, stowaway, without inspection, etc.)
Visitor

| Arrival/Departure Record (I-94) Number | Date authorized stay expired/or will expire, as shown on Form I-94 or I-95 *(mm/dd/yyyy)* |
|---|---|
| 441478777 09 | 07/18/2002 |

**Your Current Immigration Status:**

| In Status *(state nonimmigrant classification, e.g., F-1, etc.)* | Out of Status *(state nonimmigrant violation, e.g., overstay student, EWI etc.)* |
|---|---|
| X - EOIR | Temporary Protected Status |

| Alien Registration Number (A#) *(if any)* | U.S. Social Security Number *(if any)* |
|---|---|
| 077-656-263 | |

Are you now or have you ever been under immigration proceedings?
☒ Yes ☐ No

If you answered "Yes" to the above question, provide the following information.

Type of proceedings:
☐ Exclusion ☒ Removal/Deportation ☐ Recission ☐ Judicial Proceedings

| Location of Proceedings | Date of Proceedings *(mm/dd/yyyy)* |
|---|---|
| Board of Immigration Appeals | 06/14/2006 |

**For USCIS Use Only**

| Returned | Receipt |
|---|---|
| Date | |
| Date | |
| Resubmitted | |
| Date | |
| Date | |
| Reloc Sent | |
| Date | |
| Date | |
| Reloc Rec'd | |
| Date | |
| Date | |

☐ Applicant Interviewed on _____

Case ID #:

A #:

Remarks

Action Block

**To Be Completed by**
*Attorney or Representative, if any.*

☒ Fill in box if G-28 is attached to represent the applicant.

ATTY State License #
6225348

Produced 06/22/2017 from USCIS' EDMS; Alien No. 077656263 Document 0069 of 0215, Page 2 of 3 OMB No. 1615-0040

Department of Homeland Security
U.S. Citizenship and Immigration Services U.S. Department of Homeland Security

**I-765, Application For**
**Employment Authorization**

| Do not write in this block. | | |
|---|---|---|
| Remarks INITIAL A 077656263 C19 Applicant is filing under §274a.12 | Action Block FEB X 4 2013 | APP I765 EAC1290973164  09/24/2012 |

☒ Application Approved. Employment Authorized / Extended *(Circle One)* until _____ (Date).
Subject to the following conditions: _____ 2/4/23 - 9/30/2013 (Date).
Application Denied.
☐ Failed to establish eligibility under 8 CFR 274a.12 (a) or (c).
☐ Failed to establish economic necessity as required in 8 CFR 274a.12(c)(14), (18) and 8 CFR 214.2(f)

I am applying for:
☐ Permission to accept employment.
☐ Replacement *(of lost employment authorization document).*
☒ Renewal of my permission to accept employment *(attach previous employment authorization document).*

| 1. Name (Family Name in CAPS) (First) (Middle) NISSAN    Danial    J | Which USCIS Office? Phoenix, AZ | Date(s) 10/24/2011 |
|---|---|---|

2. Other Names Used (include Maiden Name)
None

Results (Granted or Denied - attach all documentation)
Granted

3. Address in the United States (Number and Street)      (Apt. Number)
2327 W. Farwell Ave.                                    1S

12. Date of Last Entry into the U.S.  (mm/dd/yyyy)
01/19/2002

(Town or City)      (State/Country)      (ZIP Code)
Chicago           IL/USA              60645

13. Place of Last Entry into the U.S.
Newark, NJ

4. Country of Citizenship/Nationality
Syria

14. Manner of Last Entry (Visitor, Student, etc.)
B1/B2

5. Place of Birth (Town or City)  (State/Province)  (Country)
Haseka                                       Syria

15. Current Immigration Status (Visitor, Student, etc.)
**Temporary Protected Status Applicant**

| 7. Gender ☒ Male  ☐ Female |
|---|

8. Marital Status ☒ Married  ☐ Single  ☐ Widowed  ☐ Divorced

16. Go to Part 2 of the Instructions, Eligibility Categories. In the space below, place the letter and number of the category you selected from the instructions (For example, (a)(8), (c)(17)(iii), etc.).

Eligibility under 8 CFR 274a.12 ( A  ) ( 12 ) (         )

9. _____ (include all numbers you have ever used) (if any)

17. If you entered the Eligibility Category, (c)(3)(C), in item 16 above, list your degree, your employer's name as listed in E-Verify, and your employer's E-Verify Company Identification Number or a valid E-Verify Client Company Identification Number in the space below.

10. Alien Registration Number (A-Number) or I-94 Number (if any)
077-656-263

Degree: _____

11. Have you ever before applied for employment authorization from USCIS?
☒ Yes (If "Yes," complete below)   ☐ No

Employer's Name as listed in E-Verify: _____

Employer's E-Verify Company Identification Number or a valid E-Verify Client Company Identification Number

## Certification

Your Certification: I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking. I have read the Instructions in Part 2 and have identified the appropriate eligibility category in **Block 16.**

Signature _____

Telephone Number
(312) 607-1282

Date

**Signature of Person Preparing Form, If Other Than Above:** I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

Print Name
Mark S. Kocol 407 S. Dearborn

Address
#1145. Chicago IL

Signature _____

Date 9/12/12

| Remarks | Initial Receipt | Resubmitted | Relocated | | Completed | | |
|---|---|---|---|---|---|---|---|
| | | | Rec'd | Sent | Approved | Denied | Returned |
| | | | | | | | |

Form I-765 (Rev. 01/19/11) Y

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0046 of 0215, Page 2 of 6

## Part 3. Information about your spouse and children *(if any)*

**1. Provide the following information about your spouse** *(if married).*

| Last Name of Spouse | First Name | Middle Name |
|---|---|---|
| Kalamperovic | Sadeta | |

| Address (Street Number and Name) | | Apt # |
|---|---|---|
| 2327 W. Farwell Ave. | | |

| Town/City | State/Province | Country | Zip/Postal Code |
|---|---|---|---|
| Chicago | IL | USA | 60645 |

| Your Spouse's Birth Date *(mm/dd/yyyy)* | Date and Place of Present Marriage |
|---|---|
| 03/30/1963 | |

| Name of Prior Husbands/Wives | Date(s) Marriage(s) Ended *(mm/dd/yyyy)* | |
|---|---|---|
| Migdalia Reyes | 01/13/2004 | 10/04/2005 |

**2. List the names, ages, and current residence of children** *(if any).*

| Name *(First/Middle/Last)* | Date of Birth (mm/dd/yyyy) | Residence |
|---|---|---|
| None | | |
| | | |
| | | |
| | | |

## Part 4. Eligibility standards

**1. Provide the following information:**

I am a national of (or an alien having no nationality, who last habitually resided in the state of):

| Syria |
|---|

I entered the United States on the following date (provide month/day/year), and have resided in the United States since that time.

| 01/19/2002 |
|---|

**2.** To be eligible for Temporary Protected Status, you must be admissible as an immigrant to the United States, with certain exceptions.

If any of the questions beginning below on this page and continuing on **Pages 3, 4, and 5** apply to you, describe the circumstances and include a full explanation on a separate sheet(s) of paper. Use the number 2 before each letter referring to the specific question (2a, 2b, etc).

If you were ever arrested, provide the disposition (outcome) for all arrests. For example, "case dismissed" from the appropriate authority. **NOTE:** For information about waivers concerning the grounds of inadmissibility, see **Page 5.**

**2a.** Have you been convicted of any felony or two or more misdemeanors committed in the United States?

☐ Yes ☒ No

**2b. (i)** Have you ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion?

☐ Yes ☒ No

**(ii)** Have you been convicted by a final judgment of a particularly serious crime, constituting a danger to the community of the United States (an alien convicted of an aggravated felony is considered to have committed a particularly serious crime)?

☐ Yes ☒ No

**(iii)** Have you committed a serious nonpolitical crime outside of the United States prior to your arrival in the United States?

☐ Yes ☒ No

Form I-821 (Rev. 11/23/10) Y Page 2

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0046 of 0215, Page 3 of 6

(iv) Have you engaged in or are you still engaged in activities that could be reasonable grounds for concluding that you are a danger to the security of the United States?

☐ Yes ☒ No

**2c.** (i) Have you been convicted of, or have you committed acts which constitute the essential elements of a crime (other than a purely political offense) or a violation of or a conspiracy to violate any law relating to a controlled substance as defined in Section 102 of the Controlled Substance Act?

☐ Yes ☒ No

(ii) Have you been convicted of two or more offenses (other than purely political offenses) for which the aggregate sentences to confinement actually imposed were five years or more?

☐ Yes ☒ No

(iii) Have you trafficked in or do you continue to traffic in any controlled substance, or are you or have you been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking of any controlled substance?

☐ Yes ☒ No

(iv) Have you engaged in or do you continue to engage solely, principally, or incidentally in any activity related to espionage or sabotage or violate any law involving the export of goods, technology, or sensitive information, any other unlawful activity, or any activity the purpose of which is in opposition, or the control, or overthrow of the Government of the United States?

☐ Yes ☒ No

(v) Have you engaged in or do you continue to engage in terrorist activities?

☐ Yes ☒ No

(vi) Have you engaged in or do you continue to engage in or plan to engage in activities in the United States that would have potentially serious adverse foreign policy consequences for the United States?

☐ Yes ☒ No

(vii) Have you been or do you continue to be a member of the Communist or other totalitarian party, except when membership was involuntary?

☐ Yes ☒ No

(viii) Have you participated in Nazi persecution or genocide?

☐ Yes ☒ No

**2d.** Have you been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations, or been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency, or similar action?

☐ Yes ☒ No

**2e.** Have you committed a serious criminal offense in the United States and asserted immunity from prosecution?

☐ Yes ☒ No

**2f.** Have you within the past ten years, engaged in prostitution or procurement of prostitution or do you continue to engage in prostitution or procurement of prostitution?

☐ Yes ☒ No

**2g.** Have you been or do you intend to be involved in any other commercial vice?

☐ Yes ☒ No

**2h.** Have you been excluded and deported from the United States within the past year, or have you been deported or removed from the United States at government expense within the last five years (20 years if you have been convicted of an aggravated felony)?

☐ Yes ☒ No

Form I-821 (Rev. 11/23/10) Y Page 3

188

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0046 of 0215, Page 4 of 6

**2i.** Have you ever assisted any other person to enter the United States in violation of the law?

   ☐ Yes  ☒ No

**2j.** (i) Do you have a communicable disease of public health significance?

   ☐ Yes  ☒ No

(ii) Do you have or have you had a physical or mental disorder and behavior (or a history of behavior that is likely to recur) associated with the disorder which has posed or may pose a threat to the property, safety, or welfare of yourself or others?

   ☐ Yes  ☒ No

(iii) Are you now or have you been a drug abuser or drug addict?

   ☐ Yes  ☒ No

**2k.** Have you entered the United States as a stowaway?

   ☐ Yes  ☒ No

**2l.** Are you subject to a final order for violation of section 274C (producing and/or using false documentation to unlawfully satisfy a requirement of the Immigration and Nationality Act)?

   ☐ Yes  ☒ No

**2m.** Do you practice polygamy?

   ☐ Yes  ☒ No

**2n.** Were you the guardian of, and did you accompany another alien who was ordered excluded and deported (or removed) from the United States?

   ☐ Yes  ☒ No

**2o.** Have you detained, retained, or withheld the custody of a child having a lawful claim to U.S. citizenship, outside the United States from a U.S. citizen granted custody?

   ☐ Yes  ☒ No

**2p.** Have you EVER ordered, incited, called for, committed, assisted, helped with, or otherwise participated in any of the following:

(i) acts involving torture or genocide?

   ☐ Yes  ☒ No

(ii) killing any person?

   ☐ Yes  ☒ No

(iii) intentionally and severely injuring any person?

   ☐ Yes  ☒ No

(iv) engaging in any kind of sexual contact or relations with any person who was being forced or threatened?

   ☐ Yes  ☒ No

(v) limiting or denying any person's ability to exercise religious beliefs?

   ☐ Yes  ☒ No

**2q.** Have you EVER:

(i) served in, been a member of, assisted in, or participated in any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, rebel group, guerrilla group, militia, or insurgent organization?

   ☐ Yes  ☒ No

Form I-821 (Rev. 11/23/10) Y Page 4

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0046 of 0215, Page 5 of 6

(ii) served in any prison, jail, prison camp, detention facility, labor camp, or any other situation that involved detaining persons?

☐ Yes  ☒ No

**2r.** Have you EVER been a member of, assisted in, or participated in any group, unit, or organization of any kind in which you or other persons used any type of weapon against any person or threatened to do so?

☐ Yes  ☒ No

**2s.** Have you EVER assisted or participated in selling or providing weapons to any person who to your knowledge used them against another person, or in transporting weapons to any person who to your knowledge used them against another person?

☐ Yes  ☒ No

**2t.** Have you ever received any type of military, paramilitary, or weapons training?

☐ Yes  ☒ No

**NOTE ABOUT WAIVERS:** You may be eligible for a waiver of the grounds described in the questions: 2e; 2f; 2g; 2h; 2i; 2j; 2k; 2l; 2m; 2n or 2o. The Form I-601 is the USCIS application used to request a waiver. The form is available at local USCIS offices, on our Web site at **www.uscis.gov** or by calling the USCIS toll-free forms line at **1-800-870-3676.**

| Part 5. | Signature. | *Read the information on penalties in the instructions before completing this section. If someone helped you prepare this petition, he or she must complete Part 6.* |
|---------|------------|---|

**Applicant's Statement** (check one):

☒ I can read and understand English, and have read and understand each and every question and instruction on this form, as well as my answer to each question.

☐ Each and every question and instruction on this form, as well as my answer to each question, has been read to me by the person named below in _____ , a language in which I am fluent. I understand each and every question and instruction on this form, as well as my answer to each question.

**YOUR (APPLICANT'S) CERTIFICATION:**

I certify, under penalty of perjury under the laws of of the United States of America, that the foregoing is true and correct. Copies of documents submitted are exact photocopies of unaltered original documents, and I understand that I may be required to submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from my records that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefits that I am seeking.

| Signature | Daytime Phone Number *(Area/Country Codes)* | Date *(mm/dd/yyyy)* |
|-----------|---------------------------------------------|---------------------|
| *[signature]* | 312-607-1282 | 09/17/2012 |

**NOTE:** If you do not completely fill out this form or fail to submit required documents listed in the instructions, you may not be found eligible for the requested benefit and this petition may be denied.

Form I-821 (Rev. 11/23/10) Y Page 5

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0046 of 0215, Page 6 of 6

**Part 6. Interpreter's Statement:**

Language used: _____

I certify that I am fluent in English and the above-mentioned language.

I further certify that I have read each and every question and instruction on this form, as well as the answer to each question, to this applicant in the above-mentioned language, and the applicant has understood each and every instruction and question of the form, as well as the answer to each question.

| Signature | Print Your Name | Date (mm/dd/yyyy) |
|---|---|---|
| | | |

**Part 7. Preparer's Statement:**

I declare that I prepared this petition at the request of the above person and it is based on all the information of which I have knowledge.

Attorney or Representative: In the event of a Request for Evidence (RFE), may USCIS contact you by fax or e-mail?

[X] Yes [ ] No

| Signature | Print Your Name | Date (mm/dd/yyyy) |
|---|---|---|
| | Mark S. Kocol | 9/17/12 |

| Firm Name and Address | Daytime Phone Number | Fax Number |
|---|---|---|
| Mark S. Kocol, PC, 407 S., Dearborn #1145, Chicago, IL | 312-588-0466 | 866-725-0343 |

**Part 8. Checklist.**

[ ] Did you answer each question?

[ ] Did you sign the Form I-821 application?

[ ] Did you submit the required application and biometric services fees, or a written request for waiver of the fees?

[ ] Did you submit the necessary documents and photos, if required?

[ ] Did you also submit the Form I-765 with the filing fee or a written request for a waiver of the filing fee (See instructions, items **10, 11** and **12**)?

**Have you submitted:**

[ ] The filing fee for this application or a written request for a waiver of the filing fee (see instructions, items **10** and **12**)?

[ ] Supporting evidence to prove identity, nationality, date of entry, and residence?

[ ] Other required supporting documents (photos, etc.) for each application?

Form I-821 (Rev. 11/23/10) Y Page 6



Department of Homeland Security
U.S. Citizenship and Immigration Service

**I-797A, Notice of Action**

Produced 06/22/2017 from USCIS' EDMS, Alien File No. 077656261. Document 0030 of 0215. Page 1 of 2

# THE UNITED STATES OF AMERICA

| RECEIPT NUMBER EAC-12-909-73163 | | CASE TYPE I821 /I-821D | |
|---|---|---|---|
| RECEIPT DATE UNKNOWN | PRIORITY DATE | APPLICANT A077 656 263 NISSAN, DANIAL J. | |
| NOTICE DATE May 10, 2013 | PAGE 1 of 2 | BENEFICIARY A077 656 263 NISSAN, DANIAL J. | |

MARK S KOCOL
407 SOUTH DEARBORN STREET SUITE 11
CHICAGO IL 60605

Notice Type: Approval Notice
Valid from 05/10/2013 to 09/30/2013

You have been granted Temporary Protected Status (TPS) under section 244 of the Immigration and Nationality Act. The benefits of TPS are temporary protection from removal (or deportation) and employment authorization in the United States.

Attached to this notice is a Form I-94 indicating your Temporary Protected Status in the United States. The I-94 is valid until the expiration date shown on it.

If the program is extended, you must re-register with the U.S. Citizenship and Immigration Services (USCIS) within the time period designated for re-registration. In order to obtain these TPS extensions, you must apply to the USCIS at least thirty days prior to the expiration date on your I-94.

Failure to re-register for a TPS extension may result in the withdrawal of your TPS and may result in removal proceedings being initiated against you.

While you are under Temporary Protected Status, you:

(1) will not be removed from the United States;
(2) will be granted work authorization, if a request has been made with the required fee, until the expiration of the time period designated for your Temporary Protected Status;
(3) will be considered as being in, and maintaining, lawful status as a nonimmigrant for purposes of adjustment of status under section 245 of the Act and for change of status under section 248 of the Act;
(4) will not be considered to be permanently residing in the United States under the code of law;
(5) may be deemed ineligible for public assistance by a state or any political subdivision thereof which furnishes such assistance; and
(6) may not depart the United States without prior approval of the Attorney General of the United States.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVCS
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (800) 375-5283
Form I797A (Rev. 10/31/05)N

PLEASE TEAR OFF FORM I-94 PRINTED BELOW, AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

---

Detach This Half for Personal Records

Receipt# EAC-12-909-73163
I-94# 441478777 09
NAME NISSAN, DANIAL J.
CLASS

VALID FROM 05/10/2013 UNTIL 09/30/2013

PETITIONER: NISSAN, DANIAL J.
2327 W FARWELL AVE APT 1S
CHICAGO IL 60645

**441478777 09**

Receipt Number EAC-12-909-73163
United States Citizenship and Immigration Services

I-94
Departure Record

Petitioner: NISSAN, DANIAL

14 Family Name
NISSAN
15 First (Given) Name
DANIAL

17 Country of Citizenship
SYRIA

Produced 06/22/2017 from USCIS' EDMS, Alien File No. 077656263. Document 0030 of 0215. Page 1 of 2

Form I-797A (Rev. 10/31/05) N

Department of Homeland Security
U.S. Citizenship and Immigration Services
Produced 06/22/2017 from USCIS EDMS: Alien File No. 077656263, Document 0030 of 0215, Page 2 of 2

**I-797A, Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER EAC-12-909-73163 | | CASE TYPE I821 / I-821D | |
|---|---|---|---|
| RECEIPT DATE UNKNOWN | PRIORITY DATE | APPLICANT A077 656 263 NISSAN, DANIAL J. | |
| NOTICE DATE May 10, 2013 | PAGE 2 of 2 | BENEFICIARY A077 656 263 NISSAN, DANIAL J. | |

(continued)

PLEASE NOTE: As long as you remain eligible for Temporary Protected Status and you maintain your status by complying with the registration requirements, you will be allowed to remain and work in the United States, if so authorized, until the end of the period of the time designated for your Temporary Protected Status.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVCS
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS    VT    05479-0001
Customer Service Telephone: (800) 375-5283
Form I797A (Rev. 10/31/05)N

PLEASE TEAR OFF FORM I-94 PRINTED BELOW, AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

Detach This Half for Personal Records

VOID VOID VOID    VOID VOID VOID

Receipt# VOID VOID
I-94# VOID VOID
NAME VOID VOID
CLASS VOID VOID

VOID VOID VOID

PETITIONER:
VOID VOID VOID

Receipt Number VOID VOID
United States Citizenship and Immigration
Services VOID VOID

I-94 VOID VOID VOID
Departure Record VOID Petitioner VOID

14. Family Name
VOID VOID VOID
15 First (Given) Name    16. Date of Birth
VOID VOID VOID
17 Country of Citizenship
VOID VOID VOID

VOID VOID VOID    VOID VOID VOID

Produced 06/22/2017 from USCIS EDMS: Alien File No. 077656263, Document 0030 of 0215, Page 2 of 2
Form I-797A (Rev. 10/31/05) N

80

Department of Homeland Security
U.S. Citizenship and Immigration Services

Produced 06/22/2017 from USCIS' EDMS; Alien File No. 077656263 Document 0009 of 0215

**I-797, Notice of Action**

of 2

# THE UNITED STATES OF AMERICA

| RECEIPT NUMBER<br>EAC-13-908-55538 | | CASE TYPE I765 APPLICATION FOR EMPLOYMENT<br>AUTHORIZATION |
|---|---|---|
| RECEIPT DATE<br>UNKNOWN | PRIORITY DATE | APPLICANT A077 656 263<br>NISSAN, DANIAL J. |
| NOTICE DATE<br>September 26, 2013 | PAGE<br>1 of 1 | |

| | |
|---|---|
| MARK STANLEY KOCOL<br>330 SOUTH WELLS<br>CHICAGO IL 60606 | **Notice Type:** Approval Notice<br>Class: A12<br>Valid from 10/01/2013 to 03/31/2015 |

Your application for employment authorization has been approved. The Form I-766, Employment Authorization Document, was sent under separate cover to the beneficiary.

This card authorizes your employment in the United States. Show this card to your employer to verify authorization to work during the dates on the card.

If any information on the card is incorrect, please write the office listed below. Include your Employment Authorization Document, I-766, a photocopy of this notice, and evidence to support the necessary corrections.

THIS APPROVAL NOTICE IS NOT A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION, NOR MAY IT BE USED IN PLACE OF A VISA OR FORM I-766.

As a reminder, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days and your underlying Form I-140 is approved or is still pending. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

---

Please see the additional information on the back. You will be notified separately about any other cases you filed.

U.S. CITIZENSHIP & IMMIGRATION SVCS

VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS    VT    05479-0001
**Customer Service Telephone: (800) 375-5283**



Form I-797 (Rev. 01/31/05) N

27

Department of Homeland Security
U.S. Citizenship and Immigration Services

Form I-797C, Notice of Action

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| RECEIPT NUMBER | | CASE TYPE I765 APPLICATION FOR EMPLOYMENT AUTHORIZATION |
|---|---|---|
| EAC-15-904-68323 | | |
| RECEIPT DATE March 4, 2015 | PRIORITY DATE | APPLICANT A077 656 263 |
| NOTICE DATE May 18, 2015 | PAGE 1 of 1 | NISSAN, DANIAL J. |

MARK STANLEY KOCOL
MARK S KOCOL PC
330 SOUTH WELLS FL 618D
CHICAGO IL 60606

**Notice Type:** Approval Notice
**Class:** A12
**Valid from** 05/18/2015 to 09/30/2016

This notice is to advise you of action taken on this case. The official notice has been mailed according to the mailing preferences noted on the Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. Any relevant documentation was mailed according to the specified mailing preferences.

Your application for employment authorization has been approved. The Form I-766, Employment Authorization Document, was sent under separate cover to the beneficiary.

This card authorizes your employment in the United States. Show this card to your employer to verify authorization to work during the dates on the card.

If any information on the card is incorrect, please write the office listed below. Include your Employment Authorization Document, I-766, a photocopy of this notice, and evidence to support the necessary corrections.

THIS APPROVAL NOTICE IS NOT A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION, NOR MAY IT BE USED IN PLACE OF A VISA OR FORM I-766.

As a reminder, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days and your underlying Form I-140 is approved or is still pending. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

This courtesy copy may not be used in lieu of official notification to demonstrate the filing or processing action taken on this case.

THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVCS
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS     VT    05479-0001
**Customer Service Telephone: (800) 375-5283**

Department of Homeland Security
U.S. Citizenship and Immigration Services

**I-797, Notice of Action**

## THE UNITED STATES OF AMERICA

| | |
|---|---|
| **RECEIPT NUMBER**<br>EAC-16-907-71703 | **CASE TYPE** I765 APPLICATION FOR EMPLOYMENT AUTHORIZATION |
| **RECEIPT DATE**<br>September 26, 2016    **PRIORITY DATE** | **APPLICANT** A077 656 263<br>NISSAN, DANIAL J. |
| **NOTICE DATE**<br>November 14, 2016    **PAGE**<br>1 of 1 | |

| | |
|---|---|
| MARK STANLEY KOCOL<br>3011 WEST 183RD STREET<br>HOMEWOOD IL 60430 | **Notice Type:** Approval Notice<br>**Class:** A12<br>**Valid from** 11/14/2016 to 03/31/2018 |

Your application for employment authorization has been approved. The Form I-766, Employment Authorization Document, was sent under separate cover to the beneficiary.

This card authorizes your employment in the United States. Show this card to your employer to verify authorization to work during the dates on the card.

If any information on the card is incorrect, please write the office listed below. Include your Employment Authorization Document, I-766, a photocopy of this notice, and evidence to support the necessary corrections.

THIS APPROVAL NOTICE IS NOT A VISA OR EVIDENCE OF EMPLOYMENT AUTHORIZATION, NOR MAY IT BE USED IN PLACE OF A VISA OR FORM I-766.

As a reminder, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days and your underlying Form I-140 is approved or is still pending. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
VERMONT SERVICE CENTER
US CITIZENSHIP & IMMIGRATION SVCS
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
**Customer Service Telephone: (800) 375-5283**



Form I-797 (Rev. 01/31/05) N

# THE UNITED STATES OF AMERICA

**I-797 | NOTICE OF ACTION** | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number IOE0907631298 | USCIS Account Number 038373970848 | Case Type I821 - APPLICATION FOR TEMPORARY PROTECTED STATUS |
|---|---|---|
| Received Date 10/07/2019 | Priority Date 10/07/2019 | Applicant A077 656 263 DANIAL NISSAN |
| Notice Date 11/15/2019 | Page 1 of 1 | |

NISSAN, DANIAL
c/o MARK S KOCOL PC
MARK S KOCOL PC
3011 WEST 183RD STREET STE 134
HOMEWOOD IL 60430

**Notice Type:** Approval Notice
Valid from: 10/01/2019 to 03/31/2021

You have been granted Temporary Protected Status (TPS) under section 244 of the Immigration and Nationality Act. The benefits of TPS are temporary protection from removal (or deportation) and employment authorization in the United States.

If you requested employment authorization pursuant to your registration for TPS, you will receive a separate notice containing the decision on that request. If the request for employment authorization is approved you will be issued an employment authorization document (EAD). That EAD will be valid until the expiration date shown on the EAD itself. An EAD may be granted only to the end of the time period that has been designated for your TPS or 12 months, whichever is shorter. The EAD will serve as evidence of your Temporary Protected Status.

If the program is extended, you must re-register with the U.S. Citizenship and Immigration Services (USCIS) within the time period designated for re-registration. In order to obtain these extensions of employment authorization you must apply to the USCIS at least thirty days prior to the expiration date on your employment authorization document. If approved, you may be granted extensions of that employment authorization up to the end of the time period that has been designated for your TPS.

Failure to re-register for a TPS extension may result in the withdrawal of your TPS and may result in removal proceedings being initiated against you.

While you are under Temporary Protected Status, you:

(1) will not be removed from the United States;
(2) will be granted work authorization, if a request has been made with the required fee, until the expiration of the time period designated for your Temporary Protected Status;
(3) will be considered as being in, and maintaining, lawful status as a nonimmigrant for purposes of adjustment of status under section 245 of the Act and for change of status under section 248 of the Act;
(4) will not be considered to be permanently residing in the United States under the code of law;
(5) may be deemed ineligible for public assistance by a state or any political subdivision thereof which furnishes such assistance; and
(6) **may not depart the United States without prior approval of the Attorney General of the United States.**

PLEASE NOTE: As long as you remain eligible for Temporary Protected Status and you maintain your status by complying with the registration requirements, you will be allowed to remain and work in the United States, if so authorized, until the end of the period of the time designated for your Temporary Protected Status.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

Vermont Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
75 Lower Welden Street
Saint Albans VT 05479-0001



**Customer Service Telephone: 800-375-5283**



FORM I-797 [REV. 08/01/16]



UNITED STATES OF AMERICA

EMPLOYMENT AUTHORIZATION

Surname
**NISSAN**

Given Name
**DANIAL**

USCIS#
**077-656-263**

Country of Birth
**Syria**

Terms and Conditions
**None**

Category
**A12**

Card#
**IOE0911411081**

Valid From:
**05/21/21**

Card Expires:
**09/30/22**

Sex
**M**

NOT VALID FOR REENTRY TO U.S.







THE UNITED STATES OF AMERICA

**I-797A | NOTICE OF ACTION** | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number IOE0924564461 | USCIS Account Number 023222386664 | Case Type J821 - APPLICATION FOR TEMPORARY PROTECTED STATUS |
|---|---|---|
| Received Date 02/28/2024 | Priority Date 02/28/2024 | Applicant A077 656 263 NISSAN, DANIAL |
| Notice Date 04/03/2024 | Page 1 of 2 | |

NISSAN, DANIAL
c/o KOCOL, MARK STANLEY
18300 SOUTH HALSTED ST STE B302
GLENWOOD IL 60425

**Notice Type:** Approval Notice
Valid from: 04/01/2024 to 09/30/2025

You have been granted Temporary Protected Status (TPS) under section 244 of the Immigration and Nationality Act. The benefits of TPS are temporary protection from removal (or deportation), employment authorization in the United States, and the opportunity to apply for travel authorization.

Attached to this notice is a Form I-94 indicating your Temporary Protected Status in the United States. The I-94 is valid until the expiration date shown on it.

If you requested an employment authorization document (EAD) pursuant to your registration for TPS, you will receive a separate notice containing the decision on that request. If your EAD request is approved, you will be issued an EAD that will be valid until the expiration date shown on the EAD itself. The EAD will serve as evidence of your TPS and employment authorization.

If the TPS designation is extended, you must re-register with U.S. Citizenship and Immigration Services (USCIS) within the time period designated for re-registration. If you wish to obtain an EAD valid for the time period of the extended TPS designation, you must also apply for an EAD during the filing period(s) described in the applicable Federal Register notice (FRN). The FRN notice will provide guidance on required forms and application fees to re-register for TPS and to apply for a new EAD. You should also pay close attention to any future FRNs issued by USCIS regarding your country's TPS, including any information that may be included in such notices about possible automatic extensions of the validity date(s) on EADs.

Failure to re-register during a TPS extension re-register period may result in the withdrawal of your TPS and may result in removal proceedings being initiated against you.

While you are under Temporary Protected Status, you:

Please see the additional information on the back. You will be notified separately about any other cases you filed.
USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

USCIS TSC
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd. STE 114
Irving TX 75038-0015

USCIS Contact Center: www.uscis.gov/contactcenter

PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

Detach This Half for Personal Records

**Receipt** IOE0924564461
**I-94#** **441478777 09**
**NAME** NISSAN, DANIAL
**CLASS**

**VALID FROM** 04/01/2024 **UNTIL** 09/30/2025

APPLICANT: NISSAN, DANIAL
1919 E HOPI LANE
MT PROSPECT IL 60056

**441478777 09**

**Receipt Number** IOE0924564461
**United States Citizenship and Immigration Services**

**I94 Departure Record**

14 Family Name
NISSAN
15 First (Given) Name
DANIAL 
17 Country of Citizenship
SY

FORM I-797A [REV. 08/01/16]

# THE UNITED STATES OF AMERICA

## I-797A | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES



| Receipt Number | USCIS Account Number | Case Type |
|---|---|---|
| IOE0924564461 | 023222386664 | I821 - APPLICATION FOR TEMPORARY PROTECTED STATUS |
| Received Date | Priority Date | Applicant A077 656 263 |
| 02/28/2024 | 02/28/2024 | NISSAN, DANIAL |
| Notice Date | Page | |
| 04/03/2024 | 2 of 2 | |

(1)  will not be removed from the United States;

(2)  have work authorization and will be granted evidence of work authorization, if you have submitted an EAD request with the required fee, that is valid until the expiration of the time period designated for your Temporary Protected Status;

(3)  will be considered as being in, and maintaining, lawful status as a nonimmigrant for purposes of adjustment of status under section 245 of the Act and for change of status under section 248 of the Act;

(4)  will not be considered to be permanently residing in the United States under the code of law;

(5)  may be deemed ineligible for public assistance by a state or any political subdivision thereof which furnishes such assistance; and

(6)  may not depart the United States without prior approval of the Attorney General of the United States.

PLEASE NOTE: As long as you remain eligible for Temporary Protected Status and you maintain your status by complying with the registration requirements, you will be allowed to remain and work in the United States until the end of the period of the time designated for your Temporary Protected Status.

NOTICE: Although this application/petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify the information submitted in this application, petition and/or supporting documentation to ensure conformity with applicable laws, rules, regulations, and other authorities. Methods used for verifying information may include, but are not limited to, the review of public information and records, contact by correspondence, the internet, or telephone, and site inspections of businesses and residences. Information obtained during the course of verification will be used to determine whether revocation, rescission, and/or removal proceedings are appropriate. Applicants, petitioners, and representatives of record will be provided an opportunity to address derogatory information before any formal proceeding is initiated.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

USCIS TSC
U.S. CITIZENSHIP & IMMIGRATION SVC
6046 N Belt Line Rd. STE 114
Irving TX 75038-0015

USCIS Contact Center: www.uscis.gov/contactcenter



INTENTIONALLY LEFT BLANK

Detach This Half for Personal Records

INTENTIONALLY LEFT BLANK

Receipt

INTENTIONALLY LEFT BLANK

NAME

INTENTIONALLY LEFT BLANK

CLASS

VALID FROM UNTIL

INTENTIONALLY LEFT BLANK

APPLICANT:

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

INTENTIONALLY LEFT BLANK

Receipt Number

United States Citizenship and Immigration Services

INTENTIONALLY LEFT BLANK

I94 Departure Record

INTENTIONALLY LEFT BLANK

14 Family Name

15 First (Given) Name

INTENTIONALLY LEFT BLANK

17 Country of Citizenship

INTENTIONALLY LEFT BLANK

FORM I-797A [REV. 08/01/16]



**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| REQUEST FOR APPLICANT TO APPEAR FOR INITIAL INTERVIEW | Notice Date August 14, 2019 |
|---|---|

| Case Type FORM I485, APPLICATION TO REGISTER PERMANENT RESIDENCE OR ADJUST STATUS | A# A077 656 263 |
|---|---|

| Receipt Number MSC1990517553 | Received Date January 22, 2019 | Priority Date | Page 1 of 2 |
|---|---|---|---|

DANIAL J NISSAN
c/o MARK STANLEY KOCOL
3011 WEST 183RD STREET STE 134
HOMEWOOD IL 60430

A Number

Receipt Number

You are hereby notified to appear for the interview appointment, as scheduled below, for the completion of your Application to Register Permanent Residence or Adjust Status (Form I-485) and any supporting applications or petitions. *Failure to appear for this interview and/or failure to bring the below listed items will result in the denial of your application. (8 CFR 103.2(b)(13))*

**Who should come with you?**
- If your eligibility is based on your marriage, your husband or wife must come with you to the interview.
- If you do not speak English fluently, you should bring an interpreter.
- Your attorney or authorized representative may come with you to the interview.
- If your eligibility is based on a parent/child relationship and the child is a minor, the petitioning parent and the child must appear for the interview.

*NOTE: Every adult (over 18 years of age) who comes to the interview must bring Government-issued photo identification, such as a driver's license or ID card, in order to enter the building and to verify his/her identity at the time of the interview. You do not need to bring your children unless otherwise instructed. Please be on time, but do not arrive more than 30 minutes early. We may record or videotape your interview.*

*YOU MUST BRING THE FOLLOWING ITEMS WITH YOU:* (Please use as a checklist to prepare for your interview)
- This Interview Notice and your Government issued photo identification.
- A completed medical examination (Form I-693) and vaccination supplement in a sealed envelope (unless already submitted).
- A completed Affidavit(s) of Support (Form I-864) with all required evidence, including the following, for each of your sponsors (unless already submitted):
  - Federal Income Tax returns and W-2's, or certified IRS printouts, for the most recent tax year;
  - Letters from each current employer, verifying current rate of pay and average weekly hours, and pay stubs for the past 2 months;
  - Evidence of your sponsor's and/or co-sponsor's United States Citizenship or Lawful Permanent Resident status.
- All documentation establishing your eligibility for Lawful Permanent Resident status.
- Any immigration-related documentation ever issued to you, including any Employment Authorization Document (EAD) and any Authorization for Advance Parole (Form I-512).
- All travel documents used to enter the United States, including Passports, Advance Parole documents (I-512) and I-94s (Arrival/Departure Document).
- Your Birth Certificate.
- Your petitioner's Birth Certificate and your petitioner's evidence of United States Citizenship or Lawful Permanent Resident Status.
- If you have children, bring a Birth Certificate for each of your children.
- If your eligibility is based on your marriage, in addition to your spouse coming to the interview with you, bring:
  - A certified copy of your Marriage Document issued by the appropriate civil authority;
  - Your spouse's Birth Certificate and your spouse's evidence of United States Citizenship or Lawful Permanent Resident status;
  - If either you or your spouse were ever married before, all divorce decrees/death certificates for each prior marriage/former spouse;
  - Birth Certificates for all children of this marriage, and custody papers for your children and for your spouse's children not living with you;
- Supporting evidence of your relationship, such as copies of any documentation regarding joint assets or liabilities you and your spouse may have together. This may include: tax returns, bank statements, insurance documents (car, life, health), property documents (car, house, etc.), rental agreements, utility bills, credit cards, contracts, leases, photos, correspondence and/or any other documents you feel may substantiate your relationship.
- Original and copy of each supporting document that you submitted with your application. Otherwise, we may keep your originals for our records.
- If you have ever been arrested, bring the related Police Report and the original or certified Final Court Disposition for each arrest, even if the charges have been dismissed or expunged. If no court record is available, bring a letter from the court with jurisdiction indicating this.
- A certified English translation for each foreign language document. The translator must certify that s/he is fluent in both languages, and that the translation is in its entirety is complete and accurate.

If you have questions, please call the USCIS Contact Center at 1-800-375-5283 (hearing impaired TDD service is 1-800-767-1833)

| PLEASE COME TO: U.S. Citizenship and Immigration Services 101 WEST IDA B. WELLS DRIVE CHICAGO, IL 60605 | ON: Monday, September 23, 2019 AT: 08:00AM |
|---|---|

If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Form I-797C 04/01/19

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

| THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT. |
| --- |

| REQUEST FOR APPLICANT TO APPEAR FOR INITIAL INTERVIEW | Notice Date<br>August 14, 2019 |
| --- | --- |

| Case Type<br>FORM I485, APPLICATION TO REGISTER PERMANENT RESIDENCE OR ADJUST STATUS | A#<br>A077 656 263 |
| --- | --- |

| Receipt Number<br>MSC1990517553 | Received Date<br>January 22, 2019 | Priority Date | Page<br>2 of 2 |
| --- | --- | --- | --- |

*YOU MUST APPEAR FOR THIS INTERVIEW*- If an emergency, such as your own illness or a close relative's hospitalization, prevents you from appearing, call the U.S. Citizenship and Immigration Services (USCIS) National Customer Service Center at 1-800-375-5283 as soon as possible. Please be advised that rescheduling will delay processing of application/petition, and may require some steps to be repeated. It may also affect your eligibility for other immigration benefits while this application is pending.

**If you have questions, please call the USCIS Contact Center at 1-800-375-5283 (hearing impaired TDD service is 1-800-767-1833)**

| PLEASE COME TO: U.S. Citizenship and Immigration Services<br>101 WEST IDA B. WELLS DRIVE<br>CHICAGO, IL 60605 | ON: **Monday, September 23, 2019**<br>AT: **08:00AM** |
| --- | --- |

2

If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

Form I-797C  04/01/19

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Chicago Field Office
101 W. Ida B. Wells Dr.
Chicago, IL 60605

September 26, 2019

**U.S. Citizenship
and Immigration
Services**

Danial Nissan
2327 West Farwell Ave Apt 1S
Chicago, IL 60645

A077656263
MSC1990517553

## NOTICE OF DECISION

Dear Danial Nissan:

On January 22, 2019, you filed Form I-485, Application to Register Permanent Residence or Adjust Status, with U.S. Citizenship and Immigration Services (USCIS) under section 245 of the Immigration and Nationality Act (INA).

After a thorough review of your application, supporting documents, and your testimony during your interview, we must inform you that we are denying your application because USCIS does not have jurisdiction to decide whether you are eligible for adjustment of status since an Immigration Judge entered a Final Removal Order against you on July 29, 2004.

### Statement of Facts and Analysis, Including Ground(s) for Decision

You filed Form I-485 based on being the beneficiary of an immigrant petition. On September 23, 2019, you appeared for an interview to determine your eligibility for adjustment of status. During the interview and review of your application with an Immigration Services Officer, you testified that the information on your Form I-485, along with any amendments made during the interview, and supporting documents were true and correct.

USCIS has jurisdiction to adjudicate an application for adjustment of status only if the Immigration Judge does not have jurisdiction. See Title 8, Code of Federal Regulations (8 CFR), sections 245.2(a) and 1245.2(a). In general, except if the applicant is an "arriving alien," the Immigration Judge has jurisdiction to grant or deny a Form I-485 if the adjustment applicant is in a section 240 removal proceeding before the U.S. Department of Justice, Executive Office for Immigration Review (EOIR).

USCIS reviewed your case file, A077656263, and determined that an Immigration Judge ordered that you be removed from the United States, but you have not yet departed under that order. After a thorough review of your application, supporting documents, and your testimony during your interview, it does not appear that the removal proceedings against you have been terminated. See 8 CFR section 245.1(c)(8)(ii). USCIS also determined that you are not an arriving alien because you were admitted on 01/19/2002, as a B-2 (visitor).

Since you are a respondent in a removal proceeding, and you are not an "arriving alien," only EOIR has jurisdiction to grant or deny your Form I-485 based on the merits. However, because the Immigration Judge entered a Final Removal Order against you, your Form I-485 is denied based on lack of USCIS jurisdiction. 8 CFR sections 245.2(a)(1) and 1245.2(a)(1).





 (/sites/eservice5/9690694/)

---

## Status of Documents Submitted to eService

| Print |

### Only Documents Accepted Qualify for Proof of Service of Process

The eService Team has processed your document(s). Please review the chart below for the status of each document submitted for processing.

This indicates your document was accepted for Service of Process.✅

❌This indicates your document was rejected for processing.❌

**ANumber:** 077656263
**Processing Date:** 09-08-2020 11:42:24 am
**Total Files:** 1
**Number of Accepted Files:** 1 ✅
**Number of Rejected Files:** 0

| # | File Name | Status |
|---|-----------|--------|
| 1 | Nissan_Jt.Mtn.Reopen_8.19.2020.Num.pdf | ✅ |

**Submission details include:** Processing of Files for 077656263
**Processing Message from ICE:**

```
The eService Team...
```

# Joint Motion to Reopen Cover Sheet
## Date: August 18, 2020

1. Alien Registration #: A077-656-263

2. Alien Name: Danial Nissan

3. Date Order Issued by Chicago Immigration Court: July 29, 2004

4. Date Final Order issued by BIA: June 14, 2006 (denial of Motion to Reopen)

5. Has the Respondent ever been arrested?  ___ Yes  __XX__ No

6. Supporting documents per OPLA Guidelines, including:

## Table of Contents

| Exh. | Document(s) | Page(s) |
|---|---|---|
| A. | One-page cover letter summarizing the request | 1 |
| B. | Signed DHS Form G-28, *Notice of Entry of Appearance* (incl. Motion to Substitute Counsel, with EOIR-28) | 2-3 |
| C. | Proposed application for relief: I-485, *Application to Register Permanent Residence of Adjust Status* (fee paid and filed , 2019) | 4-22 |
| D. | Proof of prima facie eligibility: approved I-130, *Petition for Alien Relative*, through U.S. citizen spouse, Sadeta Kalamperovic (Date of approval: September 26, 2019; priority date: December 23, 2007), incl. September 26, 2019 DHS decision denying I-485 | 23-24 |
| E. | Copies of income tax returns (IRS transcripts) for the last 3 years: | |
| | a. 2019 | 25-26 |
| | b. 2018 | 27-28 |
| | c. 2017 | 29-30 |
| F. | Evidence of compelling discretionary factors: | |
| | a. Marriage certificate, Danial Nissan & Sadeta Kalamperovic (December 5, 2005) | 31 |
| | b. Proof of lawful entry/admission (January 19, 2002) | 32 |

| Exh. | Document(s) | Page(s) |
|---|---|---|
| c. | Confirmation of Danial Nissan as bone marrow donor to his sister, Lina Nissan, on October 10, 2002 | 33 |
| d. | Confirmation of special registration on December 16, 2002 | 34 |
| e. | Order of the Immigration Judge (July 29, 2004) | 35 |
| f. | Board of Immigration Appeals denial of Motion to Reopen (June 14, 2006) | 36 |
| g. | Grant of TPS (May 10, 2013-September 30, 2013) | 37 |
| h. | Extension of grant of TPS (October 1, 2013-March 31, 2015) | 38 |
| i. | Extension of grant of TPS (May 18, 2015-September 30, 2016) | 39 |
| j. | Extension of grant of TPS (November 14, 2016-March 31, 2018) | 40 |
| k. | Extension of grant of TPS (April 1, 2018-September 30, 2019) | 41 |
| l. | Extension of grant of TPS (October 1, 2019-March 31, 2020) | 42 |
| m. | *Article*, "23 Christian Families Trapped in ISIS Stronghold Raqqa Facing Violence, Forced Taxes," *The Christian Post* (October, 2014) | 43-44 |
| n. | UNHCR, Registration Certificate (refugee status) (July 11, 2015), confirming refugee status of Danial Nissan's brother, mother, and father | 45 |
| G. | Draft Motion to Reopen with proposed Immigration Judge Order | 46-50 |

## Analysis of Equities

Danny bears the burden of demonstrating that his request merits a favorable exercise of discretion. *Matter of Marin*, 16 I&N Dec. 581, 584585 (BIA 1978). Positive factors include family ties within the United States, residence of long duration in this country, hardships to the alien and his family if he is deported, property ownership or business ties, demonstrated value and service to the community, genuine rehabilitation if a criminal record exists, and any other evidence attesting to the alien's good character. *Id.* The severity of adverse factors may require the alien to introduce additional offsetting favorable evidence which may involve "unusual" or "outstanding" equities. *Id.* Each case must be judged on its own merits and both adverse and positive factors should be considered. *Id.*; Matter of Edwards, 20 I&N Dec. 191, 196 (BIA 1990).

Danny has never been arrested by the police for any criminal activity. His only adverse factor is that he has an order of removal issued by former Judge Carlos Cuevas from 2004 (**Ex. F** at 35). Tempering the adverse nature of the removal order is the basis for why he entered the United States to begin with – as a bone marrow donor for his sister (Id. at 33) – and his subsequent compliance with Special Registration in December, 2012 as a national of Syria (Id. at 34). He was placed into proceedings ***because*** he complied with his legal responsibilities.

Family ties within the United States: Danny and his wife Sadeta (**Ex. D** at 23) reside in the United States together and are approaching their fifteen (15) year anniversary together.

Residence of long duration in this country: Danny has resided in the United States for eighteen-plus years, nearly half of his life and all of his adult years.

Hardships if Danny is deported: Danny cannot return safely to Syria given conditions there including the civil war, the banishment of Assyrian Christians like him and his family (**Ex. F** at 43-44) and the U.S. government's recognition of the dangers in Syria through its designation of that country for TPS starting in 2012. The lack of safety has led, in fact, to his parents and brother relocating to Australia after being accepted as refugees by the UNHCR (Id. at 45).

Property ownership or business ties: Danny has legally worked in this country as a driver since 2012 and now runs his own private driving business.

Evidence attesting to Danny's good character: In short, Danny's giving of himself to the point of traveling to the United States with his mother and sister in early-2001 to provide his bone marrow (Id. at 33) speaks volumes as to his positive character, his depth of caring for those he loves. He and Sadeta have been married for nearly 15 years and their love continues. Chicago DHS was unwilling to agree that his TPS status – requiring that he be admissible as an immigrant in order to have been granted in the first place and granted *after* his order of removal – provided eligibility for adjustment of status (**Ex. D** at 24). He is presently prima facie eligible for lawful permanent residency and his ability to safely venture to Syria for visa processing

[separate from any/all INA § 212(a)(9) issues] is anything but certain. In short, Danny's ability to pursue the green card his marriage to Sadeta allows will be fundamentally-compromised, likely forever, if a joint motion to reopen is not positively-considered.

To that end, and similar to the rationale enumerated by the Board of Immigration Appeals in the unpublished case of *In Re: Jean Robert Dorilus*, A076-461-872 (BIA March 14, 2019) (see attached), we believe that Danny's marriage to a U.S. citizen with an approved I-130 petition, plus his TPS status, together warrant reopening of this removal matter to allow pursuance of adjustment of status under INA § 245(a).



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**DORILUS, JEAN ROBERT**

**DHS/ICE Office of Chief Counsel - MIA**
**333 South Miami Ave., Suite 200**
**Miami, FL 33130**

**Name: DORILUS, JEAN ROBERT**          **A 076-461-872**

**Date of this notice: 3/14/2019**

Enclosed is a copy of the Board's decision in the above-referenced case. If the attached
decision orders that you be removed from the United States or affirms an Immigration Judge's
decision ordering that you be removed, any petition for review of the attached decision must
be filed with and received by the appropriate court of appeals within 30 days of the date of
this decision.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Panel Members:
Guendelsberger, John

Userteam: Docket

For more unpublished decisions, visit
www.irac.net/unpublished/index

Immigrant & Refugee Appellate Center, LLC | www.irac.net

Cite as: Jean Robert Dorilus, A076 461 872 (BIA March 14, 2019)



**U.S. Department of Justice**
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

File: A076-461-872 – Miami, FL

Date: MAR 1 4 2019

In re: Jean Robert DORILUS

IN REMOVAL PROCEEDINGS

MOTION

ON BEHALF OF RESPONDENT: Pro se

APPLICATION: Reopening

The respondent, a native and citizen of Haiti, has filed an untimely motion in which he requests the Board to reopen proceedings. The record before us does not contain a reply to the motion from the Department of Homeland Security (DHS), and the motion is therefore deemed unopposed. *See* 8 C.F.R. § 1003.2(g)(3).

The respondent has submitted documentation with his motion showing that his United States citizen wife filed a Form I-130 visa petition on his behalf (Mot. Exh. 5), and it appears that the visa petition was approved on December 4, 2018. The respondent's new evidence demonstrates that he was granted Temporary Protected Status (TPS) (Mot. Exh. 4). Additionally, although the respondent originally arrived in the United States without being admitted or paroled, the new evidence shows that the respondent left the United States and returned under a grant of advance parole (Mot. Exhs. 1, 4). In light of the evidence before us, it appears the respondent is eligible to be considered before the Immigration Judge for adjustment of status under section 245(a) of the Immigration and Nationality Act, 8 U.S.C. § 1255(a).

The respondent states in his motion that he and his wife have a child together, that his family members will suffer significant hardship if he must leave the United States, and that conditions in Haiti are extremely poor and sometimes life threatening.

Considering the totality of circumstances, including the respondent's grant of TPS; the conditions in Haiti; the respondent's family members in the United States; and the lack of affirmative opposition to reopening from the DHS, we will reopen proceedings pursuant to 8 C.F.R. § 1003.2(a). The record will be remanded to the Immigration Judge for consideration of the respondent's eligibility for adjustment of status under section 245(a) of the Act.

ORDER: The proceedings are reopened pursuant to 8 C.F.R. § 1003.2(a).

A076-461-872

FURTHER ORDER: The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

FOR THE BOARD

Immigrant & Refugee Appellate Center, LLC | www.irac.net

**2**



# Mark S. Kocol, P.C.

Practice Concentrating in United States Immigration Law

Mark S. Kocol

August 19, 2020

Office of the Principal Legal Advisor
U.S. Department of Homeland Security
525 West Van Buren Street, Suite 701
Chicago, Illinois 60607

<u>**RE**</u>: **Cover Letter accompanying Proposed Joint Motion to Reopen for
Adjustment of Status through U.S. citizen spouse
<u>Respondent</u>: Danial Nissan    <u>Alien #</u>: A077-656-263**

Dear Sir/Madam,

Pursuant to your office's July, 2018 "Instructions for Joint Motion to Reopen Requests for
Cases Decided by the Chicago Immigration Court," I hereby tender a request to your office to
consider joining in a motion to reopen for Mr. Danial Nissan (Danny) and his U.S. citizen
spouse, Ms. Sadeta Kalamperovic (Sadeta).

By way of summary, Danny was admitted to the United States as a tourist from Syria to donate
bone marrow to his then-teenaged sister who was under care at the University of Chicago
Children's Hospital for myelogenous leukemia. Following mandatory reporting for "Special
Registration" in 2002, Danny was placed into removal proceedings but subsequently denied a
continuance by former-Judge Carlos Cuevas to allow adjudication of an I-130, *Petition for
Alien Relative*, filed by Sadeta when she was a lawful permanent resident. Denied motions to
reopen & reconsider, Danny was ordered removed. The Department of Homeland Security
(DHS) has since granted him temporary protected status (TPS) and Chicago DHS has approved
an I-130 based on Sadeta now being a U.S. citizen.

Danny desires reopening to allow him to adjust his status pursuant to INA § 245(a).

Very truly yours,

Mark S. Kocol

File #: 20906
MSK / Attachments

 Gmail

**Mark Kocol <mkocol.immigrationlaw@gmail.com>**

---

## Re: FOLLOW-UP Re: Niz-Chavez & Joint Motion to Reopen request for Danial Nissan
8 messages

---

**Mark Kocol** <mkocol.immigrationlaw@gmail.com>                           Sun, Nov 14, 2021 at 5:38 PM
To: "Galassi, Jessica" <Jessica.J.Galassi@ice.dhs.gov>

My apologies - I forgot to note in my email earlier the new issue affecting the basis to reconsider: the Supreme Court decision in *Niz-Chavez v Garland*. This new issue is separate and apart from the recent PD memo and it did not exist when we were discussing the issue earlier this year.

Given Mr. Nissan's US citizen spouse (the same spouse to whom he was married when IJ Cuevas ordered removal), there is strong support for the proposition that *Niz-Chavez* mandates reopening since his NTA clearly contained no time or date of hearing information (please see attached).

In any event, before encumbering you/your office with another full, written PD filing or otherwise, one which will create additional legal paperwork for both of us, I would ask whether you may be amenable to reconsidering the prior PD denial given the unique facts here, recency of your prior review, and Supreme Court precedent that applies here.


--
Mark

**PLEASE NOTE MY NEW MAILING ADDRESS (eff. 2/1/2021)**:

Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425

312-588-0466 (TEXT & phone)
866-725-0343 (fax)
www.chicago-immigration-attorney.com


On Sun, Nov 14, 2021 at 10:52 AM Mark Kocol <mkocol.immigrationlaw@gmail.com> wrote:
Good morning Jessica -

From colleagues, it sounds like you are the/THE point person on all PD requests in Chicago?

Pursuant to current guidance (https://www.ice.gov/about-ice/opla/prosecutorial-discretion), and based on prior email conversations, can you please advise whether reconsideration of our prior materials (with updated current confirmation of continued TPS protection granted to Mr. Nissan) is a potential? Or is refiling our only other option for you to consider PD in this case?

Thanks in advance.


--
Mark

**PLEASE NOTE MY NEW MAILING ADDRESS (eff. 2/1/2021)**:

Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302

Glenwood, IL 60425

312-588-0466 (TEXT & phone)
866-725-0343 (fax)
www.chicago-immigration-attorney.com

On Tue, Jun 22, 2021 at 6:34 PM Mark Kocol <mkocol.immigrationlaw@gmail.com> wrote:
I saw that you're not supposed to be back until 6/22/2021 - enjoy your time off. I'm guessing all of our lives will be getting busy soon especially with a post Covid world dawning. Talk to you soon.

On Tue, Jun 22, 2021 at 6:31 PM Galassi, Jessica <Jessica.J.Galassi@ice.dhs.gov> wrote:

I'm very sorry for your loss. Please accept my condolences.

Please keep me posted on what you and your client decide to do. I will schedule a meeting with my supervisor as soon as I am able to do so to discuss whether we will review the case in light of the most recent guidance.

**From:** Mark Kocol <mkocol.immigrationlaw@gmail.com>
**Sent:** Tuesday, June 22, 2021 5:58 PM
**To:** Galassi, Jessica <Jessica.J.Galassi@ice.dhs.gov>
**Subject:** Re: FOLLOW-UP: Joint Motion to Reopen request for Danial Nissan

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact ICE SOC SPAM with questions or concerns.

Jessica - thanks for the quick response. I'm still going to meet with them this weekend to bring them up to speed. My father's passing earlier this year has us burying his ashes tomorrow with a mass, etc. So I have been tough to get a hold of for them. I owe them a meetup this weekend, will discuss where all these things stand. Thank you again for the follow-up.

On Tue, Jun 22, 2021 at 5:53 PM Galassi, Jessica <Jessica.J.Galassi@ice.dhs.gov> wrote:

Hi Mark,

Let me raise this to my supervisor ahead of you filing a MTR sua sponte and get back to you. I will say that our office has been inundated with these types of requests and we are busy trying to figure out the appropriate way to address these issues in light of the guidance. Can you give me a bit of time to discuss this with my bosses?

Thanks,

Jessica

**From:** Mark Kocol <mkocol.immigrationlaw@gmail.com>
**Sent:** Monday, June 21, 2021 9:18 PM
**To:** Galassi, Jessica <Jessica.J.Galassi@ice.dhs.gov>
**Subject:** FOLLOW-UP: Joint Motion to Reopen request for Danial Nissan

---

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact ICE SOC SPAM with questions or concerns.

---

Good evening Ms. Galassi -

I am aware of the May 27, 2021 memo issued by John D. Trasvina attached. The memo clearly does not prescribe a specific analysis for reviewing whether to join in certain motions, incl. of the type presented previously here for Mr. Nissan whose TPS has now been extended through September 30, 2022 (attached).

Given that this memo does not address review/assessment of motions such as presented here, but does/DOES address a number of issues relevant to what we presented previously in Mr. Nissan's support (i.e. eligibility for relief; TPS/lawful status; his arrival with a B-2 solely to be a bone marrow for his sister, among others, etc.) vis-a-vis Mr. Nissan's not fitting any of the current enforcement categories, I respectfully ask whether the May 27 memo allows you/your office a basis to re-assess the merits of the motion we presented previously? Stated differently, would you potentially - based on the May 27 memo - be willing to re-review the requested joint motion we presented previously? Or would re-submission be a preferred action on our part?

I have been in the process of finalizing a formal request for sua sponte motion to reopen for Chicago EOIR's consideration. I do not know who would eventually review the motion given this is an old Judge Cuevas case. In lieu of creating more legal work to add to the already overburdened Chicago EOIR system, I am drafting this email to see if you/your office is amenable to discussing this case anew, or whether you feel that the issue would need to await further guidance from D.C. before re-examining the request we presented months ago.

I am not easily offended so if the answer is a clear "no," I respect that. All I would request is some interaction on the issue when you get the chance. Thank you in advance.

--

Mark

**PLEASE NOTE MY NEW**

**MAILING**

**ADDRESS (eff. 2/1/2021)**

:

Mark S. Kocol, P.C.

18300 South Halsted Street  Suite B-302

Glenwood, IL 60425

312-588-0466 (TEXT & phone)
866-725-0343 (fax)
www.chicago-immigration-attorney.com

On Thu, Jan 21, 2021 at 6:13 PM Galassi, Jessica <Jessica.J.Galassi@ice.dhs.gov> wrote:

Hello Attorney Kocol,

Our office has reviewed your request for a joint motion to reopen on behalf of Danial Nissan. After careful consideration of your request and all supporting documentation, as well as a review of our records, we would respectfully decline to join in your motion as a matter of discretion.

Kind regards,

Jessica Galassi

Assistant Chief Counsel

Office of the Principal Legal Advisor, Chicago

U.S. Immigration and Customs Enforcement

U.S. Department of Homeland Security

525 W. Van Buren St., Ste. 701

Chicago, IL 60607

Direct: (312) 542-8215

**\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\***

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs

Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

--

--

Mark

**PLEASE NOTE MY NEW**

**MAILING**

**ADDRESS (eff. 2/1/2021)**

:

Mark S. Kocol, P.C.

18300 South Halsted Street  Suite B-302

Glenwood, IL 60425

312-588-0466 (TEXT & phone)
866-725-0343 (fax)
www.chicago-immigration-attorney.com

--

--

Mark

**PLEASE NOTE MY NEW MAILING ADDRESS (eff. 2/1/2021)**:

Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425

312-588-0466 (TEXT & phone)
866-725-0343 (fax)
www.chicago-immigration-attorney.com

**4 attachments**

📄 **Nissan.NTA_11.14.2021.pdf**
2080K

📄 **Nissan_130.Approval.pdf**
127K

📄 **Nissan_130.Orig.Approval.pdf**
98K

📄 **Nissan_MC.pdf**
105K



**CONFORMED COPY; RETURN TO SENDER**

Mark S. Kocol
Mark S. Kocol, P.C.
18300 South Halsted Street Suite B-302
Glenwood, IL 60425
Telephone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR ID No.: BL176134
*Attorney for Respondent*

**NON-DETAINED**

**UNITED STATES DEPARTMENT OF JUSTICE**
**BOARD OF IMMIGRATION APPEALS**
**5107 LEESBURG PIKE, SUITE 2000**
**FALLS CHURCH, VA 22041**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Danial Nissan | ) | A077-656-263 |
| | ) | |
| Respondent. | ) | |
| | ) | |
| In removal proceedings | ) | |
| | ) | |



**MOTION TO REOPEN**

Danial Nissan
A077-656-263

<u>Proof of Service</u>

On June 25, 2022, I served a copy of Respondent's MOTION TO REOPEN on the Office of the Chief Counsel, Immigration & Customs Enforcement, United States Department of Homeland Security, 525 West Van Buren Street, 7th Floor, Chicago, IL 60607 online (and/or via email or FedEx overnight delivery) per local custom.

Date: June 25, 2022

Mark S. Kocol
Mark S. Kocol, P.C.
18300 South Halsted Street, Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #: BL176134





**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS**

## Payment Receipt

A payment has been processed for the following Board of Immigration Appeals (BIA) case. Please contact the BIA Clerk's Office for questions regarding this payment at (703) 605-1007.

You must include a copy of this receipt in the appeal or motion package you are filing with the BIA Clerk's Office. Failure to include a receipt showing proof of payment will result in rejection of the appeal or motion.

**A-Number:** 077-656-263

**Payment Tracking ID:** 270KM9P4

**Payment Processed On:** 6/25/2022 8:48:00 AM EST

**Filing Type:** BIA Motion

**Payment Type:** PAYPAL

**Payment Amount:** $110.00

Save or print your receipt immediately. You will not receive a copy of your receipt via email. The tracking ID is required to retrieve a duplicate receipt.

Mark S. Kocol
Mark S. Kocol, P.C.
18300 South Halsted Street Suite B-302
Glenwood, IL 60425
Telephone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR ID No.: BL176134
*Attorney for Respondent*

**NON-DETAINED**

### UNITED STATES DEPARTMENT OF JUSTICE
### BOARD OF IMMIGRATION APPEALS
### 5107 LEESBURG PIKE, SUITE 2000
### FALLS CHURCH, VA 22041

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Danial Nissan | ) | A077-656-263 |
| | ) | |
| Respondent. | ) | |
| | ) | |
| In removal proceedings | ) | |
| | ) | |

## <u>MOTION TO REOPEN</u>

Danial Nissan
A077-656-263

<u>Proof of Service</u>

On June 25, 2022, I served a copy of Respondent's MOTION TO REOPEN on the Office of the Chief Counsel, Immigration & Customs Enforcement, United States Department of Homeland Security, 525 West Van Buren Street, 7th Floor, Chicago, IL 60607 online (and/or via email or FedEx overnight delivery) per local custom.

_____,                    Date: June 25, 2022

Mark S. Kocol
Mark S. Kocol, P.C.
18300 South Halsted Street, Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #: BL176134

## I. INTRODUCTION.

Danial Nissan (Danial), a Syrian national, and his U.S. citizen spouse of sixteen-plus (16+) years, Sadeta Kalamperovic (Sadeta), together urge the Board of Immigration Appeals (Board) to reopen Danial's removal proceedings.

Country conditions for Danial (an Assyrian Christian) have fundamentally changed for the worse in Syria since his removal matter was last before the Executive Office for Immigration Review (EOIR). There is absolutely no safety for him in his native country today as recognized by both the United States Department of State (DOS) and the United Nations High Commissioner for Refugees (UNHCR). Danial's family was forced to flee Syria in 2011 before resettling as UNHCR-recognized refugees in Australia in 2013. Changed country conditions justify reopening under 8 C.F.R. § 1003.2(c)(3)(ii) to allow Danial to seek political asylum and/or withholding of removal.

The Notice to Appear (NTA) issued to Danial in 2002 by the *legacy*-Immigration & Naturalization Service (*legacy*-INS)[1] unequivocally failed to contain the time and place of hearing, thus not triggering the "stop-time" rule for cancellation of removal relief under INA § 240A(b). That failure justifies reopening under *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), to allow Danial to pursue cancellation of removal: he has been physically present in this country for more than twenty (20) years and he has a qualifying relative in his U.S. citizen spouse who will suffer exceptional and unusual hardship if Danial cannot remain in the United States given her age, health, financial issues, and her own unique immigrant experience.

---

[1] On or about March 1, 2003, the functions of the *legacy*-INS were transferred to the Department of Homeland Security's (DHS) Citizenship & Immigration Services (USCIS), Immigration & Customs Enforcement (ICE), and Customs & Border Protection (CBP) as part of the *Homeland Security Act of 2002* (HSA) of 2002, Pub.L. 107-296, 116 Stat. 2135, enacted November 25, 2002. Reference herein is generally made to DHS as it relates to actions taken by its Chicago-based U.S. Citizenship & Immigration Services (USCIS) officers, Immigration & Customs Enforcement (ICE) officials, and DHS Counsel, unless otherwise noted.

Danial has been protected from removal for more than nine (9) years by the DHS given its designation of Syria for *Temporary Protected Status* (TPS) in March, 2012. A material change in fact and law underlying Danial's removability under INA 237(a)(1)(B) – his TPS status granted by the DHS – *vitiates* that removability. Clearly, DHS "***shall not* remove**" Danial while he holds TPS status under INA § 244(a)(1)(A) (emphasis added). This justifies reopening by the Board under 8 C.F.R. § 1003.2(c)(3)(v).

Danial has unsuccessfully sought to either have Chicago DHS agree to adjudicate a "green card" application for him (based on his sponsorship for an immigrant visa by Sadeta) or to discretionarily-agree (on 2 separate occasions) to reopen his removal matter to allow that adjudication by the immigration court. *See* 8 C.F.R. § 1003.2(c)(3)(iii). Danial is otherwise statutorily eligible for adjustment of status under INA § 245(a), ***but for*** the 2006 removal order, and he cannot depart the United States to process for an immigrant visa in Syria as there is no functioning U.S. Embassy there. He also has no travel document – *legacy*-INS confiscated his in 2002. Danial's only remaining immigrant visa processing option is to depart the U.S. (without a valid passport) for a third country which will automatically trigger a 10-year bar from returning under INA § 212(a)(9)(A)(ii)(II). This "Catch-22" of being otherwise statutorily eligible for an immigrant visa but having no available venue for adjudication of the necessary paperwork, inside or outside the United States, presents an "exceptional circumstance" justifying reopening *sua sponte* by the Board under 8 C.F.R. § 1003.2(a). This is further warranted given that DHS took no steps to remove Danial from 2005-2012 before he was granted TPS.

In sum, Danial seeks reopening under INA § 240 and 8 C.F.R. § 1003.2(c) in order to allow all forms of relief to be presented to the Chicago immigration court, incl. political asylum and withholding of removal (**Ex. 1**); cancellation of removal for non-lawful permanent residents (**Ex. 2**); and adjustment of status (**Ex. 4**) based on the longtime sponsorship (**Ex. 5**) of his U.S. citizen spouse (**Ex. 6**). Danial

also argues that he is no longer removable from the United States based on the December 16, 2002 NTA as a current day TPS-holder (**Ex. 3**), facts when taken cumulatively, leave it eminently worthwhile to reopen his removal proceedings.

## II. STATEMENT OF FACTS & PROCEDURAL HISTORY.

Danial is a native and citizen of Syria, born on January 15, 1981 (**Ex. 7 at 46-47**), and baptized Christian (**Ex. 8 at 48-49**). He was raised in Al Hasakah, Syria (**Ex. 9, ¶ 8**) before being issued a B-2 nonimmigrant visa to travel to the United States (**Ex. 10 at 86-88**) to donate bone marrow for his younger sister, Lina Nissan (Lina) (**Ex. 9, ¶¶ 20-21**). Lina was being treated for leukemia at the University of Chicago Hospital (**Ex. 11 at 89-93; Ex. 12 at 94; Ex. 9, ¶ 22-23**).

Admitted to the United States on January 19, 2002, and authorized to remain until July 18, 2002, Danial sought extension of his stay (as a derivative beneficiary in his mother's application) to help address his sister's continuing medical needs (**Ex. 14**). While that B-2 extension was pending, Danial registered his presence in the United States under the "National Security Entry and Exit Registration System" (NSEERS) (**Ex. 15; Ex. 16 at 141; Ex. 9, ¶¶ 26-27**) and he was placed into removal proceedings by *legacy*-INS (**Ex. 9, ¶ 27; Ex. 17**).

At a hearing on February 13, 2003, Danial was granted a continuance by EOIR to seek legal counsel (**Ex. 18**). One further continuance was allowed on October 30, 2003 for attorney-preparation (**Ex. 19**).

On or about January 13, 2004, Danial married Migdalia Reyes, a U.S. citizen (**Ex. 20**), and they filed an I-130, *Petition for Alien Relative* (**Ex. 21**), which was received at DHS on July 26, 2004 (**Ex. 22**). On that basis, Danial requested an emergency continuance from EOIR (**Ex. 23**) which was denied (**Ex. 24**). EOIR determined that the Board's holding in *Matter of Velarde-Pacheco*, 23 I & N Dec. 253 (BIA 2002) (*Velarde*) applied in the context of a Motion to Reopen, not a motion for continuance (**Ex. 25 at 174-178**), and Danial was ordered removed from the United States. The EOIR's decision did not

[3]

otherwise analyze any of the issues enumerated in *Velarde*[2] when ordering Danial removed to Syria. Id. On August 27, 2004, Danial appealed the EOIR's decision to the Board (**Ex. 26**).

Four weeks later, the Chicago DHS office scheduled an interview on Danial's and Migdalia's I-130 (**Ex. 27**). DHS then issued a separate request for evidence (RFE) on November 9, 2004 (**Ex. 28**). On November 15, 2004, Danial and Migdalia appeared at DHS (**Ex. 9**, ¶ 39), waived the presence of their attorney, and were interviewed (Id., ¶ 40; *also see* **Ex. 29**). Danial and Migdalia timely responded to Chicago DHS' RFE on January 14, 2005 (**Ex. 30**). On May 6, 2005, Chicago DHS informed Danial and Migdalia (**Ex. 31**) that the I-130 petition would be denied unless countervailing evidence were submitted – DHS asserted then that their marriage was entered solely to obtain Danial an immigration benefit.

On August 3, 2005, DHS Counsel filed its opposition to Danial's appeal (**Ex. 32**) and Chicago DHS denied Danial's I-130 on August 29, 2005 (**Ex. 33**). On October 26, 2005, Danial and Migdalia divorced (**Ex. 35**). The Board subsequently dismissed Danial's appeal on November 8, 2005 (**Ex. 34**).

On December 5, 2005, Danial and Sadeta married (**Ex. 36**; **Ex. 9**, ¶ 61; **Ex. 13**, ¶ 69). A U.S. citizen (**Ex. 37**), Sadeta filed an I-130, *Petition for Alien Relative*, for Danial on December 22, 2005 (**Ex. 9**, ¶ 61; **Ex. 13**, ¶ 70).

On or about February 8, 2006 (through prior Counsel), Danial filed a Motion to Reopen with the Board (**Ex. 38**). The motion sought reopening of the removal proceedings pursuant to *Velarde* with relevant evidence in support, incl. a sworn statement from Danial attesting to the bonafide basis of his prior marriage with Migdalia. (**Ex. 9**, ¶¶ 63-64; **Ex. 38** at 230-232).

On February 22, 2006, DHS Counsel opposed Danial's Motion to Reopen (**Ex. 39** at 241), arguing that he had remained in the U.S. beyond a period of voluntary departure (VD)[3] granted by the

---

[2] "It is the assessment of this Judge that given the posture of this case, this is not a *Matter of Garcia* motion. It is a *Matter of Arthur* motion. Given the posture of this case *Velarde* does not apply because it is not within the context of a motion to reopen proceeding." (**Ex. 24** at 177).

[3] Danial **never sought** VD during the removal proceedings:

[4]

Board.[4] DHS Counsel's reasoning that Danial was statutorily-ineligible for adjustment of status under INA § 245(a) was based on that erroneous allegation (**Ex. 39** at 241). DHS also argued that Sadeta's I-130 was not *prima facie* approvable due to Chicago DHS' allegations of marriage fraud. Id. DHS Counsel finally asserted that the Board should not allow reopening in its discretion based on the same allegation of marriage fraud. Id. On March 24, 2006, the Board declined to reopen proceedings finding that Danial had not overcome the DHS' allegations of marriage fraud and because DHS did not oppose reopening *solely* on *Matter of Arthur*, 20 I & N Dec. 475 (1991) (**Ex. 40** at 245-246).

On March 28, 2006, the visa petition filed by Sadeta on December 22, 2005 was approved by DHS' administrative service center (**Ex. 41** at 247). On or about April 27, 2006, Danial filed a Motion to Reconsider (**Ex. 42** at 248, 251-252) the March 24, 2006 Motion to Reopen denial, attaching a copy of the I-130 approval.[5]

DHS Counsel opposed the Motion to Reconsider arguing timeliness, a failure to state any errors of law or fact in the Board's March 24, 2006 denial of the Motion to Reopen, and a lack of "sufficient arguments or new evidence to justify reconsideration." (**Ex. 43** at 255-257). Interestingly, said opposition was filed ten (10) days *after* Danial's file was routed to the DHS' "Deportations" (i.e., Chicago's ICE) unit, apparently to facilitate his removal from the United States (**Ex. 44** at 259) – DHS did not contact Danial to appear for removal (**Ex. 9**, ¶ 65).

---

"Q. He's not seeking any other relief other than the continuance, right?
A. Yes, that's correct.
Q. And he doesn't want to leave voluntarily. He just doesn't want to leave?
A. That's right.
Q. Okay. Well, I'll just issue an order indicating that he be removed and deported from the United States to Syria." (**Ex. 24** at 172-173) (emphasis added).

[4] The Board *never* provided Danial any period of Voluntary Departure (**Ex. 34** at 217).

[5] The Motion also clarified that the DHS approval contained an error, to wit: the approval was under INA § 203(a)(2)(A) and not INA § 201(b), notwithstanding that Sadeta is a U.S. citizen.

On June 1, 2006, Danial filed papers to supplement his Motion to Reconsider, attaching evidence that the I-130 approval was properly based on INA § 201(b) (**Ex. 45** at 260-262). On June 14, 2006, the Board denied the Motion to Reconsider (**Ex. 46** at 264), finding it to be akin to a Motion a Reopen and thus time- and number-barred.[6]

On April 9, 2007, the Chicago DHS issued Danial and Sadeta a *Notice of Intent to Revoke* (NOIR) (**Ex. 47** at 265-266) the approval of the December 22, 2005 I-130 approval, alleging that Danial had never overcome its allegation of marriage fraud in his prior marriage to Migdalia. Danial timely responded to the NOID on or about June 6, 2007 (**Ex. 48** at 267-271) and the petition was never, in fact, revoked (**Ex. 49** at 272).[7]

Rather than enforce the removal order, DHS routed Danial's file to its records center in early-August 2007 (**Exs. 50, 51**). DHS has never since required Danial to appear for removal (**Ex. 9**, ¶ 65).[8] On December 23, 2007, Sadeta filed a second I-130 petition for Danial which was approved May 23, 2008 (**Ex. 53** at 276).[9] It has *never* been revoked (**Ex. 54**).

---

[6] Danial sought federal court review thereafter, however, the 7th Circuit Court of Appeals dismissed Danial's petition for review (**Ex. 72** at 384-387).

[7] INA § 204(c), on which Chicago DHS was relying, is forward-looking and states that "no petition *shall be* approved if (1) the alien has previously…sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States…by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws." Further, the "director (of DHS) *will deny* a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of such an attempt or conspiracy, regardless of whether that alien received a benefit through the attempt or conspiracy." 8 C.F.R. § 204.2(a)(ii) (emphasis added). INA § 204(c) is contemplated as being applied when DHS reviews a *subsequent* I-130 petition for a foreign national. Clearly, given that the December 22, 2005 approval was never revoked, the DHS determined that Danial and Sadeta *had* overcome the allegations in the 2007 NOID with the documentary submission of June 6, 2007. Id.

[8] A number of months later (in early-March 2008), DHS did apparently issue a warrant for Danial's removal (**Ex. 52** at 275) but again never required Danial to appear for removal (**Ex. 9**, ¶ 65).

[9] Filing said petition was deemed advisable based on the effects of INA § 203(g) ["The Secretary of State *shall* terminate the registration of any alien who fails to apply for an immigrant visa within one year following notification to the alien of the availability of such visa" (emphasis added)].

[6]

Through prior Counsel, Danial was informed that he could attempt to seek adjustment of status in the process of asking the DHS Counsel to agree to reopen his removal proceedings (**Ex. 55** at 278-279) based on the 2008 approval (**Ex. 9**, ¶ 68-69). Danial filed an I-485, *Application to Register Permanent Residence or Adjust Status*, with the Chicago DHS on November 24, 2010 – this was denied based on Chicago DHS' asserted lack of jurisdiction (**Ex. 56** at 280-281). On January 25, 2012, the DHS transferred Danial's file back to the National Records Center (**Ex. 57** at 287), again without ever requiring him to appear for removal (**Ex. 9**, ¶ 65).

On March 29, 2012, the U.S. Citizenship & Immigration Service (USCIS) designated Syria for *Temporary Protected Status* (TPS) (**Ex. 58**). Danial filed the necessary paperwork on September 24, 2012 and he was approved on May 10, 2013 (**Ex. 60** at 301). A work permit under TPS was approved on February 4, 2013. Id. at 307. Danial has subsequently been approved six (6) times for renewal of his TPS status: on September 26, 2013 (through March 31, 2015) (**Ex. 61**); on May 18, 2015 (through September 30, 2016) (**Ex. 62**); on November 14, 2016 (through March 31, 2018) (**Ex. 63**); on July 5, 2018 (through September 30, 2019) (**Ex. 64**); and on November 15, 2019 (through March 31, 2021) (**Ex. 65**). He currently holds TPS through September 30, 2022 (**Exs. 3, 66**).

On January 14, 2014, Sadeta filed a 3rd I-130 petition for Danial which was approved on August 6, 2014 (**Ex. 67** at 316).[10] Said petition has never been revoked (**Ex. 68** at 317).

In late-2018, undersigned-Counsel and Danial discussed how and whether to seek the reopening of his removal matter (**Ex. 9**, ¶ 81) based on then recently issued guidelines regarding DHS's prosecutorial discretion (PD) (**Ex. 69** at 318; **Ex. 9**, ¶ 82, 84). Rather than immediately seek PD, Danial filed an I-485 application with Chicago DHS (Id. at 85) outlining that his administrative I-485 *could* be adjudicated (and jurisdiction existed) based on DHS's finding that Danial was "admissible" to the

---

[10] Filing said petition was deemed advisable based on INA § 203(g) (**Ex. 9**, ¶ 74); also see *supra*. Note 9.

[7]

United States (given its TPS grant in 2013) which had followed the removal order (from November 8, 2005) (**Ex. 70** at 320-323).

Danial and Sadeta were interviewed by the Chicago DHS on September 23, 2019 (**Ex. 71**) with the never-revoked 2008 I-130 approval (**Ex. 53**) being reapproved (**Ex. 5**). The adjustment of status application was denied on jurisdictional grounds (**Ex. 73**).

On September 5, 2020, Danial officially sought PD from DHS Counsel (**Ex. 74** at 389-393) under its 2018 guidelines. On January 21, 2021, DHS Counsel declined to agree to reopen "as a matter of discretion." (**Ex. 75** at 447). Undersigned Counsel requested (via email) that DHS Counsel reconsider (**Ex. 76** at 448-449) said decision based on Danial's father's[11] health status (**Ex. 78** at 451). The extension of Syrian TPS through September 30, 2022 (on January 29, 2021) (**Ex. 79** at 452) was an additional basis on which reconsideration was sought. No response was received from DHS.

On May 27, 2021, the DHS issued a revised set of guidelines for assessing whether and when to exercise PD (**Ex. 80**). Undersigned Counsel contacted DHS Counsel via email requesting whether it would reconsider Danial's PD request based on these updated guidelines (**Ex. 81** at 466-470). On June 22, 2021, DHS Counsel confirmed that the issue would be presented to supervisory counsel. Id. at 467. Hearing nothing further, undersigned Counsel emailed DHS Counsel on November 14, 2021 (**Ex. 82**) to advise that the Supreme Court's decision in *Niz-Chavez* v. Garland, 141 S. Ct. 1474 (2021),[12] referencing its prior decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), was a subsequent basis

---

[11] Danial's father, mother, and brother all fled Syria in 2011 (**Ex. 9**, ¶¶ 76-77) and were recognized refugees by the UNHCR in 2013 (**Ex. 77**). His father suffers from dementia, osteoarthritis, benign positional vertigo, emphysema, and an enlarged prostate (**Ex. 78** at 451).

[12] Wherein the Supreme Court held that a Notice to Appear must convey the time and place of the hearing in a single document in order to trigger the stop-time rule in cancellation of removal cases, and that a subsequently issued hearing notice does not stop time if the Notice to Appear did not include the required information. Id.

upon which reconsideration was sought. Id. at 397. On November 15, 2021, DHS Counsel stated again that consideration had been elevated to supervisory counsel. Id.

Undersigned Counsel requested the status of DHS Counsel's reconsideration via email on December 13, 2021 (**Ex. 83** at 472) but only received an auto-response (**Ex. 84** at 473). On February 14, 2022, DHS Counsel formally declined to reconsider its prior PD denial stating that, based on *Niz-Chavez*, "any motion on that basis would be untimely and there would be no exceptional circumstance that would warrant" reopening (**Ex. 85** at 474).[13]

## III. STANDARDS FOR REOPENING.

A foreign national "may file only one motion to reopen removal proceedings…and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened." 8 C.F.R. § 1003.2(c)(2). Said "motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." INA § 240(c)(7)(B). These time and numerical limitations "shall not apply to a motion to reopen proceedings (to) apply…for asylum or withholding of deportation based on changed circumstances arising in the country of nationality…if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii). Nor shall the time and number limits apply where a "three-member panel of the Board agrees that reopening is warranted (due to a) material change in fact or law underlying a removability ground or grounds." 8 C.F.R. § 1003.2(c)(3)(v).

Danial has never been subject to any criminal proceedings and no other collateral matters are pending as of this writing, incl. no requests for PD (**Ex. 9**, ¶ 141).

## IV. ARGUMENT.

---

[13] The DHS has recently issued guidance on the application of PD for TPS holders with outstanding removal orders who have been denied adjustment of status by DHS *solely* on the basis of there being an outstanding removal order (**Ex. 86** at 476). Danial has not sought further reconsideration by DHS Counsel under this guidance believing the effort will be fruitless.

A motion to reopen allows individuals to ask the Board to consider material and previously unavailable evidence for vacating an existing removal order. See INA § 240(c)(7); 8 C.F.R. §§ 1003.2(c); 1003.23(b)(3). The Supreme Court recognizes such motions are "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." *Kucana v. Holder*, 558 U.S. 233, 242 (2010) (quoting *Dada v. Mukasey*, 554 U.S. 1, 18 (2008)). When the Board reopens a case, the existing removal order is vacated. *Nken v. Holder*, 556 U.S. 418, 429 n.1 (2009).

Reopening may be had where the new facts alleged, together with the facts already of record, indicate a reasonable likelihood of success on the merits, to make it worthwhile to develop the issues at a hearing. *Matter of L-O-G-*, 21 I&N Dec. 413 (BIA 1996); *Matter of Sipus*, 14 I&N Dec. 229 (BIA 1972), reaffirmed. By granting reopening the Board does not rule on the ultimate merits of the underlying application(s) for relief. Id.

1. **Changed Country Conditions in Syria, present day as opposed to July, 2004, warrant reopening of Danial's removal matter by the Board.**

Danial seeks reopening based on changed circumstances in Syria where present-day material evidence exists of the dangers to him which was not available (and could not have been discovered or presented) at his previous removal hearing. 8 C.F.R. § 1003.2(c)(3)(ii). He is the member of a social group (including his family) that has been found to be refugees by the UNHCR after fleeing Syria; he is an ethnic and religious minority Assyrian Christian; and he fears being prosecuted as a draft evader for never having served in the Syrian military. Danial desires to seek political asylum and withholding of removal (**Ex. 1; Ex. 9, ¶ 100**).

Reopening based on 8 C.F.R. § 1003.2(c)(3)(ii) requires that there be changed circumstances, that these are material, and the evidence showing changed circumstances 'was not available and could not have been discovered or presented at the previous hearing.'" *Joseph v. Holder*, 579 F.3d 827, 833–34 (7th Cir. 2009). A motion to reopen (regardless of timing) may be denied if: (1) it is not supported by previously unavailable and material evidence; (2) it fails to establish the applicant's *prima facie*

[10]

eligibility for the underlying relief sought; or (3) the Board determines discretionary relief is not appropriate in the petitioner's case." *Boika v. Holder*, 727 F.3d 735, 738 (7th Cir. 2013).

<u>Previously unavailable and material evidence</u>

The Board will "compare the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing below." *Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007). The U.S. State Department's country reports on human rights practices serve as a useful comparison in examining changes in country conditions. *Ayele v. Holder*, 564 F.3d 862, 873 (7th Cir. 2009).

At the time of his last hearing on July 29, 2004, Danial did not harbor a fear for his safety if returned to Syria (**Ex. 9, ¶ 104**) – in fact, his then-Counsel told him that he had no serious claim to political asylum unless "Israel were to invade Syria." Id. Country conditions and religious freedom reports of the time did not support a basis for a political asylum claim:

> "The Constitution provides for freedom of religion, and the Government generally respects this right in practice…There was no change in the status of respect for religious freedom during the period covered by this report…Christians tend to be urbanized, and most live in Damascus and Aleppo, although significant numbers live in the Hasaka governorate[14] in the northeast and in the Wadi al-Nasara…**The generally amicable relationship among religions in society contributed to religious freedom (though) there were occasional reports of minor tensions between religious faiths mainly attributable to economic rivalries rather than religious affiliation. Relations among the various religious communities generally are amicable, and there is little evidence of societal discrimination or violence against religious minorities.**" (**Ex. 88** at 489-490, 493) (emphasis added).

> Country conditions as reported by the DOS for 2021 are starkly more dangerous than in 2004:

> "Significant human rights issues included credible reports of: unlawful or arbitrary killings by the regime; forced disappearances by the regime; torture, including torture involving sexual violence, by the regime; harsh and life-threatening prison conditions, including denial of medical care…political prisoners and detainees; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; punishment of family members for offenses allegedly committed by an individual; serious abuses in internal conflict, including unlawful recruitment…by the regime and other armed actors, and aerial and ground attacks impacting civilians and civilian infrastructure such as schools, markets, and hospitals…substantial suppression of the rights of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of

---

[14] Daniel and his family are from Al-Hasakah which is the capital city of the Al-Hasakah Governorate, in the northeastern part of Syria (**Exs. 7-8**).

[11]

nongovernmental and civil society organizations; undue restrictions on freedom of movement; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; serious government restrictions on or harassment of domestic and international human rights organizations; lack of investigation of and accountability for violence against women; coerced abortion; trafficking in persons; violence and severe discrimination targeting lesbian, gay, bisexual, transgender, and intersex persons; existence and use of laws criminalizing consensual same-sex sexual conduct between adults; and severe restrictions on workers' rights…The regime took no steps to identify, investigate, prosecute, or punish officials who committed human rights violations or abuses or who engaged in corruption. **Regime-linked paramilitary groups reportedly engaged in frequent violations and abuses, including massacres; indiscriminate killings; kidnapping of civilians; extreme physical abuse, including sexual violence; and unlawful detentions. Regime-aligned militias, including Hizballah, reportedly launched numerous attacks that killed and injured civilians.** Russian forces were implicated in the deaths of civilians and destruction of civilian objects and protected sites resulting from air strikes. **The unstable security situation in areas under the control of armed opposition groups continued to foster an environment in which human rights abuses were committed, including killings, extreme physical abuse, and abductions.**" (**Ex. 89** at 495-496) (emphasis added).

\* \*

"**ISIS…continued to carry out unlawful killings, attacks, and kidnappings, sometimes targeting civilians.**" Id. at 496 (emphasis added).

The Department of State's 2020 Religious Freedom Report describes similar conditions:

"Sectarian violence continued due to tensions among religious groups that, according to nongovernmental organization (NGO) and media sources, was exacerbated by government actions, the deterioration of the economy, and the broader ongoing conflict in the country…Government and progovernment forces continued major aerial and ground offensives initiated in 2019 to recapture areas of the northwest of the country, killing more than 1,000 civilians and forcing nearly one million people to flee prior to the brokering of a ceasefire in March that largely held through the remainder of the year. The government, with the support of its Russian and Iranian allies, continued to commit human rights abuses and violations against its perceived opponents…**The President and Secretary of State continued to condemn the government's failure to respect the human rights of its citizens, including the right to religious freedom.**" (**Ex. 90** at 573, 589) (emphasis added).

"The regime inconsistently cooperated with UNHCR and other humanitarian organizations in providing protection and assistance to IDPs, refugees, asylum seekers, stateless persons, and other persons of concern…UNHCR maintained that conditions for Syrian refugee return to the country in safety and dignity were not yet in place and did not promote or facilitate the return of refugees to the country during the year." (**Ex. 89** at 546).

In addition, the UNHCR today finds that Syrians like Danial are in need of international

protection due to ongoing reasonable fears of persecution:

"In view of the serious violations of international humanitarian law and violations and abuses of human rights law and ongoing armed conflict in Syria, **UNHCR continues to**

[12]

characterize the flight of civilians from Syria as a refugee movement, with the vast majority of Syrian asylum-seekers continuing to be in need of international refugee protection, fulfilling the requirements of the refugee definition contained in Article 1A(2) of the 1951 Convention." (Ex. 91 at 598) (emphasis added).

<u>*Prima Facie* Eligibility for Asylum</u>

*Prima facie* eligibility for political asylum[15] requires that Danial present "sufficient evidence to demonstrate a reasonable likelihood of success on the merits so as to make it worthwhile to develop the issues further at a full evidentiary hearing." *Matter of A ‑ N & R ‑ M ‑ N*, 22 I & N Dec. 953, 956 (BIA 1999). An asylum application based on a well-founded fear of future persecution must demonstrate that the petitioner faces a "reasonable possibility of suffering such persecution if he…were to return to that country," 8 C.F.R. § 1208.13(b)(2)(i)(B), and the petitioner is "unable or unwilling to return to, or avail himself…of the protection (of) that country because of such fear." 8 C.F.R. § 1208.13(b)(2)(i)(C). A person has a well-founded fear of persecution if a reasonable person in the same position would fear persecution. *Jukic v. INS*, 40 F.3d 747, 749 (5th Cir. 1994).

A. <u>Danial is from Al Hasakah where Assyrian Christians have historically been a minority population.</u>

Christian Assyrians are a minority religious group in Syria (**Ex. 92** at 660), comprising just 10% of the Syrian population. This has historically been so (**Ex. 93** at 683). Danial is a Christian Assyrian from Al Hasakah, the capital of the Al-Hasakah Governate in northeastern Syria (**Exs. 7-8**; **Ex. 9** at ¶ 8).

B. <u>After years of fighting by various combatants in Syria, Al Hasakah is currently under the control of the Syrian Democratic Forces:</u>

The Syrian Democratic Forces (SDF) are an alliance of Kurdish and Arab militias fighting for self-rule in northeast Syria where they have historically experienced discrimination (**Ex. 94** at 719). SDF is the main military fighting force of the Kurdish People's Protection Group (YPG). Id. Formed in 2015,

---

[15] Danial seeks, in the alternative to political asylum, withholding of removal. Given the generally heightened burden of proof for withholding of removal, this Motion is argued in terms of the necessary requirements for reopening to pursue political asylum. All evidence and argument apply equally as well to Danial's desire to seek withholding of removal if reopening for political asylum were not granted here.

the SDF was allied with U.S. forces in the region fighting the Islamic State in Syria (**Ex. 95** at 722). The

SDF exercises functional control over Al Hasakah (**Ex. 96** at 724-725), but this was not always so.

Beginning in 2011, Syrian government forces engaged with rebels in the area:

> "(By) September 2011 organized rebel militias were regularly engaging in combat with
> government troops in cities around Syria. The Free Syrian Army, a rebel umbrella group
> formed by defectors from the Syrian army in July, claimed leadership over the armed
> opposition fighting in Syria, but its authority was largely unrecognized by the local militias."
> (**Ex. 97** at 726).

> "According to individual testimonies…State forces shot indiscriminately at unarmed
> protestors. Most were shot in the upper body, including in the head. Defectors from military
> and security forces told the commission that they had received orders to shoot at unarmed
> protesters without warning…**Civilians bore the brunt of the violence as cities were
> blockaded and curfews imposed. The commission heard many testimonies describing
> how those who ventured outside their homes were shot by snipers**." (**Ex. 93** at 687, 688)
> (emphasis added).

Through 2012 and into 2013, Syrian government forces suffered setbacks on the battlefield and

the Muslim-backed Free Syrian Army controlled Al Hasakah and its oil fields by early-2013 (**Ex. 98** at

733). Shortly thereafter, ISIS was formed and announced a caliphate in Syria in 2014 (**Ex. 99** at 740).

> "In April 2013 (ISIS) began to develop into a well-organised, dominant armed force in
> control of large swathes of populated areas in Syria and Iraq, posing a significant threat to
> peace and stability in the region…Prioritising the construction of a 'state' over fighting the
> Syrian Government, ISIS consolidated its authority by stifling dissent and targeting local
> community leaders, other armed group commanders, and activists. This triggered mounting
> resentment, which led to armed confrontations with other major armed groups in early 2014.
> **Following a withdrawal to its strongholds in north-eastern Syria**, the group consolidated
> its military control and financial capacity." (**Ex. 102** at 756) (emphasis added).

> "Until (ISIS's successes) in Iraq, the threat it posed to regional stability was underestimated
> by the international community. The failure to find a political solution or any other
> alternative to stop the violence in Syria and to relieve the population's suffering, left a
> dangerous vacuum that was filled by radicals and their foreign backers…ISIS's resources
> were eventually reinforced significantly by the group's gains in Iraq in July 2014. (Following
> this) the group steadily expanded its control over natural resources and **territory in eastern
> Syria**." Id. at 756-757) (emphasis added).
> ***
> "The external support provided to all belligerents in Syria (eventually) contributed to the
> radicalisation of armed groups, ultimately benefitting ISIS (with) charity organisations and
> wealthy individuals (funding) radical entities willing to promote their ideologies and serve
> their agendas. Arms and support provided to armed groups deemed as moderate (repeatedly
> fell) into the hands of more radical actors, including ISIS." Id. at 757.
> ***

[14]

"In (later-2014), the armed group's military capabilities (expanded) extensively (and it began to employ) brutal tactics, including the use of explosive weapons, mass civilian casualty attacks from suicide or remote detonated car bombs, and the execution of fighters captured during military operations. The group…also relied on its increased mobility and firepower capabilities to surprise its opponents and ensure local superiority. Its military strategy (was) negotiation of local agreements with various groups as part of a 'divide and rule' policy. (It carried) out large-scale victimisation through the systematic imposition of harsh restrictions on basic rights and freedoms indicating an underlying policy. The brutal nature and overall scale of abuses (was) intended to reinforce the group's absolute monopoly on political and social life to enforce compliance and conformity among communities under their control. Imposition of severe measures disguised as religious edicts has formed part of the attack against the civilian population, in addition to the perpetration of armed violence against civilians, mistreatment of persons taking no active part in hostilities, and violence against identified communities." Id.

**"ISIS…beheaded, shot, and stoned men, women and children in public spaces in towns and villages across northeastern Syria**…The mutilated bodies of male victims are often placed on display, a warning to the local population of the consequences of failure to submit to the armed group's authority. One man, a witness to the killing of a 16-year-old boy in Al-Ashara (Dayr Az-Zawr), said the boy's body was hung on a cross in a public square "for people to see what it looks like to be punished by ISIS." (**Ex. 102** at 760) (emphasis added).

By 2015, ISIS held an area that contained an estimated eight to twelve million people and stretched from western Iraq to northeastern Syria (**Ex. 100** at 743) where it enforced its interpretation of Islamic law:

**"ISIS' violence was particularly focused against minorities such as Christians (who were specifically targeted by ISIS as non-Muslims, whose persecution served a dual purpose of sending a message to the Christian West**…ISIS (targeted) Christians, and other religious minorities…with killings, kidnappings, physical mistreatment, and arrests, resulting in the deaths of thousands of civilians in the areas of the country they controlled since the start of the revolution." (**Ex. 91** at 642).

**"Executions have been recorded in…Al-Hasakah** (before which) ISIS fighters announce the victims' 'crimes.' Following the killings, the corpses (were) placed on public display, often on crosses, for up to three days, serving as a warning to local residents. Witnesses saw scenes of still-bleeding bodies hanging from crosses and of heads placed on spikes along park railings." Id. (emphasis added).

On May 30, 2015, ISIS launched an offensive on the Syrian government-controlled part of Al-Hasakah, and advanced to the city's outskirts (**Ex. 103** at 770-771) before government forces and the SDF expelled them. Significant U.S. military support (**Ex. 101**) eventually allowed the SDF to claw back control of 95% of ISIS' territory (**Ex. 99** at 736).

[15]

Further complicating the stability in Al Hasakah is Iran – present since 2013 to train Syrian regime forces, Iran has increased its military and logistical presence in Al Hasakah, forging closer affiliations with local militias penetrating local communities (**Ex. 112** at 797). Ongoing conflicts between the SDF and the Autonomous Administration of North & East Syria (Id.) have also contributed to Iran's increasing influence.

C.  The UNHCR finds that persons like Danial, an Assyrian Christian male who never served in the Syrian military, possess a reasonable fear of harm and mistreatment if returned.

> "For many civilians who have fled Syria, the nexus to a 1951 Convention ground will lie in the direct or indirect, real or perceived association with one of the parties to the conflict. A particular feature of the conflict in Syria is that different parties to the conflict frequently impute a political opinion to larger groups of people, including families, tribes, religious or ethnic groups, or whole towns, villages or neighborhoods, by association. As such, members of a larger entity, without individually being singled out, may become the target of repercussions by different actors for reason of real or perceived support to another party to the conflict. The perception of sharing a political opinion or affiliation in relation to the conflict is often based on little more than an individual's physical presence in a particular area (or the fact that he/she originates from a particular area), or his/her ethnic or religious background. **In those situations, the risk of being harmed is serious and real, and in no way diminished by the fact that the person concerned may not be targeted on an individual basis.** *UNHCR maintains that Syrians…likely to be in need of international refugee protection (include draft) evaders and deserters from the Syrian Armed Forces (plus members) of religious and ethnic minority groups, and persons perceived as contravening strict Islamic rules.*" (**Ex. 91** at 598-599) (emphasis added).

With respect to draft evaders, the UNHCR details the basis for their continued protection needs[16]:

> "Military service is mandatory for all Syrian men between the ages of 18 to 42…including those who reach the age of service while living abroad…By law, mandatory military service lasts 18 or 21 months, depending on the educational level. However, since 2011, many conscripts have been forced…to serve for extended periods of time…The right to conscientious objection is not legally recognized and there are no provisions for substitute or alternative service…Members of security and intelligence agencies are reported to arrest men wanted for military service for the purposes of extracting bribes from relatives to secure the men's release." Id. 616-618.

> "Using wanted lists, the army and security agencies are reported to continue their efforts to identify and forcibly conscript draft evaders, primarily at mobile and fixed checkpoints, but

---

[16] Which correspond to the beliefs and fears held by Danial (**Ex. 9**, ¶¶ 116, 138).

also in government institutions such as universities and hospitals, at government reception centers, and during house searches. **Returnees from abroad are reported to be among those arrested for the purpose of conscription upon return**." Id. 622-623. (emphasis added).

"The Military Penal Code stipulates that draft evasion is punished by imprisonment. Those who have exceeded the military service age (42 years)[17] without having completed their mandatory military service are (also) subject to financial sanctions, and possible confiscation of their movable and immovable assets and imprisonment." Id. at 620.

Regarding ethnic and religious minorities, the UNHCR details the basis for the continued need for protection for Assyrian Christians in Al Hasakah:

> "**The security situation in areas under** *de facto* **control of the…SDF is unpredictable due to ongoing clashes and shelling exchanges between the SDF/YPG and government forces on the one hand and (Syrian National Army)-affiliated armed groups and Turkish forces on the other hand** (with) regular attacks against the SDF by ISIS along the Euphrates and Khabour River Valley, as well as tensions and occasional clashes between the Kurdish Asayish and government forces along the dividing lines in Hassakeh and Deir Ez-Zour Governates." Id. 603-604 (emphasis added)
> ***
> "Despite the loss of territory, **ISIS continues to target members of religious and ethnic minorities in areas where it has a continued presence or influence, including the North-East**. Among those targeted are…members of minority communities…with attacks being motivated by either political (perceived support of the SDF) and/or religious reasons (ISIS considers members of religious and ethnic minority groups as 'infidels')" Id. 646-647 (emphasis added).

D. The United States' withdrawal of troops from Syria in 2019 created greater instability in Al Hasakah:

After several years fighting alongside and/or in support of the SDF, the United States announced its withdrawal of military forces from Syria on October 6, 2019 (**Ex. 104** at 772, 773). The move was criticized for its potential encouragement of ISIS' return to Syria (**Ex. 105** at 779):

> "The White House said Monday that it has begun pulling U.S. troops out of northern Syria, paving the way for Turkey to launch a long-threatened offensive into the area that many worry could crush the U.S.-allied Kurdish fighters in the region. The Trump administration's move has sparked outrage, with critics saying the United States was abandoning a faithful partner that was integral to the defeat of the Islamic State in Syria." (**Ex. 95** at 722).

ISIS' presence in the region and mistreatment of Christians *has* actually been felt since the U.S. withdrawal from Syria:

---

[17] Danial turns age 42 in less than seven months on January 15, 2023 (**Ex. 7** at 46-47).

"In northeastern Syria, the Christian minority is caught in the crossfire. When Turkey launched Operation 'Peace Spring' against Kurdish YPG fighters on the Turkish-Syrian border (in October, 2019), Christians found themselves surrounded by fighting. Turkish forces and their allies took control of a handful of predominantly Christian villages in the Khabur Valley. Meanwhile, **Islamic State (ISIS) group sleeper cells have been reactivated, targeting the Christian minority – whose members they consider heretics** – and forcing US troops to take up positions in the villages in late January 2020. The consequences have been disastrous. While international observers had hoped for the return of Christians to the region, the exact opposite occurred. In a new exodus of the Christian minority, many have fled to Europe, the United States or Australia, even if that meant leaving all their possessions behind." (**Ex. 106** at 783) (emphasis added).

E.   ISIS has returned to Al Hasakah in a 2022 attempt to free its prisoners and reinforce is military strength:

"On January 20, 2022, insurgents affiliated with the Islamic State (ISIS), attacked Al-Sina prison[18] in the Ghweiran neighborhood in the city of al-Hasakah in Syria's far northeast. The attack sent a message to many beyond the borders of the small city that the organization has significant military, financial, and media abilities. The raid, one of a long series of multi-pronged attacks in Syria and its neighboring Iraq, highlights ISIS' resolve to model its post-caliphate strategy for insurgencies that are not necessarily contingent on territorial control…(This) brazen attack was a stark reminder of ISIS' organizational strength that had been long forgotten since the fall of the border town of Baghouz in March 2019 when former American president Donald Trump announced the collapse of the group's territorial caliphate. Since then, **ISIS and its affiliate militias have decided to revert to guerrilla warfare and working under a unified leadership, which has shown exceptional malleability, especially in Syria. They have been able to efficiently restructure themselves organizationally at the military, security, administrative, and media fronts.**" (**Ex. 107** at 785) (emphasis added).

This aggression has earned condemnation by the United States government:

"**The United States condemns Thursday's ISIS attack on the Hasakah Provincial Internal Security Forces detention center in northeast Syria, which was an attempt to free detained ISIS fighters**…Attacking the detention facility was a top ISIS priority for more than a year." (**Ex. 108** at 787) (emphasis added).

The reasonability of Danial's fears (Ex. 9, ¶¶ 139-140) regarding the return of ISIS is based in

ISIS' historical treatment of Christians in Syria:

"During its rule, ISIS was responsible for the displacement of many members of religious minorities in north-eastern Syria…For example, **most Assyrians from the Khabur River Valley (Hassakeh Governorate) fled in the wake of the February 2015 ISIS incursion into their villages during which ISIS abducted over 250 Assyrians**, including many women and children, before later releasing them in exchange for ransom. By early 2020,

---

[18] This prison served, in its prior useful life, as Danial's high school when he attended from 1995-1999 (**Ex. 9, ¶ 9**).

most Assyrians had not returned to their villages for fear of an ISIS resurgence and renewed insecurity caused by 'Operation Peace Spring.'" Id. at 647, Note 743 (emphasis added).

\*\*\*

"(ISIS was reported to have) **deliberately singled out members of religious and ethnic minority groups for attacks, both on account of their religion and their perceived pro-government stance, further pushing minorities into seeking the government's protection.**" Id. at 642. (emphasis added).

\*\*\*

"The extremist ideology of ISIS and some of the other groups fighting against the government has increased Christians' fears about their future place in the country should the government fall and has driven some to support Assad…In both the IS zone and other rebel areas…many minorities…have fled whenever extremists have sought to impose their rigorous interpretations of Islamic law." Id., Note 708.

The UNHCR confirms that many Syrians "may become the target of repercussions by different actors for reason of real or perceived support to another party to the conflict" in Syria with the tenuousness of one's safety hinging on one's physical presence in a particular area (such as Danial does from Al Hasakah), or his/her ethnic or religious background. Danial's family was determined to be "refugees" by UNHCR (**Ex. 77**) – it is eminently-reasonable for Danial to possess a fear of harm and mistreatment if he is returned to Syria today based both on his ethnicity and religion, his membership in a particular social group comprised of his family[19] who have been determined by UNHCR to be "refugees," and his draft evader status. Conditions for improvement in Syria are non-existent:

"The Syria crisis, currently in its 11th year, remains the largest displacement crisis in the world." (**Ex. 109** at 789).

"Since the conflict erupted in March 2011, Syria has witnessed unprecedented devastation and displacement. More than 6 million Syrians have fled the country and 6.7 million are internally displaced. (More) than 14 million people (are) continuing to be in need of assistance." (**Ex. 110** at 792).

There were 5,721,721 UNHCR-registered Syrian refugees as of June 2, 2022 (**Ex. 111** at 794). Thus:

"UNHCR continues to call on states not to forcibly return Syrian nationals and former habitual residents of Syria…to any part of Syria, regardless of whether the area is under

---

[19] A person's family can qualify as a "particular social group" for purposes of asylum and withholding of removal. *W.G.A. v. Sessions*, 900 F.3d 957, 965 (7th Cir. 2018).

[19]

control of the Government or under control of another state or non-state entity." (**Ex. 91** at 602).

Danial merits reopening based on 8 C.F.R. § 1003.2(c)(3)(ii) – the new facts as outlined, together with the facts already of record, indicate a reasonable likelihood of success on the merits of a political asylum application. These issues should be developed further at a reopened hearing before EOIR.

2. **Recent Supreme Court precedent supports reopening of Danial's removal matter to allow him to seek cancellation of removal given a patently insufficient NTA served on him in 2002**.

The U.S. Supreme Court has determined that an NTA failing to designate the time or place of the noncitizen's removal proceedings is not a "notice to appear under 8 U.S.C. §1229(a)," and ***does not trigger*** the "stop-time rule" for purposes of cancellation of removal. *Pereira v. Sessions*, 138 S. Ct. 2105 (2018) (emphasis added). The NTA prepared and served by *legacy*-INS on Danial patently failed to provide the time and place of his initial hearing (**Ex. 17**). It cannot be found to have in any way led to the triggering of the "stop-time rule."

It is recognized that the Board has found that a deficient NTA is cured by the subsequent service of an EOIR notice of hearing specifying that missing information – this notice triggers the "stop-time" rule of section 240A(d)(1)(A) of the Act, 8 U.S.C. § 1229b(d)(1)(A) (2012). *Matter of Mendoza-Hernandez* and *Matter of Capula-Cortes*, 27 I&N Dec. 520 (BIA 2019), distinguishing *Pereira v. Sessions*, 138 S. Ct. 2105 (2018). Nonetheless, the dissent in *Mendoza-Hernandez* confirms the long-term flaw recognized by the Supreme Court:

> "A subsequent 'notice of hearing' (cannot) complete or cure a deficient 'notice to appear.' First, neither notice would meet, on its own, the definition of 'a notice to appear' under section 239(a)(1). Second, the statute contains no ambiguity or gap that would permit a 'combination approach to trigger the stop time rule under the plain text roadmap provided by the Supreme Court in *Pereira*. **The statute refers to a <u>single document</u>, 'a notice to appear' issued by the DHS. *Pereira* makes clear that a section 239(a)(1) 'notice to appear' must include the date and time of hearing in order to trigger the 'stop-time' rule.**" *Id.* at 538 (emphasis added).

Given the DHS' facially faulty NTA, Danial's matter should be reopened to allow him to seek cancellation of removal based on the degree of hardship (**Ex. 13**, at ¶¶ 71-95) that his U.S. citizen spouse (**Exs. 6, 37**) expects if Danial were to be removed from the United States. It is worthwhile and proper to develop these facts at a reopened removal proceeding before EOIR.

3. **<u>Danial's grant of TPS provides a sufficient change in law and fact that warrants reopening by a 3-member panel of the Board.</u>**

Pursuant to DHS regulation, "an alien *may **in the discretion** of the director* be granted TPS if he establishes" that he (a) is a national of a foreign state designated under section 244(b) of the Act; (b) has been continuously physically present in the United States since the effective date of the most recent designation of that foreign state; (c) has continuously resided in the United States since such date as the Attorney General may designate; (d) ***is admissible as an immigrant***; (e) is not ineligible under 8 C.F.R. § 244.4; and (f)(1) registers for Temporary Protected Status during the initial registration period." 8 C.F.R. § 244.2 (emphasis added).

Danial formally sought TPS on September 24, 2012 (**Ex. 60**) which was during the initial TPS registration period (**Ex. 58**). With the submission of evidence to DHS of his Syrian nationality (**Exs. 7, 10**), and proof that he has continually resided in the United States since January, 2002, Danial was able to establish that he is otherwise "admissible" to the United States as an immigrant when DHS granted him TPS on May 10, 2013 (**Ex. 60** at 232). He holds TPS status to this day (**Exs. 61-66**) – DHS has exercised its favorable discretion in granting Danial TPS for 9+ years.

Pursuant to the Act, DHS "***shall not remove*** (Danial) from the United States during the period in which (his TPS) status is in effect." INA § 244(a)(1) (emphasis added). Given the grant of TPS by DHS, DHS can no longer remove Danial based on the November 8, 2005 order of removal. These changes in fact (Danial's continued approval for TPS) and law [INA § 244(a)(1)'s preclusion of DHS from being able to remove Danial while he holds TPS] warrant the Board's reopening of Danial's removal matter.

[21]

Further, Danial has exercised due diligence in presenting this and related issues for Board review after exhausting all other relevant arguments: with Chicago DHS, arguing that it could adjudicate his I-485 (given his TPS-status) (**Ex. 70**); and with his two (2) subsequent unsuccessful attempts to have the DHS Counsel agree to reopen (**Exs. 74-75, 76, 85**).

Reopening by this Board is warranted under 8 C.F.R. § 1003.2(c)(3)(v).[20]

### 4. *Sua Sponte* reopening is warranted given the unique facts presented here.

The Board has the authority to reopen cases *sua sponte*. 8 C.F.R. § 1003.2(a). *Sua sponte* reopening is appropriate in cases presenting "truly exceptional situations." *Matter of G-D-*, 22 I&N Dec. 1132, 1134 (BIA 1999); *Matter of Beckford*, 22 I & N Dec. 1216 (BIA 2000). *Sua sponte* requests to reopen are not used as a general cure for filing defects or to otherwise circumvent the regulations, even when enforcing the regulations may result in hardship to the respondent or his family members. *Matter of J-J-*, 21 I&N Dec. 976 (BIA 1997). The record here establishes numerous exceptional factors in Danial's favor that cumulatively merit reopening pursuant to 8 C.F.R. § 1003.2(a).

Following the Board's November 8, 2005 dismissal (**Ex. 34**) of his appeal from the July 29, 2004 EOIR decision, there was in place a final order for Danial's removal. *See generally* INA § 101(a)(47)(B)(i). For seven-plus (7+) years, between that Board decision and the DHS' discretionary approval of Danial for TPS in 2013 (**Ex. 60**), Chicago's DHS and ICE offices took no steps to remove Danial from the United States (**Ex. 9** at ¶ 65). DHS did clearly forward Danial's file to Chicago ICE in May 2006 (**Ex. 44**), but it failed to issue any warrant for removal until March 4, 2008 (**Ex. 52**). One can

---

[20] This is especially relevant given the Justice Department's recent guidance to inquire whether the DHS finds a case to be a serious priority or not before proceeding: "Immigration judges should be prepared to inquire, on the record, of the parties appearing before them at scheduled hearings as to whether the case remains a removal priority for ICE and whether ICE intends to exercise some form of prosecutorial discretion, for example by requesting that the case be terminated or dismissed, by stipulating to eligibility for relief, or, where permitted by case law, by agreeing to the administrative closure of the case. The judge should ask the respondent or his or her representative for the respondent's position on these matters." Accessed at: https://www.justice.gov/eoir/book/file/1403401/download.

only surmise that DHS exercised its favorable discretion to allow Danial to remain in the United States with Sadeta and it did not enforce his removal order after November, 2005 – even though (on information and belief) DHS possessed his home address and relevant contact means from November, 2005 until his TPS grant.

Furthermore, the entire basis for DHS Counsel's rejection of Danial's past arguments for reopening and/or reconsideration possess no remaining merit – the argument against reopening in February, 2006 was based on an *alleged* (and nonexistent)[21] VD violation (**Ex. 39**). The fleeting marriage fraud allegation has long since been mooted by DHS' subsequent approval of four I-130 petitions for Danial through Sadeta, none of which have ever been denied or revoked pursuant to INA § 204(c). It is clear that Danial and Sadeta sufficiently overcame DHS concerns following an evidentiary submission of June 6, 2007 (**Ex. 48**).

Further, DHS' argument against reopening based on discretion (**Ex. 39** at 241) has been mooted by its multiple determinations that Danial is admissible to the United States as an immigrant in approving his TPS status in 2013 (**Ex. 60**), a discretionary determination [per INA § 244(a)(1)(A)] that continues to this day (**Exs. 61-66**).

Given these recognizable flaws in DHS' past legal positions, and Danial's reasonable fears of returning to Syria for visa processing on any of Sadeta's I-130 approvals, the unique facts presented here leave Danial's pursuance of an immigrant visa via consular processing completely unreasonable and exceptional:

- There is no functioning United States embassy in Syria (**Ex. 114** at 804) to which Danial may return for interview.

---

[21] The DHS Counsel's assertion that Danial violated a VD order was factually incorrect (**Ex. 39**), however it is not asserted that it was a deliberate fabrication – Counsel for Danial believes that an inadvertent misstatement of fact simply went overlooked by the Board and by Danial's prior Counsel given a separate marriage fraud allegation then being asserted by Chicago DHS (**Ex. 47**). That allegation was mooted by the DHS' approval of the initial (**Ex. 41**) and subsequent I-130 petitions through Sadeta's sponsorship (**Exs. 53, 67-68**).

- Immigrant visa matters for Syrian nationals (like Danial) are now being processed through the U.S. Embassy in Amman, Jordan (**Ex. 115** at 808)[22], a country to which Danial has never traveled (**Ex. 9**, ¶ 138).

- Danial is not a citizen of Jordan, his old Syrian passport has expired (**Ex. 10**) and, given that it was confiscated by *legacy*-INS in 2002 when he reported for NSEERS (**Ex. 16**), he possesses no travel documentation at this time (**Ex. 9**, ¶ 137).

- Danial has been denied a Syrian passport when he recently explored whether such travel document was available solely to facilitate overseas visa processing purposes. Id.

Furthermore, given the nature of Syrians resident in Jordan in large numbers as continuing refugees,[23] and Danial's lack of any family ties to that country (**Ex. 9**, ¶ 138), it is wholly unreasonable to believe that Danial has an accessible venue outside of the United States at which to process for an immigrant visa through Sadeta. The circumstances here are even more exceptional when understanding that a 10-year automatic bar against his return that would apply upon his departure. *See* INA § 212(a)(9)(A)(ii)(II).

U.S. citizens like Sadeta are warned *against* travel to Syria: "Do not travel to Syria due to terrorism, civil unrest, armed conflict, and risk of unjust detention…The U.S. Embassy in Damascus suspended its operations in February 2012 (thus the) U.S. government is unable to provide any emergency services to U.S. citizens in Syria." (**Ex. 114** at 803). Any expectation that she could potentially-relocate with Danial, *assuming* he could safely travel to Syria, and *assuming* the U.S. Embassy in Damascus was open for visa processing, and further *assuming* Danial could successfully-pursue a waiver of the 10-year bar while processing overseas, the U.S. government fully-supports the

---

[22] Damascus, Syria was the U.S. embassy designated for overseas processing (**Ex. 45** at 262) before its transfer of those matters to the immigrant visa section of the embassy in Amman, Jordan (**Ex. 115**).

[23] "Jordan is one of the countries most affected by the Syria crisis, hosting the second-highest share of refugees per capita in the world. More than 760,000 refugees are registered with UNHCR, predominantly from Syria." (**Ex. 113** at 802).

[24]

fact that it is not safe for Sadeta in Syria so she cannot relocate with him overseas. To date, Danial and Sadeta file (and have filed) their taxes jointly and when due (**Ex. 9**, ¶ 145; **Ex. 13**, ¶ 81; **Ex. 116**).

The Board is authorized to reopen cases that present ***significant*** fairness concerns. *See generally* 8 C.F.R. §§ 1003.2, 1003.23; *Matter of Yewondwosen*, 21 I&N Dec. 1025, 1027 (BIA 1997) (stating that the "Board has the ability to reopen or remand proceedings when appropriate, such as for good cause, fairness, or reasons of administrative economy"). Cumulatively, the facts enumerated above amount to "exceptional" circumstances as contemplated by *Matter of J-J-*.[24] It is eminently fair to reopen Danial's removal matter here.

## V. CONCLUSION.

For the foregoing reasons, Mr. Nissan and his U.S. citizen spouse respectfully request that the Board reopen his removal and remand the matter for further proceedings before the Chicago immigration court.

Respectfully submitted,

Dated: June 25, 2022

Mark S. Kocol
(EOIR #: BL176134)

Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone #: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com

---

[24] The Board has previously contemplated *sua sponte* reopening in the case of a TPS-holder whose facts regarding return to Haiti in their totality were deemed to warrant reopening (*see* **Ex. 74** at 395). We believe that Danial's facts, in their totality, significantly outweigh those presented in that prior Board *sua sponte* grant.

[25]



## Sworn Statement

I, Sadeta Kalamperovic, considering myself duly sworn on oath to tell the truth, state:

1. My name is Sadeta Kalamperovic and I reside at 1919 Hopi lane in Mt. Prospect, IL with my husband, Danial Nissan. We will celebrate our 20th wedding anniversary of December 5, 2025;

2. Danny and I are not only spouses – we are best friends, companions, and emotionally dependent on one another for stability and survival.

3. The fear of losing Danny is the worst pain I have ever experienced. We have built a real life together – our home, our marriage, and our future.

4. We bought a house together with a mortgage and filled it with love and labor. Danny built our fireplace, installed our flooring, renovated the bathrooms and kitchen, built me a greenhouse, and he tends to our garden. The thought of losing him and losing our home is emotionally unbearable.

5. If Danny were taken, we would lose everything. I could not afford our home alone. He would lose his job. I would be unable to function. We refuse to ever be separated. We would not survive financially or emotionally.

6. My own career – something I worked hard at to build – is now collapsing. I cannot focus and often unable to perform at work. I have panic regularly and a sense of anxiety and dread at all waking moments.

7. Every time Danny leaves the house, the dread and fear build. I worry all day about what could happen to him. We call each other every 15-20 minutes just to reassure ourselves that we are both still safe.

8. Danny is monitored medically for heart issues, and I live in constant fear that the stress will give him a heart attack. I constantly think about his mental state and whether he can survive this pressure.

9. We have both developed serious health problems because of this situation. I suffer from anxiety, high blood pressure, and depression. Danny has fallen into a deep depression and has lost hope.

10. We barely sleep and when we do, it is for only a few hours here and there. We wake up with panic attacks – neither of us get any restful sleep at night and we sleepwalk through each day as a consequence.

11. Over the last 5–6 months, Danny has developed nightmares. He screams, cries, and shakes in his sleep. During the day we feel numb, as if we are sleepwalking through our lives.

12. We are isolated from friends. We do not share what is happening with anyone because we don't know where we will be from day to day.

13. My family beyond Danny is very close, but I keep them in the dark about all that is happening with us.

14. My brother and sister-in-law are an integral part of our lives – we see each other every week and talk daily. We spend all of our holidays together, take out-of-state trips, enjoy movies and meals, and share many aspects of our lives.

15. My brother and sister-in-law call Danny regularly, sometimes just chatting. My brother and Danny work on home projects together and discuss history, while my sister-in-law and Danny talk about cooking, movies, books, and stock market investments.

16. My nephew and his children absolutely adore Danny, and they see him as their uncle. My great niece Laila calls out for Danny if I arrive without him and does FaceTime with him at least once a week. He reads to her, and they do puzzles and play cards together. We spend all holidays and birthdays together at their homes and ours. Thanksgiving is always at my brother's (a tradition), Christmas at my nephew's, Easter and alternate Christmas at our home.

17. Danny and I carry this impending removal burden alone because I could not bear to frighten them.

18. Lately I have grown extremely more concerned that the pressure has become unbearable for Danny. He talks about death – sometimes joking, sometimes not. I fear he could become suicidal. He hides his pain from me, but I see it. He feels like a failure. He once said he "does not exist in America."

19. There are moments when I truly fear Danny is not going to survive this. He has said things about "going to sleep and not waking up." He feels guilty about what would happen to me if he were gone. He loves my family and feels shame and fear that he will not be there to protect me.

20. We do not see a future without each other. We want to grow old together. We have built too much love, too much history, and too much shared life to be destroyed by silence and delay.

21. We live in fear every single day. Immigration has consumed our lives. We eat, sleep, and breathe fear. Our lives are frozen. We believe we are victims of a system that has intentionally left us suspended in terror and uncertainty..

Further, affiant sayeth not.

Sadeta Kalamperovic

Date: 11/21/2025

Endorsements / Mentions spéciales / Anotaciones

If none are given above, even after months of your date of departure, you may be denied entry into some countries.

PASSPORT
PASSEPORT PASAPORTE

USA

### THE UNITED STATES OF AMERICA

| Type/Type/Tipo | Code/Code/Código | Passport No./No. du Passeport/No. de Pasaporte |
|---|---|---|
| P | USA | A109699977 |

Surname/Nom/Apellidos
KALAMPEROVIC

Given names/Prénoms/Nombres
SADETA

Nationality/Nationalité/Nacionalidad
UNITED STATES OF AMERICA

F

Place of birth/Lieu de naissance/Lugar de nacimiento
MONTENEGRO.

Date of issue/Date de délivrance/Fecha de expedición
28 SEP 2022

Date of expiration/Date d'expiration/Fecha de caducidad
27 SEP 2032

Authority/Autorité/Autoridad
UNITED STATES DEPARTMENT OF STATE

```
P<USAKALAMPEROVIC<<SADETA<<<<<<<<<<<<<<<<<<<<<<
A109699774USA6303301F3209273426143742<012002
```




ILLINOIS

Jesse White • Secretary of State

DRIVERS LICENSE

Federal Limits Apply

04/21/2022

USA

4d LIC NO K451-7806-3692

4b EXP: 03/30/2026

3 DOB

1 KALAMPEROVIC
2 SADETA
8 1919 E HOPI LN
MOUNT PROSPECT, IL 60056

9 CLASS: D          9a END: NONE

12 REST: NONE

15 SEX: F          16 HGT: 5'-06"
17 WGT: 215 lbs   18 EYES: BRN

5 DD 20220421309NL0707

**s.**

and agents. ICE records indicate that aliens assaulted or used force against 18 ICE Enforcement and Removal Operations (ERO) officers in August 2025. In February 2025, ICE records indicated that aliens assaulted or used force against 10 ICE ERO officers. This 80% increase over six months indicates the increasing risk that ICE ERO officers face as they seek to arrest and detain aliens that entered during periods of loose border restrictions.

Additionally, there remains a strain on ICE resources, which takes ICE away from its mission to preserve national security and public safety. ICE has many aliens pending removal that entered during prior influxes at the Southwest border. Managing those removals requires a significant expenditure of ICE resources. As of September 8, 2025, there are 1,505,425 aliens on the ICE non-detained docket with final orders of removal. This number will only increase should this finding not be extended.

At present, ICE currently has 6,204 ERO Officers, with 9,960 vacancies due to surge hiring from the One Big Beautiful Bill Act, Public Law 119–21. This represents a 61% vacancy rate for ICE ERO officers. Although ICE is actively engaging in new hiring, this process takes time and includes the hiring, onboarding, and training of these new officers. The current allocation of ICE ERO officers and prospective new hires is based on the existing number of aliens in the United States. ICE ERO's efforts to properly enforce immigration on the interior, even after this hiring surge, will be impacted should the influx continue at the Southwest border.

Between April 1 and August 31, 2025, ICE arrested 84,215 aliens with criminal convictions or pending criminal charges, 502 arrested aliens were known or suspected terrorists, and 2,356 arrested aliens were suspected gang members. During this period, ICE removed 85,249 aliens with criminal convictions, 561 aliens that were known or suspected terrorists, and 2,651 suspected gang members. Failure to extend this finding will impede the ability of ICE to properly enforce immigration laws and focus on public safety risks.

On the basis of the above facts, I find that these circumstances continue to endanger the lives, property, safety, and welfare of the residents of every State in the Union. The only way to effectively prevent this danger to the States is to maintain operational control of the border, which Congress defined to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and

other contraband." Secure Fence Act of 2006, Public Law 109–367, 2, 120 Stat. 2638 (2006); 8 U.S.C. 1701 note; see also id. (stating that the Secretary of DHS "shall take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States"). Given that Congress directed DHS to prevent all unlawful entries, the thousands of aliens that DHS continues to encounter on a weekly basis attempting to enter the United States illegally via the Southwest border is an influx. Therefore, I find that there is currently an influx of aliens arriving across our entire southern border, which requires a federal response.

Accordingly, pursuant to the authorities under the INA, 8 U.S.C. 1101, *et seq.,* including the implementing regulations identified above, I find "that there exist circumstances involving the administration of the immigration laws of the United States that endanger the lives, property, safety, or welfare of the residents" of all 50 States. I further find that an actual or imminent mass influx of aliens is arriving at the southern border of the United States and presents urgent circumstances requiring an immediate federal response. I therefore request the assistance of State and local governments in all 50 States.

The finding is effective immediately and expires in 180 days. This finding may expire sooner in the event I find that circumstances have changed. Such a finding would be published in the **Federal Register**.

Kristi Noem,
*Secretary of Homeland Security.*
[FR Doc. 2025–18255 Filed 9–19–25; 8:45 am]
**BILLING CODE 9112–FP–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2831–25; DHS Docket No. USCIS–USCIS–2013–0001]

RIN 1615–ZB72

### Termination of the Designation of Syria for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security

(DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Syria for Temporary Protected Status. The designation of Syria is set to expire on September 30, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Syria no longer continues to meet the conditions for the designation for Temporary Protected Status. The Secretary, therefore, is terminating the Temporary Protected Status designation of Syria as required by statute. This termination is effective November 21, 2025. After November 21, 2025, nationals of Syria (and aliens having no nationality who last habitually resided in Syria) who have been granted Temporary Protected Status under Syria's designation will no longer have Temporary Protected Status.

**DATES:** The designation of Syria for Temporary Protected Status is terminated, effective at 11:59 p.m., local time, on November 21, 2025.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

### List of Abbreviations

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
State—Department of State
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

### What is temporary protected status?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for Temporary Protected Status if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may grant Temporary Protected Status to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the

**Federal Register** / Vol. 90, No. 181 / Monday, September 22, 2025 / Notices **45399**

Secretary—after consultation with appropriate U.S. Government agencies— must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the conditions for the Temporary Protected Status designation continue to be met. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for the designation, Temporary Protected Status will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation of a foreign state" for Temporary Protected Status. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

Temporary Protected Status is a temporary immigration benefit granted to eligible nationals of a country designated by the Secretary for Temporary Protected Status under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the designation period, Temporary Protected Status beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of Temporary Protected Status. Temporary Protected Status beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of Temporary Protected Status does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for Temporary Protected Status, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2) in accordance with the implementing regulations at 8 CFR parts 244 and 1244. When the Secretary terminates a country's designation, beneficiaries return to the same immigration status or category that they maintained before Temporary Protected Status, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category

they received while registered for Temporary Protected Status, as long as it is still valid on the date Temporary Protected Status terminates.

## Designation of Syria for Temporary Protected Status

Syria was initially designated for Temporary Protected Status on March 29, 2012, based on a determination that there were extraordinary and temporary conditions in Syria that prevented nationals of Syria from returning in safety and that permitting such aliens to remain temporarily in the United States would not be contrary to the national interest of the United States.[1] Following the initial designation, the former Secretary extended and newly designated Syria for Temporary Protected Status three times based on ongoing armed conflict and extraordinary and temporary conditions: (1) from October 1, 2013 through March 31, 2015,[2] (2) from April 1, 2015 through September 30, 2016,[3] and (3) from October 1, 2016 through March 31, 2018.[4] The Department referred to these actions as redesignations in the published **Federal Register** notices. Thereafter, the former Secretary extended Temporary Protected Status for Syria from April 1, 2018 through September 30, 2019,[5] and again from October 1, 2019 through March 31, 2021.[6] The former Secretary extended and newly designated Temporary Protected Status for Syria from March 31, 2021 through September 30, 2022,[7] and from October 1, 2022 through March 31, 2024[8] based on ongoing armed conflict and extraordinary and temporary conditions. Most recently, former Secretary Mayorkas extended Syria's designation and newly designated Syria for Temporary Protected Status based on ongoing armed conflict and extraordinary and

temporary conditions from April 1, 2024 to September 30, 2025.[9]

## Secretary's Authority To Terminate the Designation of Syria for Temporary Protected Status

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies— must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the country continues to meet the conditions for the designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any Temporary Protected Status-related documentation, such as EADs, issued or renewed after the effective date of termination. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

## Reasons for the Secretary's Termination of the Temporary Protected Status Designation for Syria

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Syria and considered whether Syria continues to meet the conditions for the designation under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). This review included examining: (a) whether extraordinary and temporary conditions in Syria that prevent Syrian nationals from returning in safety continue to exist, and (b) if permitting Syrian nationals to remain temporarily in the United States is contrary to the national interest of the United States. The Secretary also examined: (c) whether there is ongoing armed conflict within the state, and (d) whether, due to

---

[1] Designation of Syrian Arab Republic for Temporary Protected Status, 77 FR 19026 (Mar. 29, 2012).

[2] Extension and Redesignation of Syria for Temporary Protected Status, 78 FR 36223 (June 17, 2013).

[3] Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status, 80 FR 245 (Jan. 5, 2015).

[4] Extension and Redesignation of Syria for Temporary Protected Status, 81 FR 50533 (Aug. 1, 2016).

[5] Extension of the Designation of Syria for Temporary Protected Status, 83 FR 9329 (Mar. 5, 2018).

[6] Extension of the Designation of Syria for Temporary Protected Status, 84 FR 49751 (Sept. 23, 2019).

[7] Extension and Redesignation of Syria for Temporary Protected Status, 86 FR 14946 (Mar. 19, 2021).

[8] Extension and Redesignation of Syria for Temporary Protected Status, 87 FR 46982 (Aug. 1, 2022).

[9] Extension and Redesignation of Syria for Temporary Protected Status, 89 FR 5562 (Jan. 29, 2024).

such conflict, requiring aliens who are nationals of that state to return would pose a serious threat to their personal safety.

Between 2011 and 2024, the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical infrastructure, and significantly weakened the Syrian economy.[10] On December 8, 2024, the Bashar al-Assad regime fell following a ten-day offensive carried out by opposition forces, Islamist militant group Hay'at Tahrir al-Sham and the Syrian National Army.[11] Interim President Ahmed al-Sharaa took steps to establish governing infrastructure including announcing the formation of a 23-member cabinet to replace the caretaker government that had been in place since the fall of the Assad regime,[12] and a constitutional declaration which established a transitional legal framework for the post-Assad era.[13] On May 14, 2025, President Trump met with interim President al-Sharaa in Saudi Arabia and announced that he would be lifting sanctions and normalizing relations with Syria.[14] On June 30, 2025, President Trump issued an Executive Order revoking six previous Syria-related Executive Orders that imposed comprehensive economic and financial sanctions and ended the national emergency declared under those orders.[15] Following President Trump's instructions in the June 30, 2025 Executive Order, on July 7, 2025, the Department of State ("State") announced the revocation of the Foreign Terrorist Organization designation of al-Nusrah Front, also known as Hay'at Tahrir al-Sham, effective July 8, 2025.[16]

Based on the Department's review, the Secretary has determined that the termination of the Syria Temporary Protected Status designation is required.

The Secretary has determined that, while some sporadic and episodic violence occurs in Syria, the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals. From 2011 to 2024, civil war engulfed Syria.[17] Over the years, the conflict evolved from a protest movement to a civil war. Within that context, opposition groups formed and splintered, Islamic militants such as Al-Qaeda and the Islamic State of Iraq and Syria or ISIS exacerbated the violence, and many countries and foreign fighters joined the war either directly or by proxy.[18] Since al-Assad regime's ouster in December 2024, the nature of violence in Syria has significantly changed; a national-level war shifted to localized clashes and then lessened to sporadic, isolated episodes of violence. Instead of nationwide hostilities, violence now takes form in localized security and insurgent flare-ups, particularly involving former regime loyalists, sectarian tensions and other skirmishes.[19] These events underscore continuing security challenges, but not full-scale conflict. Interim President al-Sharaa has established a caretaker cabinet, ratified a constitutional declaration granting executive authority for a five-year transitional period, and initiated mechanisms like the National Dialogue Conference.[20] These steps demonstrate an effort to move the country to a stable institutional governance, not a perpetuation of armed conflict. As outlined, Syria's long-time dictator was deposed, a transitional political structure has been installed, large-scale military campaigns have ceased, and displaced populations are returning. While scattered episodes of violence persist, the structural transformation in Syria aligns far more closely with the post-conflict transitional phase of a nation rather than ongoing armed conflict.

Further, regarding the extraordinary and temporary conditions, although most Syrians require some form of

humanitarian assistance,[21] this does not prevent nationals from returning in safety, as evidenced by the U.N. High Commissioner for Refugees' estimate that "since 2024, over 1.2 million Syrians have returned to Syria. Meanwhile, internal returns continue, with 1,763,513 internally displaced people (IDP) returnees since December 2024. . . ." [22]

Based on the Department's review, the Secretary has further determined that, even assuming the relevant conditions in Syria remain both "extraordinary" and "temporary," termination of the Syria Temporary Protected Status designation is required because it is contrary to the national interest to permit Syrian nationals (or aliens having no nationality who last habitually resided in Syria) to remain temporarily in the United States.[23]

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities).[24] Determining whether permitting a class of aliens to remain temporarily in the United States is

[10] Library of Congress, Congressional Research Service, "Syria: Transition and U.S. Policy" Mar. 11, 2025, *https://www.congress.gov/crs-product/RL33487*.

[11] Council on Foreign Relations, "Conflict in Syria" May 14, 2025, *https://www.cfr.org/global-conflict-tracker/conflict/conflict-syria*.

[12] International Crisis Group, "What Lies in Store for Syria as a New Government Takes Power?" Apr. 25, 2025, *https://www.crisisgroup.org/middle-east-north-afiica/east-mediterranean-mena/syria/what-lies-store-syria-new-government-takes-power*.

[13] *Id.*

[14] Council on Foreign Relations, "Trump Meets Syria's Al-Sharaa" May 14, 2025, *https://www.cfr.org/article/trump-meets-syrias-al-sharaa*.

[15] *See* Providing for the Revocation of Syria Sanctions, 90 FR 29395 (July 3, 2025).

[16] *See* Revocation of the Foreign Terrorist Organization Designation of al-Nusrah Front, Also Known as Hay'at Tahrir al-Sham, 90 FR 30187 (July 8, 2025).

[17] Library of Congress, Congressional Research Service, "Syria: Transition and U.S. Policy" Mar. 11, 2025. *https://www.congress.gov/crs-product/RL33487*.

[18] Council on Foreign Relations, "Syria's Civil War: The Descent into Horror" Dec. 20, 2024. *https://www.cfr.org/article/syrias-civil-war*.

[19] Library of Congress, Congressional Research Service, "Syria: Transition and U.S. Policy" Mar. 11, 2025. *https://www.congress.gov/crs-product/RL33487*.

[20] International Crisis Group, "What Lies in Store for Syria as a New Government Takes Power?" Apr. 25, 2025. *https://www.crisisgroup.org/middle-east-north-africa/east-mediterranean-mena/syria/what-lies-store-syria-new-government-takes-power*.

[21] United Nations Office for the Coordination of Humanitarian Affairs, "Syrian Arab Republic: At a glance, urgently prioritized humanitarian response priorities 2025" July 24, 2025, *https://reliefweb.int/node/4167057*.

[22] UNHCR, "Press Releases: UNHCR deputy chief calls for support to end displacement for millions of Syrians" Sept. 2, 2025, *https://www.unhcr.org/us/news/press-releases/unhcr-deputy-chief-calls-support-end-displacement-millions-syrians#:~:text=%E2%80%9CI%20saw%20up%2Dclose%20how,seeing%20high%20numbers%20of%20returns*.

[23] *See INS* v. *Bagamasbad,* 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

[24] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies and her review of various considerations.

There are significant public safety and national security risks associated with the continued designation of Temporary Protected Status for Syria. Syria has been on State's list of state sponsors of terrorism since the list's inception in 1979 "because of its continued support of terrorism and terrorist groups, its former occupation of Lebanon, its pursuit of weapons of mass destruction and missile programs and use of chemical weapons, and its ongoing efforts to undermine U.S. and international stabilization activities in Iraq and Syria." [25] The U.S. Embassy in Damascus suspended operations in February 2012, and diplomatic relations were severed for over a decade.[26] This lack of diplomatic presence severely limits the U.S. government's ability to access reliable Syrian records. Furthermore, the caliber of the civil and criminal history records is not comprehensive, accurate, or reliable, making meaningful vetting virtually impossible. Even if there was an embassy in place, the United States cannot adequately vet Syrian nationals for identity, criminal history, or potential terrorist affiliations, posing an ongoing threat to public safety and national security of the United States. In a January 20, 2025 Executive Order, President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and the Director of National Intelligence to "vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks." [27] Given Syria's continued designation as a state sponsor of terrorism [28] and the lack of

access to verifiable information, the United States cannot adequately vet Syrian nationals for identity, criminal history, or potential terrorist affiliations, posing an ongoing threat to public safety and national security.

These national security and public safety vulnerabilities have already been proven in the United States. In August 2024, a former Syrian government official was indicted in the Central District of California for allegedly lying to United States immigration authorities about his prior role overseeing a detention facility where prisoners, including political dissidents, were subjected to torture and other forms of mistreatment.[29] His ability to enter the United States and obtain immigration benefits, despite his leadership role in systemic abuse under the Assad regime, reveals a critical gap in our screening processes with respect to aliens from Syria. Syrians who have participated in or directed acts of torture abroad may continue to pose a threat within the United States, whether through influence in diaspora communities, engagement in coercive or criminal activity, or by undermining the credibility and security of our immigration system. His presence highlights the risk that human rights violators can exploit our immigration system and underscores the real, ongoing threat posed when accountability and thorough vetting is not possible because the U.S. has lacked the tools and partnerships necessary to verify identities or past affiliations of Syrian nationals for over a decade.

In another example, a Syrian national admitted to the U.S. as a refugee in 2016 was later charged in 2019 for "attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS), a designated foreign terrorist organization" and for "distributing information relating to an explosive, destructive device, or weapon of mass destruction in relation to his plan to attack a church in Pittsburgh." [30] Furthermore, DHS records indicate there are Syrian nationals (or aliens who last habitually resided in Syria) who are Temporary

Protected Status beneficiaries or applicants who are or have been the subject of administrative investigations for fraud, public safety, and national security. The Secretary accordingly took account of those cases in making her determination, as fraud and egregious public safety violations are contrary to the national interest.

In Executive Order "America First Policy Directive to the Secretary of State," President Trump declared "from this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Moreover, it instructed "as soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first." [31]

There are compelling foreign policy reasons for ending the Temporary Protected Status designation for Syria. Recent events in Syria have provided a new opportunity for U.S. and Syrian relations, with President Trump expressing a commitment to assisting Syria in its next chapter in the post-Assad era. In his remarks at a United Nations Security Council briefing on the political and humanitarian situation in Syria, the acting U.S. alternate representative stated: "the President wants to see Syria and the entire region thrive. That's why he's made a bold decision on Syria with the hope the new government will take this opportunity to rebuild and take the country from being a source of instability to a source of stability." [32] Intergovernmental organizations such as the International Organization for Migration celebrated President Trump's decision to lift sanctions on Syria: "The International Organization for Migration (IOM) has welcomed the recent decisions by the European Union and the United States to lift a significant portion of sanctions imposed on Syria. The moves, along with similar decisions taken by the United Kingdom in the past few weeks, opens new possibilities for recovery, return, and regional peacebuilding after more than a decade of conflict. . ." [33] In

[25] U.S. Dep't of State, "U.S. Relations With Syria" Oct. 17, 2023, *https://2021-2025.state.gov/u-s-relations-with-syria/.*

[26] *Id.*

[27] Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 8451 (Jan. 30, 2025).

[28] As of the time of writing, Syria remains designated as a state Sponsor of Terrorism. On June 30, 2025, President Trump issued an Executive Order directing the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to take appropriate action concerning several terrorism-related designations. These included the designation of Hay'at Tahrir al-Sham as a Foreign Terrorist Organization, the designation of Al-Sharaa as a Specially Designated Global Terrorist, and the reaffirmation of Syria's status as a State Sponsor of Terrorism.

Subsequently, State removed Hay'at Tahrir al-Sham from the Foreign Terrorist Organization list. All other designations remain in effect.

[29] U.S. Dep't of Justice, "Press Release: Former Syrian Prison Official Charged with Immigration Fraud" Aug. 8, 2024, *https://www.justice.gov/usao-cdca/pr/former-syrian-prison-official-charged-immigration-fraud.*

[30] U.S. Dep't of Justice, "Press Release: Syrian Man Arrested on Terrorism Charges After Planning Attack on Christian Church" June 19, 2019, *https://www.justice.gov/archives/opa/pr/syrian-man-arrested-terrorism-charges-after-planning-attack-christian-church.*

[31] *See* America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 29, 2025).

[32] U.S. Mission to the United Nations, "Remarks by John Kelley, Acting U.S. Alternate Representative, UN Security Council" May 21, 2025, *https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-the-political-and-humanitarian-situations-in-syria-12/.*

[33] IOM, "IOM Welcomes EU and US Decisions to Lift Sanctions on Syria" May 27, 2025, *https://syria.iom.int/news/iom-welcomes-eu-and-us-decisions-lift-sanctions-syria.*

a May 27, 2025 State press briefing, a spokesperson said, ''the cessation of sanctions against Syria will advance our primary objective: the enduring defeat of the Islamic State by giving the people of Syria a chance for a better future.'' [34] As noted above, ''since 2024, over 1.2 million Syrians have returned to Syria. Meanwhile, internal returns continue, with 1,763,513 internally displaced people (IDP) returnees since December 2024. . . .'' [35] Following a meeting of the Global Coalition to Defeat ISIS Small Group, a State spokesperson released a statement that the members of the coalition ''affirmed the Coalition's continuing commitment to counter ISIS/Daesh in post-Assad Syria, including through increased border security and information sharing and the return of Syrians, Iraqis, and third country nationals to their communities and countries of origin.'' [36] In this context, extending Temporary Protected Status could complicate the administration's broader diplomatic engagement with Syria's transitional government.

In sum, the Secretary's decision to terminate the Temporary Protected Status designation for Syria is grounded in a comprehensive assessment of national interest factors including public safety, national security, and foreign policy as well as an analysis of the nature of the violence in the country today. The significant reduction in armed conflict, from a previously pervasive civil war to sporadic episodes of violence, shows that violence in Syria no longer constitutes the statutory basis for ongoing armed conflict. Moreover, in light of the continued national security and public safety risks, combined with the foreign policy considerations of sending mixed signals at a pivotal moment in U.S.-Syria relations, extending Temporary Protected Status for Syria is contrary to the U.S. national interest. In considering these factors individually and cumulatively, the Secretary has determined that Syria no longer meets the statutory basis for Temporary Protected Status.

DHS estimates that there are 6,132 [37] current approved beneficiaries under the designation of Syria for Temporary Protected Status. As of September 8, 2025, there are 833 total pending applications for the designation of Syria for Temporary Protected Status.

## Effective Date of Termination of the Designation

The Temporary Protected Status statute provides that the termination of a country's Temporary Protected Status designation may not be effective earlier than 60 days after the notice is published in the **Federal Register** or, if later, the expiration of the most-recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

The Temporary Protected Status statute authorizes the Secretary, at her discretion, to allow for an extended ''orderly transition'' period with respect to the termination and the expiration of any Temporary Protected Status-related documentation, such as EADs. The Secretary has determined, in her discretion, that a 60-day transition period is sufficient and warranted here given the Secretary's finding that continuing to permit Syrian nationals to remain temporarily in the United States is contrary to the U.S. national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3). Accordingly, the termination of the Syria Temporary Protected Status designation will be effective 60 days from this notice's publication date.[38]

DHS recognizes that Syria Temporary Protected Status beneficiaries under the designation continue to be employment authorized during the 60-day transition period.[39] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain EADs previously issued under the Temporary Protected Status designation of Syria through November 21, 2025. Therefore, as proof of continued employment authorization through November 21, 2025, Temporary Protected Status beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of September 9, 2022, March 10, 2024, and September 10, 2025.

The Secretary has considered putative reliance interests in the Syria Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, as frequently as every six months in some cases, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

## Notice of the Termination of the Temporary Protected Status Designation of Syria

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Syria; (b) whether permitting nationals of Syria (and aliens having no nationality who last habitually resided in Syria) to remain temporarily in the United States is contrary to the national interest of the United States; and (c) whether Syria is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Syrian nationals. Based on my review, I have determined that Syria no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Syria for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on November 21, 2025.

(2) Information concerning the termination of Temporary Protected Status for nationals of Syria (and aliens having no nationality who last

[34] Dep't of State, ''Department Press Briefing—May 27, 2025'' May 27, 2025, *https://www.state.gov/briefings/department-press-briefing-may-27-2025.*

[35] UNHCR, ''Press Releases: UNHCR deputy chief calls for support to end displacement for millions of Syrians'' Sept. 2, 2025, *https://www.unhcr.org/us/news/press-releases/unhcr-deputy-chief-calls-support-end-displacement-millions-syrians#:~:text=%E2%80%9CI%20saw%20up%2Dclose%20how,seeing%20high%20numbers%20of%20returns.*

[36] U.S. Department of State, ''Media Note—Meeting of the Global Coalition to Defeat ISIS Small Group'' June 10, 2025. *https://www.state.gov/releases/office-of-the-spokesperson/2025/06/meeting-of-the-global-coalition-to-defeat-isis-small-group.*

[37] Estimates as of September 8, 2025.

[38] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[39] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

habitually resided in Syria) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov.*

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–18322 Filed 9–19–25; 4:15 pm]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[Docket No. BIA–2022–0005; OMB Control Number 1076–0174; 256A2100DD/ AAKP300000/A0A501010.000000]**

### Agency Information Collection Activities; Energy and Mineral Development Program Grants

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of information collection; request for comment.

---

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, the Bureau of Indian Affairs (BIA, we) is proposing to renew an information collection.

**DATES:** Interested persons are invited to submit comments on or before November 21, 2025.

**ADDRESSES:** To submit comments, please visit *https:// www.regulations.gov/docket/BIA-2022- 0005/document* or use the search field on *https://www.regulations.gov* to find the ''BIA–2022–0005'' docket. Please follow the instructions on *Regulations.gov* for submitting a comment; and reference the ''OMB Control Number 1076–0174'' within your comment submission. You may also mail comments to Indian Affairs, RACA, 1001 Indian School Road NW, Suite 229, Albuquerque, NM 87104.

**FOR FURTHER INFORMATION CONTACT:** Steven Mullen, Information Collection Clearance Officer, Office of Regulatory Affairs and Collaborative Action— Indian Affairs, U.S. Department of the Interior, 1001 Indian School Road NW, Suite 229, Albuquerque, New Mexico 87104; *comments@bia.gov;* (202) 208– 5403. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. You may also view the ICR at *https:// www.reginfo.gov/public/Forward? SearchTarget=PRA&textfield=1076- 0174.*

**SUPPLEMENTARY INFORMATION:** In accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3501) and 5 CFR 1320.8(d)(1), we provide the general public, and other Federal agencies, with an opportunity to comment on new, proposed, revised, and continuing collections of information. This helps us assess the impact of our information collection requirements and minimize the public's reporting burden. It also helps the public understand our information collection requirements and provide the requested data in the desired format.

As part of our continuing effort to reduce paperwork and respondent burdens, we invite the public and other Federal agencies to comment on new, proposed, revised, and continuing collections of information. We are especially interested in public comment addressing the following:

(1) Whether or not the collection of information is necessary for the proper performance of the functions of the agency, including whether or not the information will have practical utility;

(2) The accuracy of our estimate of the burden for this collection of information, including the validity of the methodology and assumptions used;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) How might the agency minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of response.

Comments that you submit in response to this notice are a matter of public record. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

*Abstract:* The Energy Policy Act of 2005 authorizes the Secretary of the Interior to provide grants to Indian Tribes for energy development and appropriates funds for such grants on a year-to-year basis. See 25 U.S.C. 3502 (a)(2)(B). When funding is available, the Division of Energy and Mineral Development (DEMD) may solicit applications for energy development

projects from Indian Tribes whose lands are held in trust or restricted fee by the Federal Government under the Energy and Mineral Development Program (EMDP). Indian Tribes that would like to apply for an EMDP grant must submit an application that includes certain information, and once funding is received, recipients must submit reports on how they are using the funding.

*Title of Collection:* Energy and Mineral Development Program Grants.

*OMB Control Number:* 1076–0174.

*Form Number:* None.

*Type of Review:* Extension of a currently approved collection.

*Respondents/Affected Public:* Federally recognized Indian Tribes with Indian land.

*Total Estimated Number of Annual Respondents:* 113.

*Total Estimated Number of Annual Responses:* 143.

*Estimated Completion Time per Response:* Varies from 3 to 100 hours, depending on activity.

*Total Estimated Number of Annual Burden Hours:* 8,480 hours.

*Respondent's Obligation:* Required to obtain or retain a benefit.

*Frequency of Collection:* Annual for applications; semi-annual for progress reports.

*Total Estimated Annual Nonhour Burden Cost:* $0.

### Authority

An agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The authority for this action is the Paperwork Reduction Act of 1995 (44 U.S.C. 3501).

**Steven Mullen,**

*Information Collection Clearance Officer, Office of Regulatory Affairs and Collaborative Action—Indian Affairs.*

[FR Doc. 2025–18299 Filed 9–19–25; 8:45 am]

**BILLING CODE 4337–15–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

**[Docket No. BIA–2022–0005; OMB Control Number 1076–0164; 256A2100DD/ AAKP300000/A0A501010.000000]**

### Agency Information Collection Activities; Homeliving Programs and School Closure and Consolidation

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of information collection; request for comment.

---

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, the



Mark S Kocol (EOIR No. BL176134)
Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #: BL176134

NON-DETAINED



COPY

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BOARD OF IMMIGRATION APPEALS

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| DANIAL NISSAN | ) | File No.:     A077-656-263 |
| | ) | |
| In removal proceedings | ) | *Motion to Reopen* Filed on June 27, 2022 |
| | ) | Currently-pending and unadjudicated |
| | ) | |

## MOTION FOR LEAVE TO SUPPLEMENT PENDING

## MOTION TO REOPEN

DANIAL NISSAN
A077-656-263

### **Proof of Service**

On November **5**, 2025, I served a copy of Respondent's MOTION FOR LEAVE TO SUPPLEMENT PEDING MOTION TO REOPEN on the Office of the Chief Counsel, Immigration & Customs Enforcement, United States Department of Homeland Security, 55 East Monroe Street, Suite 1400, Chicago, IL 60607 via the ICE eService online portal to ICE Counsel's office.

Mark S. Kocol
Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #: BL176134

Date: November **5**, 2025

# <u>TABLE OF AUTHORITIES</u>

<u>Statutes and Regulations</u>                                                                                                     <u>Page(s)</u>

8 U.S.C. § 1182(a)(9)(A)(ii)………………………………………………………………………8
8 U.S.C. § 1182 (a)(9)(B)(ii)………………………………………………………………………8
8 U.S.C. § 1229b…………………………………………………………………………………8
8 U.S.C. § 1255……………………………………………………………………………………1, 8

8 C.F.R. § 1003.1(d)(3)(iv)……………………………………………………………………6
8 C.F.R. § 1003.2(a)………………………………………………………………………1, 2, 8
8 C.F.R. § 1003.2(c)(3)(ii)……………………………………………………………………2, 7
8 C.F.R. § 1003.2(c)(3)(iii)……………………………………………………………………2, 8

<u>Case Law</u>
*Pereira v. Sessions*, 138 S. Ct. 2105 (2018)……………………………………………………1, 7
*Islamic American Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007)…………………6
*Matter of Coelho*, 20 I & N Dec. 464 (BIA 1992)………………………………………………2
*Matter of L-O-G-*, 21 I & N Dec. 413 (BIA 1996)………………………………………………2
*Matter of R-R-*, 20 I & N Dec. 547 (BIA 1992)………………………………………………6

<u>Federal Register</u>
90 Fed. Reg. 45398 (September 22, 2025)……………………………………………………6

## TABLE OF CONTENTS

| Ex. | Document(s) | Page(s) |
|---|---|---|
| A. | "Syria's Christians: 'We Have No Reason to Trust Al-Jolani,'" *The Free Press* (December 13, 2024) | 10-16 |
| B. | "Hayat Tahir al-Sham Overthrows Syrian Government," *New Jersey Office of Homeland Security and Preparedness* (December 17, 2024) | 17-18 |
| C. | "Islamism, Salafism, and jihadism: A primer," *The Brookings Institution* (July 15, 2016) | 19-24 |
| D. | "The Salafi-Jihad as a Religious Ideology," *Combating Terrorism Center at West Point* (February, 2008) | 25-27 |
| E. | "Who Is the Rebel Leader Who Ousted Assad?" *Frontline* (December 13, 2024) | 28-35 |
| F. | "Syria's beleaguered Christians," *BBC News* (February 25, 2015) | 36-41 |
| G. | "Persecuted religious minorities in Syria devastated by attacks," *Global Christian Relief* (March 19, 2025) | 42-46 |
| H. | "Syria 2024 Country Reports on Human Rights Practices," *U.S. Department of State* (August 12, 2025) | 47-82 |
| I. | "Designated Foreign Terrorist Organizations," *U.S. Department of State* (accessed November 4, 2025) | 83-90 |
| J. | "Delisting Hayat Tahrir al-Sham: Implications for U.S. Counterterrorism and Syria Policy," *Policy Analysis* (July 10, 2025) | 91-93 |
| K. | "Report details killings, discrimination against religious minorities in post-Assad Syria," *The Catholic World Report* (July 7, 2025) | 94-96 |
| L. | "Syria: Persecution Dynamics," *Open Doors International* (January, 2025) | 97-134 |
| M. | "Syrian leader to discuss lifting sanctions, reconstruction in 'historic' US visit," *France 24* (November 2, 2025) | 135-136 |
| N. | "Trump administration ending legal status of thousands of Syrian immigrants in the U.S.," *CBS News* (September 19, 2025) | 137-140 |
| O. | "ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois," Press Release, *United States Department of Homeland Security* (September 8, 2025) | 141-145 |
| P. | "A Syrian man won his fight to avoid deportation. Ten months later, he remains detained," *PrismReports.org* (September 15, 2025) | 146-151 |
| Q. | "ICE in Chicago amid ongoing "Operation Midway Blitz" activity: Live updates," *CBS News* (October 28, 2025) | 152-161 |
| R. | "2 apparent US citizens swept up in Elgin ICE raid documented on Noem's social media: VIDEO," *ABC7 Chicago* (September 17, 2025) | 162-167 |
| S. | "On Chicago's first full day of 'Operation Midway Blitz,' fear, tension and a 'reality show,'" *WBEZ Chicago* (September 10, 2025) | 168-175 |
| T. | "Border Patrol official behind Chicago immigration crackdown defends tactics as Trump cheers," *AP News* (November 4, 2025) | 176-183 |

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| DANIAL NISSAN | ) | File No.:    A077-656-263 |
| | ) | |
| In removal proceedings | ) | ***Motion to Reopen*** Filed on June 27, 2022 |
| | ) | Currently-pending and unadjudicated |
| | ) | |

## MOTION FOR LEAVE TO SUPPLEMENT PENDING MOTION TO REOPEN

Respondent, Danial Nissan (Nissan), by and through undersigned counsel, respectfully moves the Board of Immigration Appeals (Board) for leave to supplement his Motion to Reopen. His 2004 removal order should be vacated and Mr. Nissan's removal proceedings reopened in light of changed country conditions in Syria; a defective Notice to Appear ("NTA") that failed to specify a date and time of initial hearing as required by *Pereira v. Sessions*, 138 S. Ct. 2105 (2018); and Mr. Nissan's continued *prima facie* eligibility for adjustment of status under INA § 245(a).

### I. Procedural Overview and Context.

Mr. Nissan filed a Motion to Reopen on June 27, 2022 (MTR-2022), which has remained pending for three-plus (3+) years. Reopening is warranted under 8 C.F.R. § 1003.2(a) because of the new extraordinary and material changes in Syria following the December 2024 deposing of Bashar al-Assad and rise to power of Abu Mohammed al-Jolani, leader of the U.S.-designated terrorist organization Hay'at Tahrir al-Sham (HTS). These new facts establish a *prima facie* case for asylum (and related) relief. These developments have created an environment ripe for significant escalation of persecution and violence against Assyrian Christians like Mr. Nissan.

This supplement coincides with the imminent cessation of Syria's *Temporary Protected Status*

[1]

(TPS) designation on November 21, 2025. Without Board action, Mr. Nissan will be subject to immediate removal to Syria – **in just 2½ weeks** – where he faces persecution as an Assyrian Christian.

These new facts justify reopening under 8 C.F.R. § 1003.2(c)(3)(ii) and (iii).

## II. Newly Material Facts and Evidence.

The Board has discretionary authority to accept supplemental filings in the interest of justice and to ensure a full record. 8 C.F.R. § 1003.2(a); *also see Matter of Coelho*, 20 I & N Dec. 464 (BIA 1992) (the Board can and should consider new, material, and previously unavailable evidence); *Matter of L-O-G-*, 21 I & N Dec. 413 (BIA 1996) (the Board may reopen or reconsider *sua sponte* in light of new evidence or changed conditions).

In fact, just since the filing of MTR-2022, the political and humanitarian landscape in Syria has fundamentally and perilously changed. The fall of the Assad regime[1] in December 2024 and the seizure of power by Hay'at Tahrir al-Sham (HTS),[2] an avowedly Salafi-jihadist organization,[3] has created a

---

[1] "A Syrian rebel coalition led by Abu Mohammad al-Jolani (took) over the capital city (on or about December 8, 2025). And while Syrians are collectively celebrating the fall of Bashar al-Assad's sadistic regime, **Syrian Christians are nervous about their future in the region. The Islamist rebels in Syria have a history of persecuting Syrian Christians. (The) radical theology of many Islamist rebels in Syria (has) resulted in acts of violence against Syrian Christians, everything from desecrating churches to kidnapping and murder. So, <u>when armed Islamist fighters standing in the streets…tell the Christians no harm will come to them, they have no reason to believe them</u>.**" "Syria's Christians: 'We Have No Reason to Trust Al-Jolani,'" *The Free Press* (December 13, 2024) (URL: https://www.thefp.com/p/syrias-christians-in-limbo-assad-jolani) **(Ex. A)** (emphasis added).

[2] "Al-Jolani is a former al-Qaeda member who was affiliated with one of the Mideast's most savage terrorist groups, ISIS. In 2011, at the start of the Syrian Civil War, he formed an al-Qaeda offshoot called the Nusra Front to battle Assad's soldiers…(Al-Jolani) merged with other anti-Assad rebel groups… to form **Hayat Tahrir al-Sham…<u>This is the group, led by al-Jolani, that rapidly took control over Syria in just 12 days, after 13 years of fighting Assad's army</u>.**" Id.

[3] "HTS is a Sunni Muslim group (that) was an official affiliate of (al-Qaeda) until 2016 when al-Jolani separated from it…and rebranded…as HTS in January 2017. **The U.S. designated (HTS) as a foreign terrorist organization (FTO) in May 2018.**" "Hayat Tahir al-Sham Overthrows Syrian Government," *New Jersey Office of Homeland Security and Preparedness* (December 17, 2024) (URL: https://www.njohsp.gov/Home/Components/News/News/1548/2) **(Ex. B)** (emphasis added).

radically different and more dangerous environment[4] for religious minorities,[5] particularly Assyrian Christians like Nissan.[6]

Since the respondent's last merits hearing in 2004, conditions in Syria – and particularly in the Al-Hasakah Governorate where Mr. Nissan was born and raised – have deteriorated in ways that materially affect his eligibility for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). At the time of the 2004 proceedings, the Assad regime exercised centralized control over the entire country. Although discrimination and monitoring of Christians existed, the Syrian government then maintained nominal order and protected minority communities from extremist violence. That baseline détente was completely upended by the civil conflict that began in 2011. The respondent's home region of Al-Hasakah has seen repeated changes of control among the Assad regime, Kurdish forces, ISIS, and mixed local militias. Mr. Nissan's immediate family, long-time residents of

---

[4] "**Salafi-jihadists tend to emphasize the military exploits of the** *Salaf* **(the early generations of Muslims) to give their violence an even more immediate divine imperative.** Most jihadist groups today can be classified as Salafi-jihadists, including al-Qaida and ISIS. Given their exclusivist view that their approach to Islam is the only authentic one, **Salafi-jihadists often justify violence against other Muslims, including non-combatants, by recourse to** *takfir*, **or the excommunication of fellow Muslims. For these groups, if Muslims have been deemed to be apostates, then violence against them is licit.**" "Islamism, Salafism, and jihadism: A primer," *The Brookings Institution* (July 15, 2016) (URL: https://www.brookings.edu/articles/islamism-salafism-and-jihadism-a-primer/) (**Ex. C**) (emphasis added).

[5] "(The) Salafi-jihad is no ordinary secular ideology, but a religious one (which is) of additional significance because it renders the attempt to challenge that ideology far more complex. Salafi-jihadists employ religious rhetoric and symbols to advance their cause. Although they selectively pick from the Islamic tradition only those elements that advance their narrow agenda, they nevertheless draw from the same religious sources that inform the lives and practices of more than a billion other Muslims. **It is for that reason that ordinary Muslims –** _not to speak of non-Muslims_ **– find it particularly difficult and dangerous to challenge Salafi-jihadists without running the risk of being accused of targeting Islam as a whole.**" "The Salafi-Jihad as a Religious Ideology," *Combating Terrorism Center at West Point* (February, 2008) (URL: https://ctc.westpoint.edu/the-salafi-jihad-as-a-religious-ideology/) (**Ex. D**) (emphasis added).

[6] As assessed by documentarian Martin Smith for *Frontline*, "(Al-Jolani has) minorities in the country (and) it reminds me of when the Americans toppled Saddam in Baghdad. (I worry that) the conditions in Syria could be similarly severe. (I'm watching for) a couple of things (like) what Jolani actually does, not what he says (and) does he keep his word? Does he protect minorities, the Alawites, the Kurds, the Christians (or does it become) a bloody mess." "Who Is the Rebel Leader Who Ousted Assad?" *Frontline* (December 13, 2024) (URL: https://www.pbs.org/wgbh/frontline/podcast/dispatch/who-is-the-rebel-leader-who-ousted-assad/) (**Ex. E**).

[3]

Al-Hasakah, fled as refugees to Australia in or about 2013 after their neighborhood came under direct threat from both ISIS and Islamist militias. Their displacement provides compelling, individualized corroboration of how the Syrian civil war has translated into recognizable persecution of Christian families there.

Since Mr. Nissan's MTR-2022 was filed, material changes have occurred with the growing dominance of Hayat Tahrir al-Sham (HTS) and fragmentation of authority across northern Syria. HTS's *de facto* governance has included restrictions on religious minorities, expropriation of Christian property, and intimidation of those who fail to conform to its Islamist code. These developments constitute a new phase of Syria's instability – qualitatively distinct from conditions which existed in 2004 and even as recent as June, 2022. The combination of regime collapse in December, 2024, of non-state actor control, and of ongoing hostilities renders Mr. Nissan, an Assyrian Christian from Al-Hasakah, at serious risk of persecution should he be returned.

The United States Department of State's 2024 Country Report on Syria, and multiple journalistic sources confirm widespread persecution,[7] targeted attacks, and confiscation of property from Christians:[8]

---

[7] "(The war has not) spared the Christian community. Thousands have been forced from their homes by the threat from hardline Islamist rebels and jihadist militants…In areas seized by the jihadist group Islamic State (IS), Christians have been ordered to convert to Islam, pay jizya (a religious levy), or face death. **In the Syrian province of Hassakeh in February 2015, hundreds of Christians are feared to have been kidnapped by the militants**…**Senior Christian clerics have also been kidnapped by unknown gunmen. Suspicion for the abductions has fallen on the Nusra Front, al-Qaeda's Syrian affiliate**." "Syria's beleaguered Christians," *BBC News* (February 25, 2015) (URL: https://www.bbc.com/news/world-middle-east-22270455) **(Ex. F)** (emphasis added).

[8] "HTS promised they would not enact radical religious policies, but as time passed, persecution against Christians and other minorities intensified. Militants have attacked churches, desecrated cemeteries, forced Christian women to adhere to Islamic dress codes and confiscated Christians' homes…**Christians…and other religious minorities…have reason to worry about their futures in such an extremist country**." "Persecuted religious minorities in Syria devastated by attacks," *Global Christian Relief* (March 19, 2025) (URL: https://globalchristianrelief.org/stories/religious-minorities-persecuted-christians-in-syria-under-attack/#:~:text=HTS%20promised%20they%20would%20not.in%20such%20an%20extremist%20country.) **(Ex. G)** (emphasis added).

[4]

"Conflict parties in Syria (incl. HTS, have) committed serious and widespread human rights violations and abuses…(These) included credible reports of: arbitrary or unlawful killings; disappearances; torture and cruel, inhuman, or degrading treatment or punishment; arbitrary arrest and detention; instances of transnational repression against individuals in another country; serious abuses in a conflict; unlawful recruitment or use of children in armed conflict; serious restrictions on freedom of expression and media freedom, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, censorship, and serious restrictions on internet freedom; trafficking in persons, including forced labor; prohibiting independent trade unions or significant or systematic restrictions on workers' freedom of association; and significant presence of any of the worst forms of child labor…. **Armed terrorist groups, including Hayat Tahrir al-Sham, reportedly carried out arbitrary detentions and subjected some detainees to torture. ISIS reportedly carried out killings, attacks, and kidnappings, including against civilians**." "Syria 2024 Country Reports on Human Rights Practices," *U.S. Department of State* (August 12, 2025) (URL: https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/) (**Ex. H**) (emphasis added).

The delisting of HTS as a Foreign Terrorist Organization[9] in mid-2025 has only emboldened extremist rule rather than moderating it:

"Policy analysts and security commentators warned that delisting weakens legal/financial pressure and could encourage HTS to act more openly as a political/military power – i.e., analysts used words like 'emboldened' or said the decision 'could embolden' extremists." "Delisting Hayat Tahrir al-Sham: Implications for U.S. Counterterrorism and Syria Policy," *Policy Analysis* (July 10, 2025) (URL: https://www.washingtoninstitute.org/pdf/view/19430/en) (**Ex. J**).

"Multiple human-rights/religious-freedom outlets and church-oriented press **reported violence, killings, discrimination and property attacks against Christians…since the fall of Assad and in the months after HTS rose into positions of power. These reports document incidents of attacks on churches, arrests/intimidation of Christian leaders, and social/exclusionary measures**." "Report details killings, discrimination against religious minorities in post-Assad Syria," *The Catholic World Report* (July 7, 2025) (URL: https://www.catholicworldreport.com/2025/07/07/report-details-killings-discrimination-against-religious-minorities-in-post-assad-syria/?utm_source=chatgpt.com) (**Ex. K**) (emphasis added).

"Christians face particular pressure from radical Islamic groups…in the northwest and in parts of Hasakah province in the northeast, where (HTS-aligned groups) have attacked civilian and church targets." "Syria: Persecution Dynamics," *Open Doors International* (January, 2025) (URL: https://www.opendoors.org.au/wp-content/uploads/2025/01/WWL-2025-Persecution-Dynamics-Syria.pdf) (**Ex. L**).

The U.S. Department of Homeland Security has formally announced the termination of TPS for

---

[9] HTS was delisted as a foreign terrorist organization (FTO) by the United States government on July 8, 2025. "Designated Foreign Terrorist Organizations," *U.S. Department of State* (accessed November 4, 2025) (URL: : https://www.state.gov/foreign-terrorist-organizations (**Ex. I**).

Syria effective November 21, 2025.[10] This renders Respondent imminently removable, materially changing the factual and legal bases from his 2004 removal order and since he filed his motion to reopen in 2022.[11]

---

[10] "The Board may on its own motion take administrative notice of commonly known facts such as current events or the contents of official documents." 8 C.F.R. § 1003.1(d)(3)(iv); also see *Matter of R-R-*, 20 I & N Dec. 547, 551, Note 3 (BIA 1992). On Sept. 19, 2025, Secretary of Homeland Security Kristi Noem published a notice terminating TPS for Syria. 90 Fed. Reg. 45398 (September 22, 2025).

[11] It is anticipated that the DHS may argue against reopening, potentially-citing among its reasons the U.S. State Department's delisting of HTS as a foreign terrorist organization, the lifting of some economic sanctions on Syria, and al-Jolani's (also known as Ahmed al-Sharaa) upcoming meeting in Washington, D.C. to discuss issues including the lifting of remaining sanctions, reconstruction, and counter-terrorism with the Trump Administration. The Trump Administration is, it appears, "(hopeful) to sign an agreement (with Syria) to join the international US-led alliance against the Islamic State (IS)." "Syrian leader to discuss lifting sanctions, reconstruction in 'historic' US visit," *France 24* (November 2, 2025) (URL: https://www.france24.com/en/middle-east/20251102-syrian-leader-to-discuss-lifting-sanctions-reconstruction-in-historic-us-visit) **(Ex. M)**.

Any such argument against reopening must fail for it ignores facts to the contrary reported in Syria (*supra.*, **Exs. H, J-K**). In fact, the incongruence is self-evident in the DHS' proclamation terminating Syria TPS:

"In a statement, DHS spokeswoman Tricia McLaughlin also cited terrorist activity in Syria as additional grounds to terminate the TPS program…'**Syria has been a hotbed of terrorism and extremism for nearly two decades**.'" "*Trump administration ending legal status of thousands of Syrian immigrants in the U.S.,*" *CBS News* (September 19, 2025) (URL: https://www.cbsnews.com/news/syria-temporary-protected-status-trump-ending/) **(Ex. N)** (emphasis added).

HTS is one of the terrorist organizations to which the Trump Administration refers **(Ex. H)**. Delisting HTS as an FTO does not equate to rehabilitation; it reflects a change in designation, not in character. The record provides no reason to believe that HTS's ideology or conduct toward religious minorities, particularly Christians in Hasakah, has fundamentally changed since its initial designation as an FTO. As courts have cautioned in other national security contexts, delisting alone cannot compel the conclusion that a violent organization has reformed. To assume otherwise risks precisely the kind of credulous optimism warned against by experience – 'new' in name only. *See, e.g., Islamic American Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007) (discussing delisting and continued scrutiny).

"(The) Department of Homeland Security (has) announced Operation Midway Blitz...This ICE operation will target the criminal illegal aliens who flocked to Chicago and Illinois because they knew Governor Pritzker and his sanctuary policies would protect them and allow them to roam free on American streets. (The operation) 'will target the worst of the worst criminal illegal aliens in Chicago.'" "ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal Aliens Terrorizing Americans in Sanctuary Illinois," Press Release, *United States Department of Homeland Security*, (September 8, 2025) (URL: https://www.dhs.gov/news/2025/09/08/ice-launches-operation-midway-blitz-honor-katie-abraham-target-criminal-illegal) **(Ex. O)**.

"'In today's times, given the current circumstances and state of affairs, I think we're going to be seeing an increase of persons detained in similar circumstances because it reflects a broader trend,' Campos said. 'That broader trend is to hold people until they capitulate and ultimately sign papers for them to be removed abroad.'" "A Syrian man won his fight to avoid deportation. Ten months later, he remains detained," *PrismReports.org* (September 15, 2025) (URL: https://prismreports.org/2025/09/15/kamel-maklad-immigration-detention-withholding-of-removal/) **(Ex. P)** (emphasis added).

Consistent with this strong armed "capitulation" approach, significant concerns exist for Mr. Nissan given that his home is situated in the jurisdiction of Chicago ICE and CBP which have reported:

- Public data shows that through September 30, 2025, there were 2,011 arrests by the Chicago field-office of which roughly half (just over 1,000) were reported as removed (deported). "ICE in Chicago amid ongoing "Operation Midway Blitz" activity: Live updates," *CBS News* (October 28, 2025) (URL: https://www.cbsnews.com/chicago/live-updates/ice-in-chicago-operation-midway-blitz-trump-live-updates/) **(Ex. Q)**;

- Multiple local investigations show that some persons arrested had no serious criminal history. "2 apparent US citizens swept up in Elgin ICE raid documented on Noem's social media: VIDEO," *ABC7 Chicago* (September 17, 2025) (URL: https://abc7chicago.com/post/ice-chicago-news-mexican-independence-day-fears-among-areas-immigrant-community-grow-reports-arrests/17826326/?utm_source=chatgpt.com) **(Ex. R)**;

- Media reports document heavy federal enforcement tactics in neighborhoods, deploying early-morning raids, helicopters, large agent deployments – raising concerns of chilling effects on communities, and potential violations of civil-liberties safeguards. "On Chicago's first full day of 'Operation Midway Blitz,' fear, tension and a 'reality show,'" *WBEZ Chicago* (September 10, 2025) (URL: https://www.wbez.org/immigration/2025/09/10/operation-midway-blitz-deportation-campaign-chicago-donald-trump-gregory-bovino?utm_source=chatgpt.com) **(Ex. S)**.

In sum, Operation Midway Blitz **(Ex. O)**, as implemented by U.S. Border Patrol commander Greg Bovino (Bovino), has provoked fierce backlash, legal challenges and investigations after frequent use of chemical agents and crowd-control munitions in neighborhoods and at demonstrations – actions repeatedly occurring without proper warning and targeting immigrant communities. Families of

[7]

detainees alleged deplorable conditions at the ICE processing facility in Broadview and have filed lawsuits accusing agents of mistreatment; in response, a Northern District of Illinois judge has imposed oversight measures requiring agents to wear identification and body cameras, document arrests and adhere to stricter reporting protocols. The court has even summoned Bovino to explain specific uses of force. Midway Blitz represents an unprecedented escalation of federal immigration enforcement in the Chicago region. *Cf.*, "Border Patrol official behind Chicago immigration crackdown defends tactics as Trump cheers," *AP News* (November 4, 2025) (URL: https://apnews.com/article/immigration-chicago-arrests-police-federal-5c21bcb2cd890fcb086480469c1a3a96?utm_source=chatgpt.com) (**Ex. T**)

### III. Updated Legal Bases for Reopening.

A. Changed Country Conditions (8 C.F.R. § 1003.2(c)(3)(ii)) – The overthrow of the Assad regime and rise of HTS governance constitute a fundamental and previously unforeseeable change in Syria's conditions from 2004-2006 when Mr. Nissan's matter was last before this Board; these changes were likewise not foreseeable when the MTR-2022 was filed. Reopening is justified to allow Mr. Nissan to present applications for asylum, withholding of removal, and CAT.

B. Defective Notice to Appear (*Pereira v. Sessions*, 138 S. Ct. 2105 (2018)) – The 2002 NTA failed to list a time and place of hearing, thus not triggering the stop-time rule. Mr. Nissan has over twenty-three (23) years of continuous physical presence in this country and a U.S. citizen spouse who would face exceptional hardship. Nissan is *prima facie* eligible for cancellation of removal under 8 U.S.C. § 1229(b).

C. Adjustment of Status Eligibility (8 C.F.R. § 1003.2(c)(3)(iii)) – Respondent's approved I-130 petition and pending I-485, previously denied by the DHS only for lack of jurisdiction, confirm his continued statutory eligibility for adjustment of status. Given the lack of a U.S. embassy in Syria[12] and

---

[12] "U.S. Embassy in Damascus suspended its operations in 2012. The U.S. government is unable to provide any routine or emergency consular services to U.S. citizens in Syria. U.S. citizens in Syria who are in

the legal and statutory triggering bars [incl. 8 U.S.C. §§ 1182(a)(9)(A)(ii), (B)(ii)] against his returning to the United States for at least five (5) years upon removal, the termination of TPS (following the detailed procedural history of Mr. Nissan's case addressed at pages 3-9 of MTR-2022) eminently-justifies the Board's reopening *sua sponte* under 8 C.F.R. § 1003.2(a) in this case.

## IV. Prayer for Relief.

WHEREFORE, Mr. Nissan respectfully requests that the Board of Immigration Appeals grant his Motion to Reopen, accepting into the record the attached supplemental country conditions reports, and remand proceedings to the Chicago immigration court to allow full consideration of applications for asylum, withholding of removal, CAT, and cancellation of removal.

Alternatively, Mr. Nissan requests that the Board exercise its *sua sponte* authority under 8 C.F.R. § 1003.2(a) in light of the exceptional humanitarian and equitable factors presented, allowing adjustment of status under 8 U.S.C. § 1255(a).

Respectfully submitted,

Date: 11/5/2025

Mark S. Kocol
Counsel for Danial Nissan

Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #: BL176134
IL Bar #: 6225348

need of emergency assistance should email the U.S. Embassy in Amman, Jordan." *See:* https://sy.usembassy.gov/services/ (accessed November 3, 2025).



Mark S Kocol (EOIR No. BL176134)
Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com

NON-DETAINED



UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| DANIAL NISSAN | )  File No.:   A077-656-263 |
| | ) |
| In removal proceedings | )  *Motion to Reopen* Filed on June 27, 2022 |
| | )  Currently-pending and unadjudicated |
| | ) |

## MOTION TO STAY REMOVAL

DANIAL NISSAN
A077-656-263

<u>Proof of Service</u>

On November **5**, 2025, I served a copy of Respondent's MOTION TO STAY REMOVAL on the Office of the Chief Counsel, Immigration & Customs Enforcement, United States Department of Homeland Security, 55 East Monroe Street, Suite 1500, Chicago, IL 60607 via the ICE eService online portal to ICE Counsel's office.

_____,
Mark S. Kocol
Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #: BL176134

Date: November _____, 2025



<u>TABLE OF AUTHORITIES</u>

| <u>Statutes and Regulations</u> | <u>Page(s)</u> |
|---|---|

8 U.S.C. § 1101(a)(47)(B)............................................................................5
8 U.S.C. § 1229a(c)(7)................................................................................5
8 U.S.C. § 1252(a)..................................................................................5, 8
8 U.S.C. § 1252(a)(1).................................................................................5
8 U.S.C. § 1252(b)(3)(B).........................................................................4, 5, 8

8 C.F.R. § 1003.2(c)(3)(ii)........................................................................2, 9
8 C.F.R. § 1003.2(d)(1)(ii)..........................................................................3
8 C.F.R. § 1003.2(f)..............................................................................2, 3

<u>Case Law</u>
*Dada v. Mukasey*, 554 U.S. 1 (2008)...............................................................2
*Judalang v. Holder*, 565 U.S. 42, 55 (2011).......................................................7
*Kucana v. Holder*, 558 U.S. 233 (2010)..........................................................2, 6
*Nken v. Holder*, 556 U.S. 418 (2009)........................................................2, 7, 8, 10

*Abassi v. INS*, 143 F.3d 513 (7th Cir. 1998).......................................................2
*Braintree Labs v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 36 (1st Cir. 2010)........................7
*Devitri v. Cronen*, 289 F.Supp. 287 (D. Mass. 2018)..............................................5, 6
*Guerra v. Barr*, 987 F.3d 870 (7th Cir. 2021).....................................................3
*In re Revel AC, Inc.*, 802 F.3d 558 (3rd Cir. 2015)................................................7
*Khouzam v. Hogan*, 497 F.Supp. 2d 615 (M.D. Pa. 2007).............................................4
*Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011).......................................4, 7
*Madrigal v. Holder*, 572 F.3d 239 (6th Cir. 2009)................................................6
*Mohammed v. Garland*, 92 F.4th 756 (7th Cir. 2024)..............................................3, 9
*Shaboyan v. Holder*, 652 F.3d 988 (9th Cir. 2011).................................................5

*Matter of G-C-L-*, 23 I & N Dec. 359 (BIA 2002)..................................................2
*Matter of Velarde*, 23 I & N Dec. 253 (BIA 2002).................................................2
*Matter of X-G-W-*, 22 I & N Dec. 71 (BIA 1998)....................................................6

## TABLE OF CONTENTS

| Ex. | Document(s) | Page(s) |
|---|---|---|
| A. | "Syria 2024 Country Reports on Human Rights Practices," *U.S. Department of State* (August 12, 2025) | 1-18 |
| B. | "Syria's Christians: 'We Have No Reason to Trust Al-Jolani,'" *The Free Press* (December 13, 2024) | 19-25 |
| C. | "Syria: Persecution Dynamics," *Open Doors International* (January, 2025) | 26-44 |
| D. | "Syria's beleaguered Christians," *BBC News* (February 25, 2015) | 45-50 |
| E. | "Report details killings, discrimination against religious minorities in post-Assad Syria," *The Catholic World Report* (July 7, 2025) | 51-54 |

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BOARD OF IMMIGRATION APPEALS

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| DANIAL NISSAN | ) | File No.:     A077-656-263 |
| | ) | |
| In removal proceedings | ) | ***Motion to Reopen*** Filed on June 27, 2022 |
| | ) | Currently-pending and unadjudicated |
| | ) | |

## MOTION TO STAY REMOVAL

Respondent, Danial Nissan (Nissan), by and through undersigned counsel, respectfully moves the Board of Immigration Appeals ("Board") to stay his removal pending adjudication of (1) his *Motion to Reopen* filed on June 27, 2022 (MTR-2022), and (2) his concurrently filed herewith *Motion for Leave to Supplement Motion to Reopen*, which presents additional, material evidence of markedly worsening conditions for Assyrian Christians like Nissan under Hay'at Tahrir al-Sham (HTS). The United States had HTS designated as a foreign terrorist organization from May, 2018 through July 8, 2025.

## I. INTRODUCTION.

Nissan seeks a stay in light of the Department of Homeland Security's very recent decision to terminate Syria's Temporary Protected Status (TPS) designation (effective November 21, 2025), which will end the lawful protection from removal he has maintained continuously since May 10, 2013. Nissan has also possessed employment authorization since February 2013 and remained in compliance with all DHS reporting and renewal requirements.

The motion is warranted by humanitarian and due process considerations, including the risk that removal prior to adjudication of Nissan's MTR-2022 would result in his immediate detention at the Broadview, Illinois ICE facility, where credible reports indicate ongoing overcrowded and inhumane

[1]

conditions with no congressional oversight allowed, amid a pattern of unprecedented law enforcement incursions by the United States Department of Homeland Security's Customs & Border Protection (CBP) and Immigration & Customs Enforcement (ICE) in the Chicago area labeled "Operation Midway Blitz."

## II. PROCEDURAL HISTORY.

1. Nissan is a native and citizen of Syria who was ordered removed by the Chicago immigration court on July 29, 2004. He arrived with a humanitarian B-2 nonimmigrant visitor visa in 2002 to provide bone marrow for transplantation for his sister who subsequently passed from leukemia.

2. Nissan has held Temporary Protected Status (TPS) since it was designated for Syria, with initial approval on May 10, 2013, and employment authorization continuously renewed from February 2013 to the present.

3. On June 27, 2022, Nissan filed a *Motion to Reopen* with the Board pursuant to 8 C.F.R. § 1003.2(c)(3)(ii), supported by extensive evidence (330 pages) of changed country conditions affecting religious and ethnic minorities in Syria. **The Board has not yet adjudicated that motion**.

4. On or about November 6, 2025, Nissan has filed a *Motion to Supplement Pending Motion to Reopen* incorporating new evidence arising after the December 2024 overthrow of Bashar al-Assad and the consolidation of political and legal power under the former HTS commander in 2025.

5. The termination of Syria's TPS – effective November 21, 2025 – places Nissan at immediate risk of removal, even as the underlying MTR-2022 remains pending.

6. Nissan respectfully moves the Board for a stay of removal to preserve its jurisdiction and ensure that he is not removed to Syria where he faces near certain persecution as an Assyrian Christian.

## III. LEGAL STANDARDS.

The Board has discretionary authority under 8 C.F.R. § 1003.2(f) to stay removal where doing so is necessary to preserve the integrity of its jurisdiction over a pending motion. The central inquiry is whether removal before adjudication would moot the pending motion or deprive Mr. Nissan of effective relief, and whether the underlying motion presents a *prima facie* meritorious claim

Given this case arises within the Seventh Circuit, it is also appropriate to consider the equitable factors that guide judicial stay determinations. Under *Nken v. Holder*, 556 U.S. 418, 434 (2009), and *Abbassi v. INS*, 143 F.3d 513 (7th Cir. 1998), courts assess: (1) the likelihood of success on the merits;

[2]

(2) whether the movant will suffer irreparable harm without a stay; (3) whether the balance of harms favors the movant; and (4) whether the public interest supports a stay.

The Seventh Circuit applies a sliding-scale analysis, meaning that a particularly strong showing on one factor (such as irreparable harm) may offset a lesser showing on another. *See, e.g., Mohammed v. Garland*, 92 F.4th 756, 762 (7th Cir. 2024); *Guerra v. Barr*, 987 F.3d 870 (7th Cir. 2021). Although the Board is not strictly bound by this judicial framework, these same considerations underscore the equitable and prudential reasons supporting a stay in Nissan's case.

## IV. ARGUMENT.

The Board has authority to issue an administrative stay because Nissan's motion to reopen remains pending. 8 C.F.R. §§ 1003.2(f), 1003.1(d)(1)(ii). Nissan has filed his stay request in conjunction with his MTR-2022 based on new evidence and a fear of persecution and torture that no administrative body or court has reviewed – **the Board should automatically stay removal**.

Absent an automatic stay here, the Board risks wrongfully allowing Nissan's removal to face persecution, torture, or even death in Syria before it fully, and with sufficient deliberation, evaluates the motion's merits. In fact, the Board could, and should, create an automatic stay policy through adjudication of this motion. *See, e.g., Matter of X-G-W-*, 22 I&N Dec. 71, 74 (BIA 1998) (adopting a policy of excusing regulatory deadline to allow certain motions to reopen to pursue asylum claims based on coercive family-planning policies), *overruled by Matter of G-C-L-*, 23 I&N Dec. 359, 361-62 (BIA 2002) (withdrawing the policy due to the passage of time); *Matter of Velarde*, 23 I&N Dec. 253 (BIA 2002) (adopting policy allowing adjudicators to grant motions to reopen to apply for adjustment of status pending approval of immigrant visa petition where a foreign national satisfies a five-factor test).

1. Where a Motion to Reopen is Predicated on New and Previously Unavailable Evidence of a Non-Frivolous Fear-Based Claim, an Automatic Stay is Warranted.

The Board should automatically stay removal when a noncitizen like Nissan seeks a stay in

[3]

conjunction with a non-frivolous motion to reopen based on new and previously unavailable evidence of a fear-based claim:

- Premature removal may mean injury or even death before the Board can adjudicate Nissan's fear-based claim.

- A cursory review of the merits of such a motion to reopen, as would necessarily occur in an emergency stay evaluation, is dangerously inappropriate where no adjudicator has previously examined the evidence or claim presented **in the MTR-2022 filed three-plus (3+) years ago**.

- The Board's refusal to grant a stay before deciding the merits of the motion would deprive Nissan of the opportunity to seek a judicial stay in conjunction with a petition for review prior to deportation to a country where he faces likely injury or even death. 8 U.S.C. § 1252(b)(3)(B).

- Absent an automatic stay in these circumstances, the Board could deprive Nissan of his statutory right to seek reopening.

First, the stakes in stay adjudications are especially high when they are tied to a motion to reopen based on a fear of physical harm and torture in the noncitizen's country of origin or return. Such claims inherently carry the risk of irreparable harm if the noncitizen is removed prematurely. *See Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (observing that for persecution and torture-based claims, the risk of physical harm must be part of the irreparable harm inquiry); *Khouzam v. Hogan*, 497 F. Supp. 2d 615, 626–27 (M.D. Pa. 2007) (granting stay of removal where habeas claims challenging rescission of relief under the Convention Against Torture were "not frivolous" and there was a likelihood of torture). If the Board denies or fails to rule on the stay sought by Nissan, he likely will face the ultimate harm he fears. *See Devitri v. Cronen*, 289 F. Supp. 3d 287, 294 (D. Mass. 2018) (delay in the Board's adjudication of stay motions for asylum applicants leads to a "Kafkaesque" result where "they will be removed back to the very country where they fear persecution and torture while awaiting a decision on whether they should be subject to removal because of their fears of persecution and torture"). Automatically staying removal in these circumstances is necessary to avoid the high risk of irreparable harm absent a stay.

[4]

Second, because Nissan's underlying motion includes new, previously unavailable evidence, it necessarily has never been reviewed by any adjudicator. *See* 8 U.S.C. §§ 1229a(c)(7)(B), (C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii). Therefore, the motion for stay is not well-suited to the rushed review that necessarily occurs when assessing it on an emergency basis. Until the Board can fully evaluate the underlying motion to reopen, an automatic stay is the only way to ensure that Nissan is not wrongly removed despite a new, meritorious fear-based asylum claim.

Third, failing to issue an automatic stay would conflict with the right to seek a judicial stay of removal in conjunction with filing a petition for review. *See* 8 U.S.C. § 1252(a), (b)(3)(B). Were the Board to deny a stay of removal before adjudicating the underlying motion to reopen, it would deprive Nissan of the right to seek a judicial stay from the 7th Circuit Court of Appeals. Until the Board rules on Nissan's pending motion to reopen, there is no final order of removal of which Nissan can seek judicial review. 8 U.S.C. §§ 1101(a)(47)(B), 1252(a)(1); *Shaboyan v. Holder*, 652 F.3d 988, 989-90 (9th Cir. 2011) (concluding the court lacked jurisdiction to review interim BIA order denying stay request where BIA had not yet adjudicated pending motion to reopen). Granting an automatic stay until the Board rules on the motion to reopen is the only way to ensure that, should the Board deny the motion to reopen, Nissan may seek a stay in federal court.

Finally, in these circumstances, removal prior to adjudication of the motion to reopen would defeat Nissan's statutory right to pursue a motion under 8 U.S.C. § 1229a(c)(7), which serves as an "important safeguard" to "ensure a proper and lawful disposition" of his immigration proceedings. *Dada v. Mukasey*, 554 U.S. 1, 18 (2008); *see also Kucana v. Holder*, 558 U.S. 233, 242 (2010). Where the consequence of an erroneous deportation is physical harm to, or even the death of, a Respondent, it is plausible, if not likely, that he would not benefit from later success on the merits. Thus, an automatic stay is the only way to ensure that Nissan has a meaningful opportunity to pursue his fear-based motion

to reopen and have the opportunity to benefit from a favorable decision. *See Devitri*, 289 F. Supp. 3d at 294. The Board may not cut off this statutory right. *Cf., Kucana*, 558 U.S. at 252-53 (holding that the agency cannot cut off right to judicial review of motions to reopen by regulation); *Madrigal v. Holder*, 572 F.3d 239, 245 (6th Cir. 2009) ("To allow the government to cut off Madrigal's statutory right to appeal an adverse decision, . . . simply by removing her before a stay can be issued or a ruling on the merits can be obtained, strikes us as a perversion of the administrative process."). An automatic stay in these circumstances avoids this risk of jeopardizing Nissan's ability to benefit from any future decision granting reopening.

For the foregoing reasons, the Board should grant an automatic stay.

2.  In the Alternative, the Board Should Stay Nissan's Removal Based on a Two-Factor Balancing Test that Prioritizes the Prevention of Harm.

If the Board declines to automatically stay Nissan's deportation based on the reasons set forth above, the Board should employ a two-factor test which balances both the likelihood of success on the merits and the risk of irreparable harm. The test weighs heavily in favor of preventing harm where the motion to reopen is based on a non-frivolous, new, fear-based claim.

Stays traditionally have been intended to resolve a two-pronged problem: "what to do when [(1)] there is insufficient time to resolve the merits and [(2)] irreparable harm may result from delay." *Nken v. Holder*, 556 U.S. 418, 432 (2009). A standard which fails to take harm into account would be arbitrarily divorced from the purpose of the process. *Cf. Judulang v. Holder*, 565 U.S. 42, 55 (2011) ("[A]gency action must be based on non-arbitrary, relevant factors," including "the purposes of the immigration laws or the appropriate operation of the immigration system.").

The Board should weigh the risk of harm heavily and prioritize preventing irreparable harm where, as here, **Nissan's motion to reopen is based on a non-frivolous religious and social group fear-based claim arising from changed country conditions**. See *Leiva-Perez*, 640 F.3d at 969;

[6]

*Devitri*, 289 F. Supp. 3d at 294. Even the more demanding federal court test for injunctive relief involves a balancing of factors, key among them the prevention of irreparable harm. *See Nken*, 556 U.S. at 434 (holding that the "most critical" factors for a federal appellate court stay of removal are risk of irreparable harm and likelihood of success on the merits); *In re Revel AC, Inc.*, 802 F.3d 558, 569 (3rd Cir. 2015) (finding that stay adjudications requires a sliding-scale balancing test so the showing of high risk of irreparable harm reduces necessary degree of possibility of success on the merits); *Braintree Labs., Inc. v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (same); *Leiva-Perez*, 640 F.3d at 966, 970 (same). And, where – as here – the motion to reopen presents never-reviewed fear-based claims, the Board should place more weight on preventing irreparable harm.

In sum, as an alternative to an automatic stay standard discussed above, the Board should adopt a two-factor balancing test that considers both the likelihood of success on the merits and preventing irreparable harm. Significant weight is due to the latter factor where, as here, the motion to reopen is based on a non-frivolous, never-reviewed fear-based claim. It is beyond doubt, Mr. Nissan will suffer irreparable harm if the Board were to deny the instant stay motion without adjudication of Nissan's motion to reopen. As discussed above, denying the stay motion without adjudicating the underlying motion to reopen deprives Nissan of the right to seek a judicial stay of removal in conjunction with filing a petition for review. *See* 8 U.S.C. §§ 1252(a), (b)(3)(B).

### 3. Even under the test for Judicial Stays of Removal filed in conjunction with a Petition for Review, Nissan Merits a Stay.

In *Nken v. Holder*, the Supreme Court instructed courts of appeals to apply the "traditional" standard when adjudicating stay motions filed in conjunction with a petition for review. Under this standard, a court considers the following four factors: (1) whether the stay applicant has made a strong showing that they are likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested

[7]

in the proceeding; and (4) where the public interest lies. *Nken*, 566 U.S. at 434. The Board should not adopt this four-factor test in the first instance when assessing a motion to reopen based on a fear-based claim that has never been reviewed on its merits. This more demanding test assumes the agency already has reviewed and rejected the underlying claim on the merits; it is not appropriate when the agency has not yet considered the facts, arguments, or evidence supporting the claims. Nevertheless, even under this more rigid test, Nissan merits a stay of removal.

A. Removal Would Moot the Board's Jurisdiction and Cause Irreparable Harm.

Nissan's motion to reopen remains pending before the Board. Removal before its adjudication would deprive the Board of jurisdiction to decide those motions and would irreparably harm Nissan by permanently foreclosing consideration of his new evidence. The Seventh Circuit recognizes that such harm is irreparable when removal would bar meaningful judicial or administrative review. *See Mohammed*, 92 F.4th at 762.

Nissan's long-standing TPS protection has shielded him from the violence and instability in Syria since 2013. The termination of TPS on November 21, 2025 exposes him to immediate enforcement risk, despite over a decade of lawful presence, employment, and good standing. Removal prior to the Board's ruling would extinguish all practical relief and violate fundamental due process.

B. Nissan Is Likely to Succeed on the Merits of His Motion to Reopen.

Nissan's supplemental evidence establishes a material change in country conditions satisfying 8 C.F.R. § 1003.2(c)(3)(ii). The December 2024 overthrow of Bashar al-Assad and the installment of Abu Mohammed al-Jolani , the former head of HTS, have fundamentally altered Syria's political landscape. HTS's historical hostility toward Syria's Christian minority – including displacement, arbitrary detention, and extrajudicial violence – is well-documented in recent reports from the U.S. Department of State, and from various news organizations:

"Conflict parties in Syria, most notably the Assad regime, committed serious and widespread

[8]

human rights violations and abuses…(These) included credible reports of: arbitrary or unlawful killings; disappearances; torture and cruel, inhuman, or degrading treatment or punishment; arbitrary arrest and detention; instances of transnational repression against individuals in another country; serious abuses in a conflict; unlawful recruitment or use of children in armed conflict; serious restrictions on freedom of expression and media freedom, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, censorship, and serious restrictions on internet freedom; trafficking in persons, including forced labor; prohibiting independent trade unions or significant or systematic restrictions on workers' freedom of association; and significant presence of any of the worst forms of child labor…**Armed terrorist groups, including Hayat Tahrir al-Sham, reportedly carried out arbitrary detentions and subjected some detainees to torture. ISIS reportedly carried out killings, attacks, and kidnappings, including against civilians**." "Syria 2024 Country Reports on Human Rights Practices," *U.S. Department of State* (August 12, 2025) (URL: https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/) **(Ex. A)** (emphasis added).

"A Syrian rebel coalition led by Abu Mohammad al-Jolani (took) over the capital city (on or about December 8, 2025). And while Syrians are collectively celebrating the fall of Bashar al-Assad's sadistic regime, **Syrian Christians are nervous about their future in the region. The Islamist rebels in Syria have a history of persecuting Syrian Christians. (The) radical theology of many Islamist rebels in Syria (has) resulted in acts of violence against Syrian Christians, everything from desecrating churches to kidnapping and murder. So, when armed Islamist fighters standing in the streets…tell the Christians no harm will come to them, they have no reason to believe them**." "Syria's Christians: 'We Have No Reason to Trust Al-Jolani,'" *The Free Press* (December 13, 2024) (URL: https://www.thefp.com/p/syrias-christians-in-limbo-assad-jolani) **(Ex. B)** (emphasis added).

"Christians face particular pressure from radical Islamic groups in Idlib province in the northwest and in parts of Hasakah province in the northeast, where (HTS-aligned groups) have attacked civilian and church targets." "Syria: Persecution Dynamics," *Open Doors International* (January, 2025) (URL: https://www.opendoors.org.au/wp-content/uploads/2025/01/WWL-2025-Persecution-Dynamics-Syria.pdf) **(Ex. C)**.

"(The war did not spare) the Christian community. Thousands have been forced from their homes by the threat from hardline Islamist rebels and jihadist militants…In areas seized by the jihadist group Islamic State (IS), Christians have been ordered to convert to Islam, pay jizya (a religious levy), or face death. **In the Syrian province of Hassakeh in February 2015, hundreds of Christians are feared to have been kidnapped by the militants…Senior Christian clerics have also been kidnapped by unknown gunmen. Suspicion for the abductions has fallen on the Nusra Front, al-Qaeda's Syrian affiliate**." "Syria's beleaguered Christians," *BBC News* (February 25, 2015) (URL: https://www.bbc.com/news/world-middle-east-22270455) **(Ex. D)** (emphasis added).

"Multiple human-rights/religious-freedom outlets and church-oriented press **reported violence, killings, discrimination and property attacks against Christians…since the fall of Assad and in the months after HTS rose into positions of power. These reports document incidents of attacks on churches, arrests/intimidation of Christian leaders, and social/exclusionary measures**." "Report details killings, discrimination against religious minorities in post-Assad Syria," *The Catholic World Report* (July 7, 2025) (URL: https://www.catholicworldreport.com/2025/07/07/report-details-killings-discrimination-against-religious-minorities-in-post-assad-syria/?utm_source=chatgpt.com) **(Ex. E)** (emphasis added).

[9]

Although HTS was formally delisted as a foreign terrorist organization in July 2025, credible evidence indicates that the leadership continues to exclude, marginalize, and threaten Christian communities. The persecution that uprooted Nissan's parents and brother after 2013 has not been reversed, and the new government's actions show no genuine effort to protect these communities. These facts leave Nissan's underlying asylum-related claim *prima facie* meritorious.

## C. The Balance of Harms and Public Interest Strongly Favor a Stay.

Nissan has lived in the United States for over two (2) decades. In fact, he was granted a humanitarian B-2 nonimmigrant visa to come to the United States to provide his sister with bone marrow needed for transplant – this was in early-2002. He has lived in the U.S. ever since and has now dutifully complied with every TPS renewal, and maintained continuous employment authorization since 2013. He has no criminal record and presents no risk to public safety. The government, by contrast, suffers no prejudice from maintaining the status quo while the Board completes its adjudication.

Premature removal would subject Nissan to persecution in a country now governed by an organization long associated with violence against religious minorities. This is certain with the expiration of TPS in just over 2 weeks. Subsequent detention in Broadview, Illinois, amid reported overcrowding and restricted oversight will assuredly occur. Operation Midway Blitz is imposing serious humanitarian harm, right here in the United States. The public interest – in fair process, consistency, and adherence to humanitarian protections – strongly favors granting this stay.

The last two stay factors, injury to other parties in the litigation and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, those factors favor Nissan because, as the Supreme Court observed, "there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* at 436. Furthermore, Nissan is not "particularly dangerous" nor has he "substantially prolonged his stay

[10]

by abusing the process provided to him," *id.*, nor do any other factors exist to suggest a greater than usual public interest in Nissan's removal.

## V. CONCLUSION.

For the foregoing reasons, Nissan respectfully requests that the Board:

1. **Grant a Stay of Removal** pending adjudication of the pending Motion to Reopen; and

2. **Hold Nissan's removal in abeyance** to preserve the Board's jurisdiction and ensure due process.

Respectfully submitted,

Date: **11/5/2025**

Mark S. Kocol
Counsel for Nissan Danial Nissan

Mark S. Kocol, P.C.
18300 South Halsted Street  Suite B-302
Glenwood, IL 60425
Phone: 312-588-0466
Email: mkocol.immigrationlaw@gmail.com
EOIR #:  BL176134
IL Bar #:  6225348

RECEIVED
DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW
2025 NOV -6  AM 8:00
BOARD OF
IMMIGRATION APPEALS
OFFICE OF THE CLERK

[11]



# **DECLARATION OF COUNSEL**

I, Mark S. Kocol, declare under penalty of perjury as follows:

1. I am an attorney licensed to practice law and counsel to Plaintiff Danial Nissan in this matter. I make this declaration based on my personal knowledge.

2. On November 19, 2025, I contacted the Board of Immigration Appeals Emergency Stay of Removal Unit by telephone at (703) 305-0289 to follow up on Plaintiff's Motion to Stay of Removal.

3. During that call, personnel of the Board informed me that the Motion to Stay would not be treated as an "emergency" unless and until the Chicago office of ICE Enforcement and Removal Operations ("ERO") was first notified of Plaintiff's legal situation.

4. I subsequently learned that this is the Board's standard operating policy – namely, that no stay request will be treated as an emergency unless the Board first contacts local ERO and ERO confirms whether there is an affirmative plan to remove the individual.

5. This policy creates a coercive procedural environment in which Plaintiff cannot seek emergency protection without the Board first alerting the very enforcement agency that has the authority to detain and remove him – and for this reason, I did not press the Board to contact ERO.

6. On November 19, 2025, I also made multiple good-faith attempts to contact Chicago ICE counsel to resolve the matter cooperatively before seeking judicial relief, using the phone number (312) 260-9513 and by written electronic communication.

7. These efforts were met only with automated, non-responsive email replies and a telephone system that repeatedly terminated my calls without access to any live personnel.

8. At no time did I receive a substantive response from ICE or ERO addressing the risk of imminent detention or removal.

9. The foregoing events are true and correct to the best of my knowledge and occurred as described.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of November 2025.

_____

Mark S. Kocol



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAHLIA DOE, SARA DOE, NESMA DOE,
LAILA DOE, WALEED DOE, MUSTAFA
DOE, and AHMAD DOE,

                                    Plaintiffs,

                    -v.-

SECRETARY KRISTI NOEM, *United
States Department of Homeland Security,
in her official capacity*; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICES; and UNITED STATES OF
AMERICA,

                                    Defendants.

25 Civ. 8686 (KPF)

**ORDER**

---

KATHERINE POLK FAILLA, District Judge:

For the reasons set forth on the record at the November 19, 2025

conference, Plaintiffs' motion for a preliminary injunction (Dkt. #19) is

GRANTED in part.  Defendants' termination of Temporary Protective Status for

Syrians in the United States is hereby POSTPONED, pending further order

from this Court or a reviewing court, pursuant to 5 U.S.C. § 705.

Given the anticipated appeal in this matter, Plaintiffs' motion to compel

production of the Certified Administrative Record (Dkt. #35) is DENIED without

prejudice as to its renewal at a later date.

The Clerk of Court is directed to terminate the pending motions at docket

entries 19 and 35.

SO ORDERED.

Dated:   November 19, 2025
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge